**LITE DePALMA GREENBERG, LLC**
Bruce Greenberg
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorney for Plaintiffs*

[Additional Counsel on signature page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FÖRSTA AP-FONDEN; STICHTING BEDRIJFSTAKPENSIOENFONDS VOOR HET SCHILDERS; AFWERKINGSEN GLASZETBEDRIJF; STICHTING PGGM DEPOSITARY; CONTRA COSTA COUNTY EMPLOYEES RETIREMENT ASSOCIATION; PACIFIC SELECT FUND and PACIFIC FUNDS SERIES TRUST, | : <br> : Civil Action No. <br> : <br> : <br> : <br> : <br> : <br> : **COMPLAINT FOR VIOLATION** <br> : **OF THE FEDERAL SECURITIES LAWS** <br> : |
| *Plaintiffs,* | : <br> : |
| v. | : **DEMAND FOR JURY TRIAL** <br> : |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; J. MICHAEL PEARSON; HOWARD B. SCHILLER; ROBERT L. ROSIELLO; DEBORAH JORN; ARI S. KELLEN; and TANYA CARRO, | : <br> : <br> : <br> : <br> : |
| *Defendants.* | : |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 6

III.  PARTIES ............................................................................................................ 6

    A. Plaintiffs ..................................................................................................... 6

    B. Defendants ................................................................................................ 10

    C. Relevant Third Parties .......................................................................... 13

IV.   VALEANT'S SCHEME TO DEFRAUD ....................................................... 15

    A. Valeant Developed an Unorthodox Business Model Dependent
       on Exorbitant Pricing .............................................................................. 15

    B. Valeant Developed a Secret Pharmacy Network to Dispense
       Its Overpriced Products ........................................................................... 18

    C. Valeant Employed a Wide Host of Deceptive Practices to Push
       Its High-Priced Products Through Its Network of Pharmacies ............ 26

          1. Altering Prescriptions and Claims Submissions ................................ 28

          2. Filling Unwanted Prescriptions........................................................ 29

          3. Directly Misleading Patients ............................................................ 31

    D. Valeant Raised the Prices of Its Products Sharply ............................... 32

    E. Valeant Misused "Patient Assistance Programs" to Offset
       Patient Pushback on Its High Prices ...................................................... 37

    F. A Valeant-Controlled Pharmacy's Discovery of Its Deceptive
       Practices Begins to Unravel the Fraudulent Scheme ........................... 43

V.    DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING
    STATEMENTS DURING THE RELEVANT PERIOD ....................................... 47

    A. Defendants' False or Misleading Statements from January
       To June 2013 ........................................................................................... 51

    B. Defendants' False or Misleading Statements from July 2013
       To January 2014 ...................................................................................... 56

    C. Defendants' False or Misleading Statements from February
       To June 2014 ........................................................................................... 59

    D. Defendants' False or Misleading Statements from July 2014
       To January 2015 ...................................................................................... 67

    E. Defendants' False or Misleading Statements from February
       To April 2015 .......................................................................................... 71

F.  DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM MAY TO JULY 2015 ................................................................................ 77

G.  DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM SEPTEMBER TO DECEMBER 2015 ............................................................. 81

VI.  THE TRUTH EMERGES REGARDING VALEANT'S PRICING PRACTICES AND ITS OTHER MISREPRESENTATIONS ................................. 94

A.  INQUIRY INTO VALEANT'S PRICE GOUGING PRACTICES .................... 94

B.  VALEANT'S SECRET RELATIONSHIP WITH PHILIDOR ......................... 97

C.  VALEANT'S SHUTDOWN OF PHILIDOR AND ADDITIONAL ATTEMPTS AT CRISIS MANAGEMENT .......................................................... 103

D.  FURTHER DISCLOSURES OF THE FINANCIAL IMPACT OF THE FRAUD ............... 109

E.  VALEANT'S FRAUDULENT ACCOUNTING ........................................ 112

F.  ADDITIONAL REVELATIONS REGARDING THE FRAUD AND ITS IMPACT............ 117

VII.  VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES ................................................................................ 122

A.  VALEANT IMPROPERLY RECOGNIZED PHILIDOR REVENUE ............... 123

B.  VALEANT CONCEALED PHILIDOR AS A VIE ................................... 124

C.  DEFENDANTS' FALSE STATEMENTS REGARDING INTERNAL CONTROLS ........... 126

D.  DEFENDANTS CONCEALED VALEANT'S RELIANCE ON PHILIDOR AND PRICE GOUGING ....................................................................... 128

E.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE QUANTITATIVELY AND QUALITATIVELY MATERIAL ....................... 131

VIII.  ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ........................... 133

A.  THE EXECUTIVE DEFENDANTS DESIGNED VALEANT'S BUSINESS STRATEGY ............................................................................... 134

B.  THE EXECUTIVE DEFENDANTS CLOSELY MONITORED, AND ULTIMATELY CLOSED, PHILIDOR ................................................................. 139

C.  EVIDENCE OF SCIENTER FROM THE US ATTORNEY'S COMPLAINT AGAINST TANNER ................................................................... 143

D.  VALEANT REFUSED TO PURSUE REMEDIES AGAINST WRONGDOERS............ 146

E.  VALEANT ADMITTED ITS WRONGDOING ....................................... 147

F.  THE CONGRESSIONAL HEARINGS ARE FURTHER EVIDENCE OF VALEANT'S SCIENTER ............................................................. 148

1.  February 4, 2016 House Oversight Committee Hearing ................. 148

2.  Senate Aging Committee Hearing ............................................ 151

G.  EXECUTIVE DEPARTURES ......................................................... 155

H.  PEARSON'S MISREPRESENTATIONS TO ACKMAN .......................... 156

I.   VALEANT'S EXECUTIVE COMPENSATION STRUCTURE PROVIDED THEM
     A MOTIVE TO ENGAGE IN FRAUD .......................................................... 160

J.   DEFENDANTS WERE MOTIVATED TO INFLATE VALEANT'S STOCK PRICE
     TO FACILITATE ACQUISITIONS ............................................................ 163

IX.  LOSS CAUSATION ............................................................................... 165

X.   PLAINTIFFS' RELIANCE ....................................................................... 179

XI.  NO SAFE HARBOR ............................................................................... 180

XII. COUNTS ............................................................................................... 181

COUNT I
VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 (Against All Defendants) ..................................................... 181

COUNT II
VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
(Against Defendants Pearson, Schiller, and Rosiello) ........................................ 182

XIII. PRAYER FOR RELIEF ........................................................................... 184

XIV. JURY DEMAND ................................................................................... 184

Plaintiffs Första AP-Fonden, Stichting Bedrijfstakpensioenfonds voor het Schilders-Afwerkingsen Glaszetbedrijf, Stichting PGGM Depository, Contra Costa County Employees Retirement Association, Pacific Select Fund, and Pacific Funds Series Trust (together, the "Pacific Life Funds") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action under the Securities Exchange Act of 1934 ("Exchange Act") against Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), and certain of its former and current officers and directors (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered on Valeant bonds purchased or acquired by Plaintiffs between January 3, 2013 and March 14, 2016, inclusive (the "Relevant Period").

Except for allegations specifically about Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, review and analysis of (i) Valeant's filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about Valeant; (iii) transcripts of Valeant earnings and/or investor conference calls; (iv) Valeant press releases; (v) media reports concerning Valeant, including online news sources; (vi) Congressional hearings and documents used at these hearings; and (vi) other publicly available information. Counsel's investigation is continuing, and many of the relevant facts are known only by the Defendants, or are exclusively within their custody or control.

## I.       INTRODUCTION

1.       This case arises from attempts by Valeant, a pharmaceutical and medical device company, and its top executives to fraudulently inflate the revenue, profits, and overall value of the Company.  Valeant's scheme ran an array of deceptive practices through a concealed captive pharmacy network, which was designed to shield Valeant products from competition with generic and other lower-priced therapies, thus enabling Valeant to charge exorbitant prices for its products.  By failing to disclose its relationships with its network of pharmacies, and the extent to which its revenue and profit growth depended on price gouging, Valeant misled investors about its business model and the sustainability of its growth.  Valeant's scheme also involved accounting fraud, including *inter alia* the early recognition of revenues for which collection was not reasonably assured.

2.       Valeant's scheme was exposed through a series of revelations beginning in September 2015, when *Bloomberg* announced that Congress was investigating Valeant for price gouging.  The revelations continued with Valeant's admission on October 19, 2015 that it had an inappropriate relationship with Philidor, a pharmacy dedicated to dispensing Valeant products to patients.  Additional revelations were made in late 2015 and early 2016, when Valeant disclosed the financial impact of its fraudulent practices.  On March 21, 2016, Valeant revealed it had engaged in accounting improprieties and would have to restate prior financial statements.  The full extent of the scheme was finally revealed on August 10, 2016, when the *Wall Street Journal* reported that federal prosecutors were investigating Valeant for criminal fraud.  Ultimately, on January 26, 2017, the United States Attorney for the Southern District of New York ("US Attorney") indicted Gary Tanner, a senior executive at Valeant, and Andrew Davenport, Philidor's former CEO, for violations of the wire and mail fraud statutes and money laundering ("Tanner Indictment").

3.     During this series of revelations, the price of Valeant's common stock fell precipitously, declining by over 93% in just 18 months, resulting in financial harm to Plaintiffs. Similarly, the price of Valeant's bonds dropped precipitously.

4.     Valeant is headquartered in Canada, but operates most of its business in the United States.  Historically, Valeant employed a traditional pharmaceutical company business strategy, engaging in the development, manufacture, and marketing of branded and generic drugs.  For decades, however, Valeant performed poorly.  This changed when Defendant J. Michael Pearson ("Pearson") took the Company's helm in 2008 as its Chairman of the Board and Chief Executive Office ("CEO").  Drawing from his prior experience as a consultant at McKinsey & Co. ("McKinsey"), where he advised (among others) Tyco International, Ltd. ("Tyco") to engage in growth-by-acquisition strategies, Pearson transformed Valeant's traditional business model of investing in research and development ("R&D"), to one that focused on acquiring other pharmaceutical companies and their products.  R&D and labor costs were cut dramatically, as Valeant turned away from developing improved drugs. The success of the business now turned on Valeant's ability to market those drugs "more efficiently."[1]  Investors were led to believe that, under Pearson's purview, Valeant's sales tactics were superior to the prior tactics, and the so-called "inefficiencies" would be remedied.

5.     For example, one feature of the new business model that Pearson implemented was to increase the prices of "orphan" drugs, which were used to treat rare medical conditions. Such drugs face little or no competition from generics or comparable treatments, thus making

---

[1]Valeant's business model also exploited tax advantages.  For instance, in September 2010, Valeant was reverse-acquired by Biovail, a Canadian pharmaceutical company, largely so that Valeant could claim Canada as its headquarters and thus take advantage of a lower tax burden there.  The tax savings added hundreds of millions of dollars to Valeant's revenues, and the gains increased as Valeant's overall revenues increased with subsequent acquisitions.

them easy targets for unreasonable price increases.   Although Valeant justified these price increases by stating that they had previously been priced "inefficiently," its strategy was no more than basic price gouging.  In fact, the prices of many of Valeant's acquired drugs increased by at least ten-fold, and in one instance, by more than 32-fold.

6.      In fact, Valeant did not employ superior sales tactics.  Rather, it engaged in a scheme of deceptive and illegal practices designed to allow it to raise the price of its drugs and ensure that the higher prices would be paid by patients and third party payers ("TPP"), despite no improvement in the drug or reduction in completion from alternative therapies or generics.

7.      Valeant's price gouging business model could only work if it insulated its products from generics and other less expensive comparable therapies.  In order to do this, Valeant developed relationships with a network of pharmacies throughout the United States to ensure that its products, rather than generics, were dispensed to patients.  Philidor, a mail order pharmacy in Pennsylvania, was the primary actor in the network.  To implement the fraud Valeant directed Philidor to deceive TPPs, by, among other things, (i) altering prescriptions to write "dispensed as written," thereby avoiding generic substitution, when in fact the prescribing doctor did not make that notation; (ii) waiving patient co-pays, so that there would be little resistance from patients; and (iii) automatically refilling prescriptions that patients had not requested and did not require.  To ensure that Philidor and its other captive pharmacies employed these manipulative devices, Valeant dispatched its own employees to the pharmacy sites to oversee the prescription fulfillment process.  The employees were directed to use aliases to hide their Valeant affiliation.  High level and well-paid Valeant executives with a direct line to Pearson were installed on site at Philidor, and the most senior management conducted its own in-person visits to ensure their fraudulent vision for Valeant was being implemented.

8.      Valeant's new business model of acquisition, followed by price gouging, was not sustainable in the long run.  Some investors understandably questioned how it was possible for Valeant to raise prices so dramatically.  To distract investors from the realities of its business and to make Valeant's revenue and profit growth appear genuine, Pearson and other Valeant executives falsely claimed the Company's success resulted from "organic growth" achieved through improved marketing.  Meanwhile, Valeant downplayed the increase in revenues that was attributable to price increases, and took extraordinary efforts to hide its relationships with Philidor and other pharmacies in the secret network.  Valeant affirmatively represented that its business depended on third party pharmacies *outside of its control*.  In fact, much of its business was funneled through Philidor and other captive pharmacies, which Valeant did control.

9.      Valeant's deceptive practices were revealed when the public began to scrutinize pharmaceutical companies' pricing practices.  A series of news reports, investor analyses, and Congressional hearings shed light on Valeant's deceptive practices beginning in September 2015 and continuing throughout most of 2016.  When Valeant's business model was exposed as nothing more than price gouging made possible with deceit, investors dumped its stock, which plummeted in value by more than 90%.  As part of the fallout, Valeant fired its key executives, including Pearson.  In the process, investors who had believed Valeant's false and misleading statements lost tens of billions of dollars.

10.     Plaintiffs bought Valeant securities during the period of the fraudulent scheme, and suffered significant losses due to Valeant's deception.  Plaintiffs seek to recover their damages due to the Defendants' misconduct, under the Securities Exchange Act of 1934, based both on its reliance on an efficient market as well as its actual reliance on Defendants' misstatements.

## II.     JURISDICTION AND VENUE

11.     The claims under United States law asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78(t)(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1331.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

15.     Valeant common stock trades in efficient markets, on the New York Stock Exchange ("NYSE"), among others.

16.     Plaintiffs' claims are premised upon their purchases of Valeant common stock and bonds issued by Valeant.

17.     Plaintiffs' purchases of Valeant-issued securities constitute domestic transactions for purposes of the federal securities laws.

## III.     PARTIES

### A.     PLAINTIFFS

18.     Första AP-Fonden ("AP1") is a pension fund for every person who is, or has been, employed in Sweden.   One of Sweden's largest pension managers, with net assets of

approximately SEK 267 billion as of June 2014, AP1 invests in equities, fixed income securities, foreign exchange and alternative investments worldwide.

19.     AP1 purchased Valeant common stock on a U.S. exchange at artificially inflated prices during the Relevant Period and suffered damages thereby.

20.     For each one of AP1's purchases of Valeant common stock listed on the Appendix to this complaint, AP1 incurred irrevocable liability for its acquisition of Valeant common stock within the United States.

21.     Stichting     Bedrijfstakpensioenfonds     voor     het     Schilders-Afwerkingsen Glaszetbedrijf ("Schilders") is a pension fund located in the Netherlands.  It is a fund of approximately €6.7 billion, which provides the pension of employees and entrepreneurs in the painters, finishers and glass industries, who number approximately 110,000.  It is an independent fund under the supervision of De Nederlandsche Bank.

22.     Schilders purchased bonds issued by Valeant during the Relevant Period at artificially inflated prices and has suffered losses as a result of Valeant's fraudulent conduct described herein.

23.     In particular, Schilders purchased the following bonds issued by Valeant during the Relevant Period at artificially inflated prices: ISIN US91829KAA16 (6.375% Notes due on 10/15/20); ISIN US91831AAA97 (5.375% Notes due on 3/15/20); ISIN US91831AAB70 (5.875% Notes due on 5/15/23); ISIN US91831AAC53 (6.125% Notes due on 4/15/25); ISIN US91911KAD46 (5.625% Notes due on 12/1/21); ISIN US91911KAE29 (5.5% Notes due on 3/1/23); and ISIN US92912EAC75 (6.75% Notes due on 8/15/23).

24.     For each one of the purchases of Valeant bonds purchased by Schilders listed on the Appendix to this complaint, Schilders incurred irrevocable liability for its acquisition of the

bonds within the United States.

25.     Stichting PGGM Depositary ("PGGM") is a foundation established and existing under the laws of the Netherlands for the purpose of holding pension fund assets.

26.     PGGM owns the High Yield Fund, which purchased bonds issued by Valeant during the Relevant Period at artificially inflated prices and has suffered losses as a result of Valeant's fraudulent conduct described herein.

27.     In particular, PGGM purchased the following bonds issued by Valeant during the Relevant Period at artificially inflated prices:  ISIN US91829KAA16 (6.375% Notes due on 10/15/20); ISIN US91831AAA97 (5.375% Notes due on 3/15/20); ISIN US91831AAB70 (5.875% Notes due on 5/15/23); ISIN US91831AAC53 (6.125% Notes due on 4/15/25); ISIN US91911KAD46 (5.625% Notes due on 12/1/21); ISIN US91911KAE29 (5.5% Notes due on 3/1/23); and ISIN US92912EAC75 (6.75% Notes due on 8/15/23).

28.     For each one of PGGM's purchases of Valeant bonds listed on the Appendix to this complaint, PGGM incurred irrevocable liability for its acquisition of the bonds within the United States.

29.     Contra Costa County Employees' Retirement Association ("CCCERA") is a public employee retirement system established by the County of Contra Costa on July 1, 1945. The association is administered by the CCCERA Board of Retirement to provide service retirement, disability, death and survivor benefits for county employees and other participating agencies under the California State Government Code, Section 31450, *et. seq.* and Section 7522, *et. seq.*

30.     CCCERA purchased bonds issued by Valeant during the Relevant Period at artificially inflated prices and has suffered losses as a result of Valeant's fraudulent conduct

described herein.

31.     In particular, CCCERA purchased the following bonds issued by Valeant during the Relevant Period at artificially inflated prices:  CUSIP 91831AAB7 (5.875% Notes due on 5/15/23); CUSIP 91831AAC5 (6/125% Notes due on 4/15/23); CUSIP 91911XAM6 (7% Notes due on 10/1/20); CUSIP 92912EAA1 (7.5% Notes due on 7/1/21); CUSIP 92912EAC7 (6.75% Notes due on 8/15/18).

32.     CCCERA also purchased Valeant common stock on a U.S. exchange at artificially inflated prices during the Relevant Period and suffered damages thereby.

33.     The Pacific Life Funds are mutual funds managed by asset manager and insurance company Pacific Life Insurance Company, which is headquartered in California and has offices throughout the country.

34.     Pacific Select Fund is a Delaware statutory trust and is bringing this action on behalf of the following portfolios: Growth Portfolio, International Large-Cap Portfolio, Focused Growth Portfolio, Large-Cap Growth Portfolio, Health Sciences Portfolio, Long/Short Large-Cap Portfolio, Value Advantage Portfolio, PD International Large-Cap Index Portfolio, High Yield Bond Portfolio, Diversified Bond Portfolio, Floating Rate Loan Portfolio, PD High Yield Bond Market Index Portfolio, and Pac Sel Core Income Portfolio.

35.     Pacific Funds Series Trust is a Delaware statutory trust and is bringing the action on behalf of the following funds: PF Large-Cap Growth Fund, PF Growth Fund, PF International Large-Cap Fund, Pacific Funds Core Income, Pacific Funds High Income, Pacific Funds Limited Duration High Income Fund, Pacific Funds Short Duration Income Fund, PF Managed Bond Fund, and Pacific Funds Strategic Income Fund.

36.     The Pacific Life Funds purchased Valeant common stock on a U.S. exchange at

artificially inflated prices during the Relevant Period and suffered damages thereby.

37.     In addition, the Pacific Life Funds purchased Valeant bonds at artificially inflated prices during the Relevant Period and suffered damages thereby, as follows:

(i)     Pacific Select Fund purchased the following Valeant bonds at artificially inflated prices with the following ISIN Numbers during the Relevant Period: CUSIP 91829KAA1 (6.375% Notes due 10/15/20); CUSIP 91831AAA9 (5.375% Notes due 3/15/20); CUSIP 91831AAC5 (6.125% Notes due 4/15/25); CUSIP 92912EAA1 (7.5% Notes due 7/15/21); CUSIP 91911KAE2 (5.5% Notes due 3/1/23); CUSIP 91831AAB7 (5.875% Notes due 5/15/23); CUSIP 92912EAC7 (6.75% Notes due 8/15/18); and CUSIP 91911KAD4 (5.625% Notes due 12/1/21); and

(ii)    Pacific Funds Series Trust purchased the following Valeant bonds at inflated prices with the following ISIN Numbers during the Relevant Period: ISIN US91829KAA16 (6.375% Notes due 10/15/20); ISIN US91911KAE29 (5.5% Notes due 3/1/23); ISIN US91831AAA97 (5.375% Notes due 3/15/20); ISIN US92912EAA10 (7.5% Notes due 7/15/21); ISIN US91831AAC53 (6.125% Notes due 4/15/25); ISIN US92912EAC75 (6.75% Notes due 8/15/18); and ISIN US91831AAB70 (5.875% Notes due 5/15/23).

38.     The details of Plaintiffs' purchases of Valeant securities during the Relevant Period are set forth in the Appendix to this complaint.

**B.    DEFENDANTS**

39.     **Valeant**: Defendant Valeant is a Canadian corporation, incorporated in British

Columbia, Canada, and has its United States headquarters located at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey and Canadian headquarters located at 2150 Boulevard Saint-Elzéar O, Laval, Quebec.  Valeant is a multinational pharmaceutical and medical device company that markets a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter products, and medical devices, directly or indirectly, in over 100 countries. Valeant is one of the largest pharmaceutical companies in the United States. Shares of Valeant stock trade on the NYSE and TSE under the ticker symbol "VRX."

40.     **Pearson**: Defendant J. Michael Pearson served as Valeant's CEO and a director of the Company from 2008 until May 3, 2016, and as Chairman of the Board of Directors from March 2011 to January 2016.  Pearson took a medical leave of absence in January and February 2016, and, on March 21, 2016, Valeant announced that Pearson had been terminated and would be replaced.  Prior to working at Valeant, Pearson worked at McKinsey as a consultant, where Valeant was one of his clients.  During the Relevant Period, Pearson obtained Valeant stock valued, at one time, at over $2 billion.  His total compensation (cash and stock awards) for 2013, 2014, and 2015, respectively, was approximately $7 million, $10.3 million and $140.3 million.

41.     **Schiller:** Defendant Howard B. Schiller served as Valeant's Chief Financial Officer ("CFO") and an Executive Vice President ("EVP") of the Company from December 2011 until June 30, 2015, when he resigned from the position.  Additionally, Schiller was a member of Valeant's Board of Directors from September 2012 until June 2016, and served as the Company's interim CEO in January and February 2016 while Pearson was on medical leave.  On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" related to the Company's accounting restatement, and asked him to resign as a director of the Company. Schiller refused, and was not made a candidate for re-election to the Board.  Schiller's total

compensation (cash and stock awards) for 2013 and 2014 was approximately $4 million and $27 million, respectively.

42.     **Rosiello**: Defendant Robert L. Rosiello has served as Valeant's CFO and an EVP of the Company since July 2015.  During Pearson's medical leave of absence and before Schiller was appointed interim CEO, Rosiello served as one of the three members of the Company's "Office of the CEO."  Like Pearson, Rosiello is a McKinsey veteran, having spent over 30 years at the consulting group.  Rosiello's total compensation (cash and stock awards) for 2015 was approximately $60.4 million.

43.     **Jorn**: Defendant Deborah Jorn served as a Valeant EVP and Company Group Chairman from August 2013 until her departure on March 2, 2016.  Jorn was general manager of Valeant's U.S. dermatology business, and she joined the Company in connection with its acquisition of Bausch & Lomb, where she had served as Vice President of Global Marketing. Jorn's total compensation (cash and stock awards) for 2013, 2014 and 2015, was approximately $1.7 million, $2.3 million and $5.6 million, respectively.

44.     **Kellen**: Defendant Dr. Ari S. Kellen has served as the Company's EVP and Company Group Chairman since January 1, 2014.  Kellen briefly served as one of the three members of the Office of the CEO after Pearson went on medical leave and before Schiller was named interim CEO.  Like Pearson and Rosiello, Kellen is a McKinsey veteran, having spent over 22 years at the consulting group.  Following Jorn's departure, Kellen became and currently serves as the head of Valeant's U.S. dermatology business.  Kellen's total compensation (cash and stock awards) for 2014 and 2015 was approximately $50.6 million and $4.7 million, respectively.

45. **Carro**: Defendant Tanya Carro was at all relevant times Valeant's Corporate Controller. On March 21, 2016, Valeant announced Carro had been placed on administrative leave after committing "improper conduct" related to the Company's accounting restatement. Shortly thereafter, Valeant announced that it had hired a new Controller.

46. Defendants Pearson, Schiller, Rosiello, Jorn, Kellen and Carro are collectively referred to herein as the "Executive Defendants."

47. The Executive Defendants possessed the authority to control the contents of Valeant's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They received copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material nonpublic information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Executive Defendants are liable for the false statements pleaded herein.

## C. RELEVANT THIRD PARTIES

48. **Philidor**: Philidor is a Delaware limited liability company. Its headquarters were located at 400 Horsham Road, Suite 109, Horsham Pennsylvania, 19044. It was formed in January 2013 with the assistance of Valeant employees to serve as the head of Valeant's secret network of specialty pharmacies. Philidor and numerous of the other pharmacies in Valeant's secret networks were named for chess strategies, including:

- <u>Philidor</u>:  The "Philidor Defense" is a chess opening;

- <u>KGA</u>:  KGA was a wholly-owned Valeant subsidiary that paid $100 million to obtain the option to acquire Philidor in December 2014.  KGA stands for "King's Gambit Accepted," a chess opening;

- <u>BQ6 Medial Group LLC ("BQ6")</u>:  BQ6 was a marketing firm that consulted for Valeant and shared a Pennsylvania address with Philidor as well as employees. BQ6 also refers to a chess move involving a bishop and a queen;

- <u>End Game Partnership L.P. ("End Game")</u>:  End Game owned a 31.5% stake in Philidor and is also a chess term;

- <u>Isolani, LLC ("Isolani")</u>:   Isolani was a Delaware company with Eric Rice, Philidor's Senior Director of Call Center Operations, as its sole member.  In chess, an isolated queen's pawn is called an "isolani."  Isolani served as Philidor's "pawn" in California, after Philidor had been denied its own license to operate in California.

- <u>Back Rank LLC</u>:  Back Rank used one of Philidor's Pennsylvania addresses and its president, James Fleming, was the Controller at Philidor.  Back Rank is also a chess term.

- <u>Lucena Holdings, LLC ("Lucena")</u>:   Lucena was used to take a 10% stake in another California pharmacy and is also a chess term.

49.    **Tanner**:  Gary Tanner was hired by Valeant in or about December 2012 as its Executive Director of Commercial Analytics.  By April 2013, Valeant also appointed Tanner to be the Senior Director for Valeant's "Access Solutions Team."  Tanner was largely responsible for overseeing daily operations at Philidor, including its alternative prescription fulfillment, or

"AF" program.  On November 16, 2016, the US Attorney charged Tanner with violations of mail and wire fraud statutes, as well as money laundering, for his role in the fraudulent scheme.  An indictment was filed on January 26, 2017.

50.     **Davenport**:  Andrew Davenport created Philidor with the assistance of Tanner, Valeant and others.  During the Relevant Time, Davenport was the Chief Executive Officer of Philidor.  On November 16, 2016, the US Attorney charged Davenport with violations of mail and wire fraud statutes, as well as money laundering, for his role in the fraudulent scheme.  An indictment was filed on January 26, 2017.

## IV.    VALEANT'S SCHEME TO DEFRAUD

### A.    VALEANT DEVELOPED AN UNORTHODOX BUSINESS MODEL DEPENDENT ON EXORBITANT PRICING

51.     Traditional pharmaceutical companies invest heavily in R&D, spending up to 20% of their revenue on developing new drugs and products for patient treatment.  Their profit and growth strategies are focused on developing these new therapies.  Their efforts are aided by U.S. patent law, which encourages pharmaceutical innovation by protecting new drugs from generic competition for a substantial period of time following market entry.  During this patent-protected window, pharmaceutical companies recoup their investments and generate income for future R&D by pricing their products non-competitively.  Once the drugs go "off patent," and generics are allowed in the market, the pharmaceutical company either lowers the prices of its drugs significantly to compete with generics, or suffers a vast decline in sales volume.

52.     Eschewing this traditional model of pharmaceutical company growth and profitability, Valeant, under the direction of Pearson, employed a new approach.  Pearson viewed pharmaceutical R&D spending as wasteful, often demonstrating low levels of return.  Thus, Pearson steered Valeant towards a business model of acquisitions.  In particular, Valeant's new

strategy was to acquire drugs and drug companies with established products and markets, and then raise the prices of the acquired drugs.  Valeant pursued this strategy aggressively.  Since 2010, Valeant has spent a combined $36 billion on acquiring companies or their product lines. Since 2008, when Pearson became CEO of Valeant, Valeant has acquired at least 100 companies.

53.     For example, in September of 2010, Valeant engaged in a reverse merger with Biovail Corporation, a Canadian company, for $3.3 billion, with Pearson becoming CEO of the combined company.  Biovail's products included dermatological drugs, drugs treating disorders of the central nervous system, and the anti-depressant drug Wellbutrin.  Similarly, in 2012, Valeant purchased Medicis Pharmaceutical Corporation ("Medicis") for $2.6 billion, providing Valeant with access to additional acne drugs, as well as other aesthetic skin care products.  Also in 2012, Valeant acquired Natur Produkt International of Russia for $180 million, which sold cough and cold treatments.  In 2013, Valeant bought eye-care giant Bausch & Lomb from private equity firm Warburg Pincus for $8.6 billion, giving Valeant access to Bausch & Lomb's specialized ophthalmology and contact lens portfolio.  Finally, in April 2015, Valeant completed its $11 billion purchase of Salix Pharmaceuticals ("Salix"), a maker of drugs treating gastrointestinal disorders.

54.     Simply acquiring products and businesses would do nothing for Valeant unless it could increase its revenues.  Many of the products it acquired, however, faced generic competition, which generally speaking, would make increasing either price or volume difficult. Thus, the products Valeant acquired were similar in that that they did not compete with products made by large, easily-recognized pharmaceutical companies.  This helped Valeant raise the prices of its products without significant scrutiny from patients or third-party parties.

55.    Valeant's unorthodox growth-by-acquisition strategy appeared successful on the surface.  Year after year, the Company reported consistent, steep increases in revenue, which rose from $3.48 billion in 2012, to $5.76 billion in 2013, to $8.25 billion in 2014, and finally to $7.71 billion in just the first three quarters of 2015.  As of July 2015, Valeant was valued at over $90 billion, making it the largest public company incorporated in Canada and the largest pharmaceutical company headquartered in the United States.

56.    During the Relevant Period, Valeant attributed the success of its non-traditional strategy to its aggressive cost-cutting measures, its "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products."  Pearson personally echoed these reasons for Valeant's success, stating in a February 22, 2015 Valeant press release that Valeant's explosive growth was owed to the Company's "output-focused research and development model,'' which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services."  These misrepresentations concealed from the public, including Plaintiffs and other investors, the true driver of the Company's growth: price-gouging made possible through deceitful practices, centering on its use of a secret network of captive pharmacies.

57.    In an effort to conceal its scheme, Valeant consistently made false statements that blurred the extent to which pricing increases contributed to the Company's revenue growth.  For instance, in response to a direct question concerning the contribution of price increase to growth during an April 29, 2015 conference call with investors, Pearson falsely responded that, "In terms of price volume, actually, volume was greater than price in terms of our growth."  On February 4, 2016, after Valeant's extraordinary price increases became the subject of widespread

17

public attention and reproach, including probes by federal authorities, regulators, and lawmakers, Valeant issued a press release admitting that Pearson's statement on the April 2015 conference call was false and that, in truth, Valeant's growth resulted from its price hikes. This admission was detailed by, *inter alia*, *The Wall Street Journal*, in a February 2, 2016, article titled, "Valeant's Sales Growth: Driven by Price Increases or Volume Growth?"

58.     In addition to making outright false statements, Valeant made critical changes to its public disclosures to take the spotlight off its price-gouging practices, beginning in 2013. First, Valeant refused to break-out the revenue numbers flowing from its major acquisitions, making it difficult for investors to determine whether the acquired drugs were experiencing any post-acquisition growth. In addition, Valeant reduced its number of operating segments from four (U.S. Neurology and Other; U.S. Dermatology; Canada & Australia; and Emerging Markets) to just two (Developed Markets and Emerging Markets) in 2013. Because various segments were driven by just a few main products, investors previously had been able to track how those products were performing. But with just two operating segments, it became impossible for investors to ascertain that same information.

### B.    VALEANT DEVELOPED A SECRET PHARMACY NETWORK TO DISPENSE ITS OVERPRICED PRODUCTS

59.     The cornerstone of Valeant's deceptive practices was its network of captive pharmacies. Without them, Valeant could not have insulated its brand name drugs from generic competition, allowing for increased sales at increased prices. Through this secret network of pharmacies, Valeant engaged in a host of deceptive practices, which included, *inter alia*, flouting statutory or contractual mandates requiring substitution of generic equivalents for Valeant-branded drugs and submitting false claims information to TPPs and pharmacy benefit managers ("PBMs") (explained *infra* Section E.). As a result, TPPs and PBMs overpaid for Valeant's

expensive branded drugs, were prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed.  All the while, investors were unaware that Valeant's illusory success was due to these deceptive practices, and instead watched as the price of Valeant's stock price was artificially increased.

60.     Traditionally, the pharmacies that dispense drugs have operated independently from pharmaceutical manufacturers to avoid any conflict of interest.  Pharmacies can serve as a check on prices and unnecessary refills.  As a result, TPPs and, in particular PBMs, require notification of any change in pharmacy ownership.  Any pharmacy that was owned or controlled by a manufacturer would spark increased scrutiny from the TPPs.

61.     For its price-gouging scheme to be effective, Valeant had to evade this inherent system of checks and balances.  Thus, it created a secret network of pharmacies that it controlled. At the center of Valeant's pharmacy network was Philidor.  On January 2, 2013, Defendants incorporated Philidor, a purportedly independent "specialty" mail order pharmacy.  During the Relevant Period, Philidor was licensed in 45 states and the District of Columbia.

62.     Specialty pharmacies typically exist to dispense self-administered drugs, because patients require individualized direction in learning how to administer these medicines. Specialty pharmacies therefore focus on drugs that are almost always highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses such as cancer and HIV.  Philidor, on the other hand, was primarily devoted to dispensing Valeant's undifferentiated, traditional drugs - principally its dermatological products - most of which had low-cost generic substitutes.  Indeed, as Philidor admitted, Valeant was its "only client."[2]

---

[2] *See Business Insider,* October 22, 2015.

63. Valeant was closely tied to Philidor even prior to its formal incorporation. One month before Philidor was incorporated, Valeant hired Tanner as the drug company's special "liaison" with Philidor and to help launch the pharmacy's operations. According to the US Attorney's complaint against Tanner, dated November 16, 2016, by April 2013, Tanner was appointed to be the "Senior Director for Valeant's 'Access Solutions Team,'" and he had "direct access to senior management of Valeant." Further, according to the US Attorney's complaint against Tanner, Tanner "interacted directly with Philidor's executives," including its CEO Davenport, and "supervised employees who worked partially or wholly out of Philidor's offices in Pennsylvania, including sales and managerial staff employed by Valeant and certain staff employed by Philidor." He also maintained an office on Philidor's premises.

64. Likewise, on the same day Philidor was incorporated, Valeant hired Laizer Komwasser - a former senior executive at Medco - to oversee Valeant's relationship with Philidor, and paid him nearly $5 million in equity awards that same day. Komwasser supervised Tanner and reported directly to Pearson. Komwasser's lofty compensation and his direct line to Valeant's CEO indicates Philidor's critical role in Valeant's success. Tanner and Komwasser were key employees who remained closely involved in the details of running the pharmacy, including expanding its business.

65. Valeant's relationship with Philidor permeated all levels of employment. In addition to Tanner and Komwasser, Valeant dispatched a team of employees to work within Philidor during the Relevant Period. Among other tasks, these employees supervised pharmacy operations and ensured that Philidor was employing the fraudulent business practices necessary to peddle Valeant's overpriced drugs. Valeant employees were also responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job

applicants and overseeing the pharmacy's billing operations.

66.     Valeant undertook great efforts to ensure that its relationship with Philidor was concealed.   For instance, the Valeant employees who performed functions at Philidor were instructed to use aliases when sending emails from Philidor accounts.   For example, one Valeant employee who also worked for Philidor, Bijal Patel, was instructed to use "Peter Parker" as an alias (i.e., Spiderman's "real" name) when sending emails from his Philidor account to obscure the fact that he was employed by both Valeant and Philidor.   Other email aliases used by Valeant employees include "Jack Reacher" (the protagonist of a popular series of books written by Lee Child) and "Brian Wilson" (the lead singer and songwriter of the Beach Boys).

67.     Valeant also made a large financial investment in Philidor.   On December 15, 2014, Valeant paid $100 million for the option to acquire Philidor for $0.   This transaction was effectively a purchase of Philidor by Valeant ("Purchase Option Agreement").   Valeant's obscure wholly-owned subsidiary, KGA, obtained the option to acquire Philidor, in order to hide the relationship between Valeant and Philidor.   Notably, the Purchase Option Agreement provided that Philidor was to enter into a purchase agreement with Isolani, LLC ("Isolani") and Lucena Holdings ("Lucena") (two other pharmacies, discussed below) as a condition to the acquisition, and stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

68.     The Purchase Option Agreement also gave Valeant, through KGA (named after King's Gambit Accepted, a chess opening), the right to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones. Significantly, it afforded Valeant the right to "make the final determination" regarding all

matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payers) and the Company's internal policies and manuals," in the event there was a dispute among the joint steering committee members.  The Purchase Option Agreement further allowed Valeant to review Philidor's strategic plan and compliance structure, including Philidor's policies and manuals.  Further, the joint steering committee had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."  Notably, those internal manuals documented many of the deceptive practices used by Philidor to boost sales of Valeant products, described in detail *infra*, Section IV.C.

69.     On the same day that Valeant officially acquired Philidor, December 15, 2014, Valeant and Philidor entered into a distribution and services agreement, which superseded the prior agreement that had been in effect between Philidor and Valeant.  In the new agreement, Philidor represented it would "operate in full compliance with all licenses and permits required by Laws and all contracts with participating insurance companies and Third Party Payors."  This agreement also gave Valeant the right to inspect Philidor's policies and procedures to verify compliance.   Kellen signed the distribution agreement on behalf of Valeant; Davenport, Philidor's CEO, signed for Philidor.

70.     Multiple former employees of Valeant and Philidor have confirmed that Valeant controlled Philidor.  For example, when asked if Valeant had control over Philidor, one woman who served as a Patient Care Specialist at Philidor from June 2015 to November 2015 stressed that "without them [Philidor], we [Valeant] can't be in business."  She cited Philidor's reliance on its ability to "administer a copay program on behalf of the manufacturer" as the reason a

relationship with Valeant was necessary.  Similarly, when asked what control Valeant had over Philidor, Valeant's Territory Manager from July 2012 to February 2013 stated "the job of the Philidor reps were [sic] to make sure everything went through for Valeant."  There was "no other job than that."  Through personal connections, she learned that Philidor sales representatives were given bonuses as high as $40,000 per quarter to ensure that all of Valeant/Medicis' products were sold through Philidor.  The former Territory Manager recalls at least ten employees being "promoted" to Philidor from Valeant/Medicis during her time with the Company.

71.     Valeant's secret pharmacy network did not end with Philidor.  After forming Philidor, Defendants created a host of related shell companies, which they used to acquire, on behalf of Valeant, interests in smaller retail pharmacies all over the United States.  The network included at least 76 "phantom" pharmacies, created with the help of Philidor or its affiliates, who filed pharmacy applications with state regulators on behalf of various shell companies.  These applications were replete with false and misleading statements that failed to disclose the shell companies' relationship with Valeant and Philidor.  For example, an application that Philidor submitted with the California State Board of Pharmacy on or about August 15, 2013 included the following false representations, made by Philidor's CEO Davenport, under penalty of perjury:

- that Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- that there were no individuals or entities with a beneficial interest in Philidor, when in fact Valeant had an interest in Philidor;

- that there were no owners or shareholders of Philidor, when in fact there were sixteen;

- that there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- that there were no entities with a 10% or more ownership interest in Philidor; and

- that Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

72.     Finding that the foregoing statements were false, on May 16 2014, the California State Board of Pharmacy denied Philidor's application.  Philidor was also found to have acted "with the intent to substantially benefit [Philidor and Davenport]," and that and Davenport, by virtue of their false statements, were "guilty of unprofessional conduct."  The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy license in February 2016, which occurs in less than 1% of applications for the particular license sought.

73.     Following its failure to obtain a license in California through Philidor's shell companies, Defendants sought access to the country's largest market by simply extending the chain between Philidor and the pharmacy.  In particular, Defendants caused a Va1eant/Philidor-controlled shell company, Lucena Holdings ("Lucena"), to acquire a stake in a pre-existing and licensed California pharmacy called "West Wilshire Pharmacy" in an effort to circumvent the Board of Pharmacy's licensing denial.  In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants made similar representations as they had done previously, falsely representing that Lucena did not have a parent company; that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6edia, an instrumentality of Valeant and Philidor; and that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit ... was denied."  In fact, Leon was Philidor's Director of Pharmacy Operations,

and California had denied Philidor's pharmacy application earlier that same year.

74.     Defendants also misled state regulators in Texas.  Back Rank, LLC ("Back Rank") was a Philidor-controlled shell company.  Back Rank's managing member, James R. Fleming, was Philidor's Controller, and his mailing address was a listed Philidor mailing address.  Defendants caused Back Rank to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit").  In a September 2015 application filed with the Texas State Board of Pharmacy, Orbit falsely represented that no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]."  In reality, as detailed above, California had denied Philidor's pharmacy application the previous year.  Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

75.     The full extent of Valeant's secret pharmacy network, including the identities of its pharmacies and shell companies is still unknown.  However, elements of that network have become public.  One clue that a pharmacy is part of Valeant's network is the preference for naming the shell companies and pharmacies after chess-related moves and players.  "Philidor" is a reference to 18th Century chess master Francois-Andre Philidor and his eponymous Philidor defense.  "Lucena" and "Back Rank," both discussed above, refer to endgame chess strategies, while "Isolani" is a term for an isolated queen's pawn.  A sampling of the numerous additional shell companies in Defendants' captive network, all registered in Delaware, likewise share chess-related names: (i) Fifty Moves, LLC is a reference to the "Fifty Move Rule"; (ii) ELO Pharmacy LLC is a reference to the ELO chess ranking system; (iii) C-K Pharmacies LLC is a reference to the Caro-Kahn chess defense; (iv) Tarrasch Pharmacy Holdings, LLC is a reference to Siegbert Tarrasch, an acclaimed early 20th Century chess master; (v) NC3 Pharmacy LLC is a reference to the Dunst Opening (a strategy popularized by American chess player Ted A. Dunst); and (vi)

Lasker Pharmacies, LLC is a reference to the early 20th Century chess player Emmanuel Lasker, considered one of the greatest chess players ever.

### C. VALEANT EMPLOYED A WIDE HOST OF DECEPTIVE PRACTICES TO PUSH ITS HIGH-PRICED PRODUCTS THROUGH ITS NETWORK OF PHARMACIES

76.     Valeant's scheme was predicated on its ability to sell drugs at exorbitant prices, even though many of these drugs faced generic competition at a fraction of the cost.  That is where Valeant's deceptive practices – forced upon its captive pharmacies – come into play. These pharmacies were directed to flout the rules, alter prescriptions and engage in other misconduct to ensure Valeant's over-priced drugs were being sold.

77.     Typically, contracts between TPPs or their PBM agents and pharmacies require less expensive generics to be dispensed, where available.  In addition, fourteen states, including Pennsylvania where Philidor is headquartered, have enacted similar laws favoring generics. However, unbeknownst to patients, physicians, and TPPs, Philidor's internal policy specifically mandated that Valeant-branded drugs be dispensed, even when a prescription ***expressly called for a generic***.  Philidor employees were instructed ***never*** to dispense generics, and were even told to alter the prescription manually, if necessary.  By minimizing generic substitution and, thus, substantially shielding Valeant-branded products from generic competition, Defendants were able to inflate the prices of Valeant's drugs far beyond the prices at which the drug had previously been marketed and sold, both within Valeant's captive pharmacy network and by pharmacies outside of Valeant's network.

78.     The fact that a high volume of claims for expensive Valeant-branded drugs were stemming solely from Philidor, which was failing to substitute generic drugs for any of Valeant's drugs should have triggered heightened scrutiny, leading PBMs to deny these claims and scrutinize Philidor and Valeant.  This is why Valeant went to great lengths to conceal its

relationship with Philidor and its entire network of pharmacies, as well as the pharmacies' relationships to each other.

79.     For example, neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed to the TPPs or PBMs - with whom they were negotiating contracts, reporting audits, submitting claims or otherwise transacting business - their relationship with Valeant.  Defendants thereby diluted the false claims because they came from seemingly unrelated pharmacies.  This created the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons, allowing Defendants' misconduct to go undetected.  Similarly, Valeant never disclosed Philidor in any of its SEC filings during the Relevant Period prior to October 19, 2015.  Likewise, Philidor never publicly discussed the nature of its relationship to Valeant prior to October 19, 2015.

80.     In furtherance of their fraudulent scheme, Defendants made a host of false and misleading statements directly to TPPs, their PBM agents, and their members/beneficiaries in order to maximize the reimbursements paid by TPPs and to boost Valeant's drug sales.  Many of Defendants' fraudulent tactics were catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs.  Those manuals explained to employees that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."  As explained in further detail below, those "back door approaches" included altering prescription information, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs.  Internal emails, including a July 19, 2015 email from Philidor's CEO Davenport, reveal that Valeant and Philidor senior management knew about these practices during the

Relevant Period.

### 1.    Altering Prescriptions and Claims Submissions

81.    First, Defendants instructed Philidor employees to alter the prescribing doctor's instructions as set forth in a prescription to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives.  In general, pharmacists who receive a prescription for a branded drug will dispense a generic substitute if one is available.  Doctors can indicate that the prescription be "dispensed as written" to ensure that the written brand name is dispensed.  However, at the direction of Valeant claims-handling manuals, Philidor employees routinely altered doctors' prescriptions to say "dispensed as written," in order to ensure that more patients received Valeant products rather than their less expensive generics.  These practices were reported by *Bloomberg* on October 29, 2015, when former Philidor employees explained that this fraud was frequently implemented with respect to certain key Valeant dermatologic products that encountered repeated denials from TPPs, such as Retin-A Micro and Vanos.

82.    Second, if the "dispensed as written" tactic did not initially work, Defendants had ways to ensure that they were eventually paid.  If claims were denied payment by a TPP, Philidor employees would re-submit them, but would designate them as "new claims," to hide the fact that these claims had previously been denied.

83.    Further, when resubmitting a claim, Philidor employees were instructed to resubmit that claim using a National Provider Identification Number ("NPI") belonging to a ***different pharmacy*** in Defendants' captive network in order to claim falsely that a pharmacy had dispensed a prescription it did not in fact dispense, and, in some cases, did not even stock.  For example, Defendants routinely caused pharmacies in the Valeant network, including Isolani, to

use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network discussed further below, Section IV.E., to bill for prescriptions R&O had never filled and, in some cases, did not even stock.  In a July 19, 2015 email to R&O, Davenport acknowledged that he was aware this practice was ongoing.

84.     These practices enabled Valeant to secure payment of a claim that had been denied by a TPP or PBM.  In an interview with the Southern Investigative Reporting Foundation, Taylor Geohagen, a former Philidor claims adjudicator during the Relevant Period, confirmed the prevalence of this fraudulent practice, nothing that NPI codes "from the pharmacies we bought out" were used to get something approved "in a pinch."

85.     To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false and misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which they were secretly associated, falsely representing that the pharmacy had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies.  Relatedly, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies.

### 2.     Filling Unwanted Prescriptions

86.     Philidor also filled Valeant prescriptions that were never even requested by patients through automatic refill programs.  In this manner, Philidor submitted for reimbursement to TPPs numerous prescription renewals that had not been requested.  For example, as reported in *New York Magazine* on January 13, 2016, Defendants caused Philidor and its captive pharmacies to refill patients' prescriptions for Jublia automatically, among other Philidor-dispensed Valeant drugs, despite the fact that the patients had not requested any refills.  Further,

it was virtually impossible for patients to decline or cancel those automatic refills.  This automatic renewal aspect of the scheme extended to products that were designed to treat non-chronic conditions that could be remedied with a limited course of treatment.  The automatic renewal fraud worked well in tandem with Philidor/Valeant's practice of waiving copays (described in detail below, Section IV.E.), because patients were not incentivized to complain about the unwanted renewals when they were not paying anything out of pocket.

87.     One Philidor employee remarked in an online forum that Philidor "auto ship[ped] [Valeant drugs] without proper approval, most people do not need these refills. The reason they ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550-$1220 from the insurance companies."

88.     The automatic renewal scheme was jointly developed by Greenfield, Director of Sales and Marketing for Valeant, and Philidor executive Fabian Forrester-Charles.  As a Philidor employee explained in an online forum:

> They took the list of customers who had been approved by [insurance] and had refills available. ***Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs. They would do this on the 30th day of the rx.*** Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not. Not a bad money making idea except ***most people did not really need refills of Solodyn so soon*** ... Of course these refills were out the door ASAP ***sometimes within an hour of the call and the [insurance] money would come in.***
>
> What patients don't get is ***your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed. I would bet a lot of Solodyn and Jublia bottles are just lying around still in the shipping package.***
>
> ***If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor.*** Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$$ and a ton of it! Think about it.

(Cafepharma, Philidor employee post dated October 27, 2015. Emphasis added.)

### 3.    Directly Misleading Patients

89.    Finally, Defendants' fraudulent practices included deceiving patients directly in order to funnel them to Philidor pharmacies.  Specifically, Defendants disseminated brochures and coupons to doctors and patients, promising Valeant drugs at no cost if prescriptions were filled at Philidor.  This ensured that the false and deceptive practices described above, which Valeant monitored at Philidor, would be used to increase Valeant drug prescription fulfillment. To induce these patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed.  For example, in a consumer complaint filed with the Better Business Bureau on March 2, 2015, a patient wrote about Philidor:

> Complaint: Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******. ***They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you.*** Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the****** unopened in order to have this taken off my Claims.
>
> (Emphasis added and all typographical errors in original) (Better Business Bureau, customer complaint dated March *5,* 2015).

90.    In fact, TPPs were billed for these drugs. For example, one patient reported in an online forum:

> My dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. ***The trial coupon offers a '$0 copay for 12 months' of this medicine • ..• Philidor RX Services continues to INCORRECTLY bill my health insurance which, in tum, is impacting my HSA I MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.***
>
> (Emphasis added and all typographical errors in original) (Pissed Consumer, customer complaint dated January 2, 2015).

91.     Other customer complaints reported similar conduct, as reported to the Better Business Bureau:

> Hello. My child had an appointment with a local dermatologist. While we were there we were referred to Philidor RX Services for filling two acne prescriptions. ***The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company. She also gave us a coupon to use for one of the prescriptions that would make it free. I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription).*** I contacted Philidor and spoke with a man who said his name was Mickey. Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account. I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice. I have received no response and no refund. *(Business Insider,* October 23, 2015, "The secret firm at the heart of Valeant's crisis has an alleged history of shady behavior with customers").

92.     Defendants also made it difficult for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills.  For example, despite a massive investment in its sales force, Philidor invested very little in creating a call center to handle customer complaints and problems.  In fact, customers and patients would routinely report that they were directed to sales staff when they tried to report these problems.

93.     Patients were also unaware of Philidor's relationship to Valeant.  Defendants concealed from investors, as well as physicians, patients, private payors, and PBMs the $100 million payment, Valeant's controlling relationship and that Philidor's financials were being consolidated into Valeant's.

### D.     VALEANT RAISED THE PRICES OF ITS PRODUCTS SHARPLY

94.     By creating a secret network of pharmacies, and ensuring that they employed the deceptive practices explained above, Valeant was able to raise the prices of its products exorbitantly.  Through this price-gouging, Valeant exhibited quarter after quarter of growth, and

investors were misled into believing that Valeant's growth and profitability were real and sustainable.

95. Pricing was crucial to Valeant's illusion of growth.  As demonstrated by documents that the Congressional Committee on Oversight and Government Reform obtained while investigating Valeant's misconduct, the prices Valeant set for its drugs were specifically designed in order to reach various profitability and revenue targets.

96. For example, Valeant's "orphan drugs" were prime opportunities to boost revenue by increasing prices because such drugs are used to treat rare diseases and thus face little competition. Valeant recognized that its higher prices might attract some new entrants to the market for a particular orphan drug.  However, it typically takes an average of 42-months for a new generic drug to receive FDA approval.  Valeant used this backlog to calculate the amount of time it could engage in price gouging to meet financial targets.  Evidence exists that this strategy was in fact employed by Valeant.  For example, on December 26, 2014, Valeant's consultant reported that "FDA Average Review Time for ANDAs [Abbreviated New Drug Application, a form used for generics] is 36-48 months."

97. A prime example of Valeant's price gouging can be found in its acquisition of Isuprel and Nitropress from Marathon Pharmaceuticals ("Marathon"). This heart medication, which had been owned by Hospira for many years, was indicated for emergency situations and had always been priced moderately.  Hospira was acquired by Marathon, which raised the prices significantly, but Valeant saw an opportunity to price the drugs even higher.

98. On December 3, 2014, Andrew Davis, Valeant's Senior VP for Business Development, emailed Laizer Komwasser ("Komwasser"), Valeant's EVP/Company Group Chairman, stating that another "opportunity company is [M]arathon, value is largely derived

from 2 hospital products they bought from Hospira which have no IP [intellectual property protections]."  Steve Sembler, the general manager of Neurology responded that those two drugs "make up the VAST majority of revenue" at Marathon and "[t]his would also have to be a price play (if we determine there is upside to take price)…"

99.     Defendants engaged consultants from Marketing Medical Economics ("MME") to study the pricing of Nitropress and Isuprel.  In a presentation, MME noted that Hospira had priced Nitropress at $47 in 2013.  Marathon acquired the drug and increased the price to $214. Similarly, Marathon raised the price of Ispurel from $48, which Hospira had changed, to over $200.  MME claimed there was still "upward potential for pricing" on these drugs, adding that for Nitropress ''most patients treated are in critical condition."

100.     Defendants also worked alongside consultants from Pearson's former employer, McKinsey, as they considered the potential to increase the prices of Isuprel and Nitropress dramatically.   On December 29, 2014, Aamir Malik, the co-leader of McKinsey's global Pharmaceuticals & Medical Products Practice, wrote an email to Pearson and Davis regarding those and other drugs stating that they "have material pricing potential."  McKinsey also noted that "Smaller/older products (e.g., Isuprel and Nitropress) are not reviewed on formulary.... Products have been in the system for so long that reviews are practically rubber stamped."

101.     Valeant's analyses further showed that generic competition for Isuprel and Nitropress would likely not arrive until mid-2017, and volumes would subsequently decline.  As soon as the drugs were acquired, Pearson, Schiller, Davis, and others held a meeting to discuss pricing.  While Davis recommended steep increases, Pearson decided to raise prices even higher.

102.     The dramatic price increases of Isuprel and Nitropress caused revenues to surge in the short-term.  Total revenues for the two drugs soared from approximately $150 million in

2014 to approximately $540 million for 2015 based on "Aggressive Pricing through consultant recommendation."  The increased revenue translated directly to profits because there was no cost increase to offset the increase in price.  As Valeant's Senior Director of Finance pointed out in an email to Davis on March 24, 2015, the price assumptions "are leading to high gross margins (more than 99%)."  Indeed, the costs associated with the two drugs in 2015 were only approximately $2 million.

103.    These practices were not limited to Isuprel and Nitropress.  According to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis, in 2015 alone, Valeant raised brand-name drug prices an average of 66%, approximately five times more than its closest industry peers.

104.    In addition to Isuprel and Nitropress, Syprine and Cuprimine also saw significant price increases.  They had previously cost $650 and $450 per 100 capsules, respectively.  By July 2015, Valeant had raised the prices of Syprine to over $21,000 for 100 capsules (a more than 32-fold increase) and Cuprimine to over $26,000 for 100 capsules (a more than 58-fold increase) in the United States, even though Valeant had spent little or no money on any additional R&D.

105.    Defendants' scheme also allowed Valeant to triple the price of Wellbutrin XL, an anti-depressant Defendants sold through Philidor and the captive pharmacy network, from less than $6,000 to $17,000 for a year's supply of the drug.  This is despite the fact that Wellbutrin XL had a generic equivalent which sold for only $360 for a year's supply. These prices were only possible because Valeant rigged the market.

106.    Likewise, Defendants' scheme allowed Valeant to increase the price of its dermatology drugs - drugs that have far cheaper generic bioequivalents - by extraordinary

amounts. For example, in February 2013, Valeant acquired Tagretin gel from Eisai Co., Ltd., and in 2015, after Valeant had incorporated Philidor, dramatically increased the price of Tagretin gel from approximately $12,176 at the beginning of the Relevant Period to over $30,320 by 2015.

107.   Additional examples where Valeant dramatically increased the prices of the drugs it acquired included (i) Glumetza, a diabetes drug which was increased from approximately $900 per 90 tablets to over $10,000 (a more than 11-fold increase); (ii) Targetin, a T-celllymphoma drug which was increased from approximately $1,800 per tube to over $30,000 (approximately a 16.7-fold increase); (iii) Carac cream, a drug for precancerous legions which was increased from approximately $230 to over $2,800 per tube (approximately a 12-fold increase); (iv) Addyi, a recently FDA approved "Female Viagra" drug, was increased by 100% immediately following Valeant's acquisition of the drug from Sprout; and (v) Mephyton, a drug that helps blood clot, has seen eight price increases since July 2014, costing $58.76 a tablet, up from $9.37.

108.   From 2014 to 2015 alone, Valeant raised prices on more than 50 other drugs. While the Company referred to this practice as "optimization," in reality, these price increases were effectuated through Defendants' deceptive practices. The below chart summarizes the increases that Defendants implemented for certain of Valeant's drugs during the Relevant Period:

| Valeant Drug | Begin | Ending | Duration (in Years) | Percent Increase |
|---|---|---|---|---|
| Carac Cream | Ql-13 | Q3-15 | 2.50 | 557% |
| Wellbutrin XL 300 MG Tablet | Ql-13 | Q3-15 | 2.50 | 381% |
| Tretinoin 0.1% CRM | Q2-14 | Q3-15 | 1.25 | 328% |
| Vanos 0.1% CRM | Ql-13 | Q3-15 | 2.50 | 279% |
| Targretin 60g 1 % Gel | Q1-13 | Q3-15 | 2.50 | 250% |
| Aldara 5% CRM | Ql-13 | Q3-15 | 2.50 | 223% |

| | | | | |
|---|---|---|---|---|
| Xerese 5%-1% Cream | Q1-13 | Q3-15 | 2.50 | 216% |
| Noritate 1% Cream | Ql-14 | Q3-15 | 1.50 | 212% |
| Migranal Nasal Spray | Ql-13 | Q3-15 | 2.50 | 159% |
| Loprox 1% Shampoo | Q1-13 | Q3-15 | 2.50 | 145% |
| Atralin 0.05% Gel | Q1-13 | Q3-15 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4 MGIML Nasal Spray | Q1-14 | Q3-15 | 2.50 | 90% |
| Jublia (Efinaconazole topical solution 10%) | Q2-14 | Q3-15 | 1.25 | 20% |

### E.   VALEANT MISUSED "PATIENT ASSISTANCE PROGRAMS" TO OFFSET PATIENT PUSHBACK ON ITS HIGH PRICES

109.   Patient Assistance Programs, or "PAPs," are employed by pharmaceutical companies to ensure that patients without the financial means to purchase high priced drugs are not deprived of critical medicine. Valeant, however, manipulated its PAPs into another deceptive tactic to conceal its price gouging from private payers. Valeant waived or reduced patient obligations for high-priced Valeant drugs to reduce patient complaints, patient refusal to accept unnecessary refills or enrollment in automatic refill programs, and negative publicity.

110.   Typically, a patient's co-payment serves as a check on prescription drug prices or frequency of distribution (i.e., refills).  Patients are unwilling to make large copayments for elective drugs or those that have close generic substitutes.  This reduces costs for TPPs as well. In order to circumvent this inherent check in pricing and distribution. Valeant routinely and systematically waived patient copays when submitting claims to insurance companies and other TPPs, falsely claiming these waivers were a part of its PAPs.  However, Valeant waived the copays for many patients who had the means to make the copayments simply to ensure that the patients would not object to the high prices, seek generic equivalents, or decline automatic refills.  As a result, Valeant was able to sell medically unnecessary and low-value drugs, and to

sell them at artificially inflated prices.  The undisclosed waiver of copays led patients to obtain higher priced Valeant drugs rather than lower priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the insurance companies and other TPPs. Copay waivers thus significantly distort an insured's economic incentive when choosing between a branded drug and its generic alternative, and when refilling a prescription.

111.   To enable this aspect of Defendants' scheme, Defendants did not inform TPPs about the copay waivers, and TPPs were thus misled about the "actual charges" for the Valeant drugs.  PBM contracts with pharmacies require pharmacies to diligently collect copayments, and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.  Defendants failed to inform TPPs or PBMs that they had engaged in a routine practice of waiving patient co-pay.

112.   Valeant used this method liberally, increasing the total it spent on PAP waivers by over 11-fold from 2012 to 2015, from $53 million to $600 million.  In addition, Valeant had forecast PAP spending to exceed $1 billion in 2016.  In comparison, the Company's revenues increased by less than 3-fold, in the same time period, from $3.5 billion in 2012 to $10.4 billion in 2015.  Though waiving patient copays cost Valeant some revenue, it more than paid off in the increased prices Valeant was permitted to charge as a result.  Indeed, Komwasser wrote a May 2014 email that "[t]hese patients are too valuable to lose."

113.   Federal anti-kickback laws prohibit such practices when the government is the TPP. Valeant therefore targeted its PAP practices toward patients with private insurance. However, engaging in such activities left Valeant open to potential violations of state laws prohibiting fraud and deceptive practice, as well as contractual terms with the TPPs.  It also increased the risk that private insurers would apply extra scrutiny to Valeant or refuse to

reimburse Valeant prescriptions.

114.    During the April 27, 2016 House Oversight Committee and the Committee on Aging of the U.S. Senate ("Senate Aging Committee") hearings relating to Valeant, Senator Elizabeth Warren ("Warren") asked Pearson "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid," to which Pearson acknowledged "we're not allowed to." Senator Warren responded, "Yeah, because it's illegal."  She explained that "[t]hese programs are illegal because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."

115.    Mark Merritt ("Merritt"), President and CEO at the PCMA, which represents PBMs, explained to Congress at a hearing on Valeant that PBMs "encourage the use of generics and more affordable brand medications."  He noted that PBMs restrain drug costs by "using differential copays and other tools to encourage patients to choose more affordable options." Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce "resistance to higher prices."  He testified that by providing copay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced TPPs "to pay hundreds of thousands more for the most expensive brands on the formulary." Echoing Senator Warren, Merritt stated that "such practices are considered illegal kickbacks in federal programs."

116.    Valeant simultaneously used its PAP program as a public relations strategy to divert attention from any negative media regarding patient complaints over massive price increases. An internal Valeant analysis outlining the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser reflected this strategy.  The analysis stated, "Take initial 25%

price increase to drive patients into the restricted distribution model," and noted that "[h]igh deductible copay requires increased foundation support." The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine." However, far from demonstrating Valeant's benevolence, the PAP program was actually a key part of its fraud.

117.    Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program."   The presentation plainly stated that "[t]he [PAP] program will be funded through planned price increases [i.e. funded by higher prices to payors rather than by Valeant]."   The analysis directed adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort."   The presentation noted that Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

118.    The presentation also identified the risks of such tactics (that were concealed from investors), including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's, payors, and/or government agencies" and "Managed Care plan actions against products could limit/ restrict re-imbursement."   To address the risks, the presentation included a "PR Mitigation" plan to "Privately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase."

119.    The presentation included a June 4, 2013 "PR Draft Communications Plan: Orphan Drug Rate Increases," which noted that orphan drugs "often command a substantial

premium in the market - to offer pharmaceutical companies a greater return on investment." It explained that "[w]hile the high cost of orphan drugs has been largely tolerated by the medical community because the overall impact of these pharmaceuticals on health budgets has been relatively small, there has recently been a renewed focus on the cost of these drugs." The presentation warned that the "press has also picked up on these trends" and Valeant's planned price increases on drugs to treat Wilson's disease "needs to be managed carefully."

120.    As part of the PAP and PR strategy, the presentation also encouraged false and misleading responses to inquiries about price increases.  A draft Q&A directed that the response to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was: "No.  These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable."  In truth, Valeant's costs of producing these drugs had not increased, and no price increase (which resulted in gross margins exceeding 90%) was required to keep Valeant commercially viable.

121.    For example, Valeant employed its PR strategy on Bema Heyman, a patient who testified at the April 27, 2016 Senate Aging Committee hearings as to her experience with Valeant and Wilson's disease. On November 1, 2013, Ms. Heyman wrote to Pearson that she was "outraged ... by the unbelievably steep increases in prices charged for Syprine." She wrote "to ask for an explanation of how the drug costs could have increased so dramatically."  On December 9, 2013, Valeant's customer service department responded (following the PR strategy) that "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute novel medicines are only viable if there is a reasonable return on the company's investment and if our business is

sustainable." This was dishonest because despite Valeant's massive price increase for Syprine, Valeant was not reinvesting in R&D to find better treatments for Wilson's disease.

122.    Thereafter, Valeant continued raising prices and Ms. Heyman's copay increased to over $10,000 per year, in addition to the $26,000 per year her insurance company was paying. Ms. Heyman could not afford the copay and was forced to use an alternative and, in her view, less desirable treatment.

123.    Ms. Heyman eventually took her complaints to the media, and was met with a much different response from Valeant.  Rather than offer false justifications for its exorbitant pricing, Valeant offered her financial assistance, sent her flowers, and offered to provide free medication for life, while continuing to charge the exorbitant prices to other patients.  This response was not motivated by any concern for Ms. Heyman's health or finances, but was designed to encourage Ms. Heyman to keep her complaints to herself.

124.    Pearson was well aware of such patient complaints, as well as the Company's response, because he personally monitored them.  For example, in January 2015, Drew Katz ("Katz") wrote an email to Bill Ackman ("Ackman"), CEO of Pershing Square and a Director of Valeant, complaining that "Valeant charges approximately $300,000/yr for the average does [sic] needed for a patient with WD [Wilson's disease] (200X higher than Merck charged when it owned the drug. Merck did not raise its rates for ... 20 years."  Katz noted that "[w]e hear that healthcare providers are now beginning to deny coverage due to the cost of the drug. And those without coverage are in real trouble."  Ackman forwarded the email to Pearson warning that "Drew is a very politically connected and influential person."

125.    Valeant also targeted its deceptive PAP at hospitals and other health care providers, which came to light in the Senate Aging Committee hearings.  In a letter to Senator

Claire McCaskill ("McCaskill") dated October, 30, 2015, Pearson stated "for those institutions where the impact [of price gouging] was significantly greater, we are beginning to reach out to hospitals to determine an appropriate pricing strategy."  Soon thereafter, Valeant announced a 30% discount program.  But at the April 2016 hearings, Senator McCaskill noted that she had not found a single hospital that had received the discounts.  Hospital affiliated witnesses at the hearing also denied receiving the discounts and several more sent letters to the Senate Aging Committee stating they had not received any such discounts.

126.    For example, the Cleveland Clinic called Brian Stolz ("Stolz"), former Vice President of Valeant, to ask about the discounts, and Stolz promised to get back to him but never did.  Valeant essentially conceded that Pearson's claim concerning discounts was inaccurate, when, on April 23, 2016, Stolz submitted a written response, admitting that "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel," and had entered into contracts with only three hospital groups. Valeant then issued a public statement stating it had formed a committee which was working to "develop solutions so any hospital that is eligible for discounts on Nitropress and Isuprel receives them," and Stolz left the Company.

### F.    A VALEANT-CONTROLLED PHARMACY'S DISCOVERY OF ITS DECEPTIVE PRACTICES BEGINS TO UNRAVEL THE FRAUDULENT SCHEME

127.    On December 1, 2014, Russell Reitz ("Reitz"), a Southern California pharmacist, sold R&O Pharmacy, a specialized pharmacy for gastroenterology patients, to Philidor. Following the sale, R&O was suddenly inundated with thousands of prescriptions from doctors using Philidor's mail-order service, numbers dwarfing the customary size of R&O's business. This occurred because Philidor was sending bulk orders of Valeant-branded pharmaceuticals to be filled by R&O.  Payment arrived later from health insurers, with each check covering

hundreds of patients and typically made out for over one million dollars.

128.    Not only was the volume of Philidor-channeled patients unusually large, but the prescriptions that Philidor was filling were also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Yet, Reitz noticed, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel, an eczema treatment, and Jublia, a topical treatment for toenail fungus.

129.    In March 2015, Reitz received an audit from one of his PBMs.  The audit showed that R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard.  Many were for medications that R&O did not even carry.  Some prescriptions were backdated to the time prior to Reitz's sale of R&O to Philidor. These practices continued throughout the summer of 2015.

130.    As a result of these suspicious practices, in the summer of 2015, R&O began investigating Philidor.  Its investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy - which, as noted above, California denied due to Philidor's "false statements of fact" in its application.  Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz realized Philidor's reason for acquiring R&O was to circumvent the California licensing board's denial of its application and conduct its shady practices in California.

131.    For instance, as evidenced by a July 14, 2015 email from Reitz, of R&O Pharmacy, to Eric Rice ("Rice"), Senior Director at Philidor, Defendants' agents' audit statements on behalf of R&O falsely claimed that R&O had dispensed prescriptions for Valeant

drugs that were actually filled by Philidor.  Specifically, Reitz told Rice that Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or ''were filled and billed before the execution of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's National Council for Prescription Drug Programs (''NCPDP") number without his knowledge or consent.  Again, in some cases, these prescriptions were for drugs that R&O did not even stock.

132.    On July 14, 2015, Reitz emailed Rice seeking to address ''the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O.  Reitz demanded that Philidor cease the practices immediately.  Reitz added that the purchase agreement required Philidor/Isolani to apply for a permit and that "this process does not take 7 months" and asked for all documents relating to the application.

133.    On July 19, 2015, Davenport responded to Reitz, stating that Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you." The next day, Reitz wrote back asking why "Philidor is responding to my concerns instead of Eric Rice" who executed the agreement on behalf of Isolani.  Reitz further stated that he learned that Rice signed off on the "Argus-Humana audit, the same audit I refused to sign," and "Eric Rice is not the PIC [pharmacist-in-charge] (I am) and has never stepped through R&O's doors. I am not sure how he could verify the accuracy of anything pertaining to that audit."

134.    On July 21, 2015, Rice and several Philidor executives, including Davenport, Fleming, and General Counsel Gretchen Wisehart, flew to California to meet Reitz at R&O.  The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice

noting that Philidor "appear[ed] to be engaging in a widespread fraud."  On August 18, 2015, Fleming emailed Reitz suggesting responses to an audit.  One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania, where Philidor was based.

135.    On August 31, 2015, counsel for R&O sent a notice of termination to Isolani's law firm. R&O's counsel wrote "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud." R&O's counsel added that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."  R&O's counsel noted that Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts" and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O."  Counsel added that "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's … NPI numbers to bill payors for prescriptions dispensed by Philidor." R&O's counsel also asserted that "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O ... to certain payors."

136.    In response to Reitz's investigation of Philidor, Reitz received letters, not from Philidor, but from Valeant's General Counsel, demanding $69 million in payments from R&O. These letters made clear that Valeant was not simply a drug manufacturer supplying Philidor, but

rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained.

137.    On September 6, 2015, Isolani's counsel sent an email informing R&O's counsel that Philidor seeking a protective order against Reitz and for an accounting.  Counsel for R&O responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential/actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

138.    R&O claimed it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

139.    Ultimately, Reitz filed suit against Valeant.  The ensuing disclosures, including the facts detailed above, set off a chain of events that, along with the government's investigations, revealed the truth about Defendants' fraud and Valeant's network of secret pharmacies.

## V.    DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

140.    During the Relevant Period, Defendant made a series of statements in press releases, SEC disclosure documents, investor conference calls, and through other media to investors concerning Valeant's assets, liabilities, operations and financial condition. The statements set forth below were materially false and misleading. Defendants' false and misleading statements during the Relevant Period were material and had the effect of falsely

increasing or maintaining the price of Valeant securities.  Moreover, Defendants' deception permitted Valeant to increase the prices of its securities in its primary offerings or private placements.  But for these artificially inflated prices, Plaintiff would not have invested in Valeant or would not have retained its Valeant investments for as long as it did.

141.    During the Relevant Period, Defendants repeatedly touted its "organic growth" and the sustainability of its business model.  These statements were designed to hide Valeant's dependence on price gouging for its increased profitability, as well as to conceal that such price gouging was only made possible through its deceptive practices and its secret pharmacy network.  Similarly, Defendants made a series of statements concerning its alternative prescription fulfillment ("AF") program, suggesting that Valeant had discovered a way to take advantage of drugs that had previously been priced inefficiently (*i.e.*, lower than the market would bear).  The statements concerning the AF program were false and misleading because they concealed the fact that the higher priced prescriptions could only be achieved by improper and deceptive practices implemented at Philidor and its other captive pharmacies, such as misuse of its PAP and automatic refill programs, and through alterations of prescriptions.  This business model was not, in fact, sustainable.  Further, Defendants' omissions and misrepresentations concealed the fact that Valeant was exposed to significant regulatory risk, including enhanced scrutiny from the SEC, the DOJ, Congress and state regulators.  Finally, Defendants made false statements about the adequacy of its compliance program and internal controls, which were in fact, deficient and ineffective.

142.    More specifically, the statements detailed below failed to include the following facts, which rendered them materially false and misleading:

143.    <u>Relationships with Philidor</u>:  Several key aspects of Valeant's relationship with

Philidor were concealed, including the fact that Philidor was formed with Valeant's assistance, and for the purpose of benefiting Valeant by enabling it to increase the prices of Valeant-branded products and to avoid substitution of Valeant drugs with lower priced therapies.   Moreover, Defendants went to great lengths to hide that Valeant employees worked at Philidor pharmacies; that Valeant was Philidor's only client; that Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; and that Valeant was consolidating Philidor's results with its own.  As a result, Philidor had the ability to shutter Philidor's business, and had obtained explicit rights to direct Philidor's activities.  All of these facts were actively concealed by Defendants from private payers, patients, physicians, PBMs and investors.

144.   Valeant's Business Strategy:  Valeant explicitly mislead the public about the nature of its business strategy.  Statements concerning "organic growth" and its alternative fulfillment program's contributions to its profitability were false.  In fact, Valeant's illusory success was dependent on (i) increasing prices far beyond industry norms to unsustainable levels; (ii) routing patients to Valeant's secret pharmacies; (iii) using patient assistance and public relations strategies to minimize patient complaints, thus keeping those complaints from getting public attention; (iv) altering prescriptions so that generic substitutions would not be dispensed; and (v) misusing its automatic refill program so that patients were supplied drugs they neither wanted nor needed.  All of these facts were actively concealed by Defendants from private payers, patients, physicians, PBMs and investors.

145.   Regulatory Risk to Valeant's Business:  By concealing the nature of its business strategy, Valeant also misled investors into thinking that Valeant employed a low risk model.  In fact, the deceptive and fraudulent practices made Valeant susceptible to a host of risks including government investigations, regulatory sanctions, criminal charges, reputational harm, contractual

violations, decreased sales, and increased scrutiny.  All of these regulatory risks were actively concealed by Defendants from private payers, patients, physicians, PBMs and investors.

146.    <u>Business Risk to Valeant's Business</u>:  In addition to the regulatory risks inherent in its concealed business model, Valeant faced competitive and other business risks to the sustainability of its success.  For example, Valeant's growth was dependent on its ability to acquire companies and drug portfolios in which it could dramatically increase prices.  Any slowdown in its ability to acquire those companies would have a material adverse effect on its business, cash flows, and results of operations.  Further, Valeant's branded products were subject to competition with more cost-effective generics that were preferred by PBMs and substituted by pharmacies.  Any threat to its ability to force its costly therapies on patients through Philidor would have a material adverse effect on its business, cash flows and results of operations.  As a result, Valeant's reported revenues, earnings per share, profitability, and future business prospects were dependent on its ability to conceal its deceptive practices, and did not accurately portray Valeant's financial performance and business prospects.

147.    <u>Improper Revenue Recognition</u>:  Valeant also improperly recognized Philidor's revenues as its own, which violated GAAP, and caused its revenues, net income and EPS to be materially misstated and inflated.

148.    <u>Internal Controls</u>:  Valeant also touted the adequacy of its internal controls, compliance and training programs.  In fact, these systems were woefully deficient and ineffective.  Defendants prioritized increasing Valeant's stock price and/or their own compensation over ensuring that Valeant complied with applicable laws, regulations and contracts.  In addition, Defendants had little regard for the accuracy of its SEC filings and public disclosures, which were replete with material misstatements, many of them specifically designed

to conceal Valeant's true business model.

149.   Oversight:   Valeant's board of directors and senior management reviewed and approved the improper accounting which reflected a material weakness in internal controls.

150.   Defendants knew the true facts, or recklessly disregarded them, in making the false statements listed below in ¶¶ 153-176, 178-181, 183, 185-250, 259, and 265.

A.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM JANUARY TO JUNE 2013

151.   On January 4, 2013, the first day of the Relevant Period, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 financial guidance, where they made several statements concerning Valeant's business model, financial prospects, and the benefits of its new Alternative Fulfillment ("AF") initiative. Pearson, in particular, stressed Valeant's "organic growth," the "sustainability" of the business, and deflected from or denied the role that price increases played in the Company's growth.

152.   Pearson stated:

2012 was another very strong year for Valeant. From a top line perspective we added over $1 billion in revenue in 2012 . . . . On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model.***

***Our businesses continued to deliver strong organic growth***, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

153.   When asked about pricing for Solodyn, a dermatological product acquired in the Medicis transaction, Pearson responded, "In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer.  ***Through the AF [alternative fulfillment] programs, it will allow us our sort of average price internally to go up, because of the way that system works***."  Pearson also discussed the expansion of Valeant's AF initiative, stating:

Yes, the more we understand about it the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III. And there's some exciting opportunities there that we're not going to give specifics of. And also as we had hoped, we think it will apply to more than just Solodyn. Ziana is actually also being-already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.

154.    When asked what percentage of Solodyn revenue would go through the AF initiative, Pearson replied it would increase because there was "evidence" AF was working, stating:

Well the last questions, it's much – it will be much closer to 50% than 10%, that's for sure. And yes, what we – ***the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work.***

155.    Later in the call, one analyst asked Pearson ''why are you so encouraged by the AF strategy when net sales have been heading in the wrong direction for the one case study we can observe, Solodyn?" Pearson responded that the AF channel had "incentives" in place to get paid for drugs that were being rejected by retail pharmacies, stating:

And again, Medicis is still learning and we're just still learning about what we can do with these AF scripts. So when someone actually makes the call or sends the script to the alternate channel, what can be done with that. And a number of things can be done. One is you can continue to try to adjudicate the claim just because the claim was or ***just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it***. If you think about the retail pharmacist, the retail pharmacist doesn't have a huge incentive to work hard to get that script reimbursed. In fact you might argue they have the opposite incentive, because they get paid more if they convert it to a generic.

***So, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid.***

***

So, I think through as we continue to learn about this *AF program, there are some things that we can do that might actually change the direction in terms of so rather than see a decline in Solodyn, if we're really successful we can begin starting to grow that product again*. So it's things like that that sort of start giving us some real optimism in terms of what you can do, *and how this program can sort of turn out to a much better case than assuming you didn't have the AF program*.

156.    On February 28, 2013, Valeant issued a press release and hosted a conference call regarding its 2012 financial results, which Pearson and Schiller attended on its behalf.  During the call, they highlighted the purported benefits of their AF strategy but did not disclose the associated improper practices and risks. In response to a question about the AF strategy, Pearson represented that "*The program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call*". *When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth,*" Pearson emphasized that it had increased sales volumes but similarly refused to disclose the improper practices and risks, stating: "*We have never given details. Medicis never gave details. and that was probably a smart practice. We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not. What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing.*"

157.    On May 3, 2013, Valeant filed a Form 10-Q Quarterly Report for the period ended March 31, 2013 ("1Q13 10-Q").  The 1Ql3 10-Q represented that ''pricing and sales limited control" while concealing that Valeant controlled and had significant influence over Philidor.

158.    The 1Q13 10-Q was signed by Pearson and Schiller and represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has evaluated the effectiveness of

our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013." (hereafter, "Internal Controls Statement").

159.    The 1Q13 10-Q included Sarbanes Oxley Certifications signed by both Pearson and Schiller pursuant to Rules 13a-14(a) of the Exchange Act, which stated, among other things, that the 1Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact (hereafter, the "SOX Certifications"). Specifically, the SOX Certifications stated:

Exhibit 31.1

> CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
> PURSUANT TO RULE 13a-14(a) AS ADOPTED
> PURSUANT TO SECTION 302 OF THE SARBANES-
> OXLEY ACT OF 2002

I, J. Michael Pearson, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Valeant Pharmaceuticals International, Inc. (the "Company");

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in this report;

4.    The Company's other certifying officer and I are responsible for establishing and 15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the Company and have:

   a.    Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the Company's internal control over financial reporting, and

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions);

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: May 3, 2013

/s/J. MICHAEL PEARSON

160.   On June 11, 2013, Schiller presented at the Goldman Sachs Healthcare Conference.  When asked about the Company's "alternative fulfillment program" by a Goldman Sachs analyst, Schiller responded that the program was increasing profits and that AF was a trend in "the whole pharmaceutical industry":

> Alternative fulfillment, I think a couple things.  One is, to me, ***the alternative fulfillments was an example of what the whole pharmaceutical industry - certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts.*** There was a day when you could call on anybody, and almost any script was profitable. Those days are gone. ***So segmenting your customer***

*base and really focusing on profitability* has got to be the future. ***And that's - alternative fulfillment was the beginning of that journey, but not the endpoint.***

So I probably think under Medicis, ***alternative fulfillment*** was held out a little bit too much as the holy grail. I really think it's- it's actually the starting points, and in some ways, it was quite a clumsy starting point. It wasn't that different, but ***it's a process where we have generation two and generation three. But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it. • • • Yes, I think -I'm hoping -we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits. And that's really the focus, is growing profits.***

### B.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM JULY 2013 TO JANUARY 2014

161.    On July 29, 2013, Valeant filed a Form 8-K with the SEC, attaching a memorandum to employees of Valeant and Bausch & Lomb and a copy of the anticipated organizational chart of the combined company upon closing of the merger of these two companies. The memorandum purported to describe Valeant's "Organizational Design and Philosophy," which emphasized the strength of Valeant's ethical culture, internal controls, and commitment to compliance. The memorandum states:

> ***In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe I recommend them and the customers who provide retail outlets for these products. Healthcare companies are held by society to the highest possible ethical standard- and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective.***
>
> ***\*\*\****

Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on three things:

> **1.      *Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements.***

162.    On August 7, 2013, Pearson and Schiller held a conference call with analysts to discuss Valeant's second quarter 2013 ("2Q13") financial results. Pearson emphasized the long-

term growth potential and sustainability of its acquisitions strategy, but without disclosing how the Company relied on captive pharmacies and price gouging; he also provided re-assurances that Valeant's strategy did not subject it to increased compliance risks.

163.    During the call Pearson was asked whether the Company would need to adopt ''more of a mainstream strategy" to "become one of the world's largest healthcare companies.'' In response, Pearson continued to defend Valeant's purportedly superior non-traditional acquisitions strategy, while not disclosing that it relied on captive pharmacies and price gouging, stating, in part:

> I don't – I think we would plan to have our same model.    *We think we can be successful by not doing what large pharma companies are doing, and that's been our strategy, that will continue to be our strategy. And so we're not looking to get into the traditional*- we're not going to go -therapeutic areas are largely driven by R&D in terms of why people organize that way*, and we don't plan to spend-increase our R&D spend as a percent of sales to what other companies are doing. And we'll continue to focus on both specialty segment*s and attractive geographic markets.

164.    Furthermore, Pearson assured investors Valeant's strategy, albeit not traditional, was not accompanied by increased compliance risks:

> *In terms of compliance, compliance is obviously very, very important for us*. . . . When people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the *very top of the list of the positive is ethical.* So our employees really do appreciate it. *That's our most important thing that-that comes before everything.*

165.    Also on August 7, 2013, Valeant filed its Form 10-Q Quarterly Report for the second quarter ended June 30, 2013 ("2Q13 10-Q"), signed by Pearson and Schiller. The 2Q13 10-Q represented that ''*pricing and sales volume of certain of our products ••• are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor. The 2Q13 10-Q contained the same Internal Controls Statement and SOX Certifications as set forth in the 1Q13 10-Q at ¶¶160-161.

166.    On October 31, 2013, Valeant issued a press release reporting its 2013 third quarter ("3Q13") financial results. The release again emphasized Valeant's incredibly rapid growth while making it appear to be organic rather than the result of inflating prices on its products, stating that "Valeant's Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and that ***"[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands, our aesthetics and oral health portfolios, our orphan drug products and CeraVe."***

167.    On November 1, 2013, Valeant filed its Form 10-Q Quarterly Report for its 3Q13 ended September 30, 2013 ("3Q13 10-Q"), signed by Pearson and Schiller. The 3Q13 10-Q represented that "***pricing and sales volume of certain of our products ••• are distributed by third parties, over which we have no or limited control***" while concealing that Valeant controlled and had significant influence over Philidor. The 3Q13 10-Q also included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

168.    On January 7, 2014, Pearson and Schiller hosted a financial guidance conference call with investors and analysts. During the call, Pearson emphasized the Company's organic growth in sales volume:

> If we compare Valeant's performance in 2013 to the company's average performance from 2009 through 2012, you can see a continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders. ***This is a result of achieving strong organic growth in a fiscally responsible manner for the products that we already own,*** coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies.

169.    Also on January 7, 2014, Pearson spoke at the Goldman Sachs Healthcare CEOs Unscripted: A View from the Top Conference. When asked about the Company's dermatology

business and Valeant's AF program Pearson continued to conceal the practices, stating:

> **The AF program** was I think rolled out a little bit too quickly and there were lots of bugs in it and **we have a next generation that we're going to- which we are implementing, which we aren't going to talk about the details of**, but net-net I - think Solodyn, it's a lot less important to us now than when we- than it was to Medicis obviously.

### C.   Defendants' False or Misleading Statements from February To June 2014

170.    On February 27, 2014, Valeant issued a press release detailing its 2013 financial results, which attributed the Company's growth to increased volume (rather than price) of dermatology sales, stating: "***The growth in the Developed Markets was driven by continued growth in certain dermatology prescription brands, our aesthetics, consumer, neurology and other and oral health portfolios, and our Canadian business unit***."

171.    On the same day, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's fourth quarter 2013 ("4Q13") and full year 2013 financial results, and again did not mention the role of price gouging in fueling Valeant's growth. While discussing Valeant's growth in ''Neurology and Other," Pearson stated, "***When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally. And so we have been able to take advantage of that and grow those products.***"

172.    On February 28, 2014, Valeant filed its Form 10-K Annual Report for the year ended December 31, 2013 ("2013 10-K"), which Pearson and Schiller signed. The 2013 10-K stated that the Company faced significant competition from generic pharmaceutical products without disclosing the deceptive steps Valeant took to prevent substitution of its products. It included statements that:

(a)      addressed generic competition stating, "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies," and claiming *"[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care"*;

(b)      addressed Variable Interest Entities ("VIE"), which are defined in GAAP as a legal entity that is subject to consolidation. Although Philidor was a VIE under GAAP (see ¶¶ 334-336 below) in its 2013 10-K, Valeant explicitly stated that the Company did not hold any interests in VIEs: *"[t]here were no material arrangements determined to be variable interest entities"*; and

(c)      included Management's Conclusion, signed by Pearson and Schiller, *"that our internal control over financial reporting was effective as of December 31, 2013."* The 2013 10-K also included the Internal Controls Statement and SOX Certifications, signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

173.   The 2013 10-K included several statements regarding the Company's purportedly lower-risk business strategy that failed to disclose the company's reliance on price gouging and captive pharmacies. For example, the 2013 10-K stated:

> *The growth of our business is further augmented through our lower risk research and development model This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*. . . . This is achieved primarily as follows: focusing our efforts on niche therapeutic areas ... and acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

174.    Moreover, the 2013 10-K represented that ''pricing and sales volume of certain of our products ... are distributed by third parties, over which we have no or limited control,'' while failing to disclose that Valeant controlled and had significant influence over Philidor.

175.    On April 22, 2014, Valeant issued a press release stating that "it ha[d] submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock." In total, this unsolicited offer to acquire Allergan, the maker of Botox (a popular anti-wrinkle treatment), was valued at approximately $46 billion.  The release disclosed that the proposal was made with the full support of Ackman and Pershing Square, his hedge fund, which had accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's largest shareholder.

176.    On May 8, 2014, Valeant issued a press release announcing Valeant's first quarter 2014 ("1Q14") financial results, which emphasized the Company's organic growth and sustainability. The release discussed Valeant's continued trend of extraordinary growth, including revenue growth which represented "an increase of 77% over the prior year," which "[e]xceeded our expectations," along with "[p]ositive organic growth in the U.S...." The release quoted Pearson as stating, in part, **"[o]ur first quarter results demonstrate the strong, durable nature of our diversified business model."**

177.    That same day, Pearson and Schiller hosted an earnings conference call with investors and analysts to discuss its 1Q14 results. When asked about the Company's dermatology products and whether ''you're doing [anything] differently, in terms of how you're marketing them ... [o]r improving the gross to nets on those products," Pearson responded, in relevant part:

> I think the other thing is - that **we've worked on is a much more sophisticated alternate fulfillment system that we've implemented [in] the US, which is really**

*helping*. Those scripts don't show up in IMS, in terms of what's doing, **but we're very pleased that Solodyn is now growing. And we've applied that to a number of our other products, which is also helping in terms of the growth.**

178.    On May 9, 2014, Valeant filed its Form 10-Q Quarterly Report for the first quarter ended March 31, 2014 ("1Q14 10-Q"), which Pearson and Schiller signed. In addition to confirming the financial results announced in the Company's May 8, 2014 earnings release, the 1Q14 10-Q included:

(a)    numerous statements regarding the Company's purportedly lower risk business strategy, for example:

**The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense;** and

(b)    the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

179.    The 1Q14 10-Q represented that ''pricing and sales volume of certain of our products …are distributed by third parties, over which we have no or limited control' while concealing that Valeant controlled and had significant influence over Philidor.

180.    On May 12, 2014, Allergan issued a press release rejecting Valeant's unsolicited bid, stating its Board of Directors "believes that the Valeant business model is not sustainable." During a conference call on the same day, Allergan's Chairman and CEO referred to ''the unsustainability of Valeant's business model,'' emphasized Valeant's lack of organic growth, and cautioned investors to ''very carefully'' check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

181.    On May 20, 2014, Valeant issued a press release announcing that it would be hosting an investor meeting and webcast on May 28, 2014, "*to respond to assertions Allergan has made that the Valeant model is not sustainable*." The release continued: "Our goal for this meeting is *to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation.*"

182.    On May 27, 2014, Allergan filed a Form 8-K with the SEC, attaching a slide presentation entitled "Certain Potential Business Risks and Issues With Valeant Pharmaceuticals International, Inc.,"which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)." It asserted that much of Valeant's growth was attributable to "unsustainable price increases- not volume." The presentation also noted Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

183.    On May 28, 20143, Valeant hosted its investor meeting and conference call to refute Allergan's claims, which Pearson, Schiller and Jorn attended. During the presentation, they emphasized Valeant's organic growth, sustainability of the business model, and asserted that Valeant was limited in its ability to increase drug prices. Specifically, Pearson and Jorn made the following statements:

(a) Pearson said they would provide investors with *"a much deeper understanding of our operating model and why we believe it is sustainable for many years*

---

[3] The same day, Valeant also issued a press release to announce that it was substantially raising is Allergan merger proposal by raising its cash consideration, making the total consideration approximately $49 billion.

*to come"* and show that " *when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth";*

(b) Jon emphasized the launch of *"additional access programs so that patients can get the medicines that their physician prescribes for them";*

(c) Jon reiterated *"that in 2014 we have returned the business to growth"* and highlighted the growth of dermatology products, including Solodyn and Acanya (medications used to treat acne which were sold through Philidor) stating:

> *We have returned many of our core promoted brands to growth.* We have new managed care capabilities, *we have launched additional access programs so that patients can get the medicines that their physician prescribes for them.*
>
> ***
>
> So what type of growth are we talking about? *It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn.* We entered the year with 49% share, branded share of the dermatology space. We are now up at 51% and as you can see, our competitors have issues. Doryx: has been declining and Monodox is flat. We are very proud of this accomplishment.
>
> Further, *we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya.* Despite loss in some major accounts in managed care, we have been able to achieve this;

(d) Pearson concluded the presentation by claiming Valeant *"has delivered strong organic growth since I have been here"* and *"[w]e are very transparent"* and *"our basic underlying growth rate is about 8%";* and

(e) During the question and answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase. Pearson claimed Valeant was *"limited"* to *9%"* price increases in dermatology and denied all of Allergan's claims stating: *"We are limited. For example in the US with our managed care contracts, I think the maximum price increase we can take*

*a year is 9% across dermatology, across ophthalmology, etc. So that is what limits. It is managed care in the United States."* He continued:

> I think we showed that when *we went through the 10 points that Allergan asserted* which was based on just looking at conventional sources and it is just not applicable to the way we run our business. *And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at.*

184.    Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of the Company. Pearson responded to several questions during the conference about price, volume, and the sufficiency of Valeant's disclosures.

(a)    With regard to price and volume, Pearson stated:

> The only country in the world that you can really sustainably increase pricing is the United States. And in the United States, you're governed by managed care contracts. *And the managed care contract-the highest price increase we could take under any managed care contract we have in the US is 9% a year.*
>
> *So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. So, we focus on volume growth, and the vast majority of our growth on a global basis - and we went through some of that this morning- is volume.*

(b) In response to why Valeant did not provide more detailed disclosures on product sales, Pearson responded, *"We're more like a generics company in terms of the amount of revenue we get per product,"* adding "[it] just makes no sense" to make such disclosures; and

(c) Pearson was also asked if others were copying Valeant's business model and said Valeant's model is transparent but hard to execute, claiming: *"as Howard [Schiller] always says, it's not a very easy model to replicate. It's very simple. We tell you exactly what we're doing. But it's very hard. It requires working really, really hard, sweating the details every day."*

185.   On June 17, 2014, Pearson and Schiller hosted a conference call "to refute recent misleading assertions made by Allergan." During the call, Defendants made the following statements that emphasized the business's organic growth and de-emphasized how much of the growth was due to price:

(a)   During his opening remarks, Pearson emphasized that Valeant's "business is strong" and its "operating model is both durable and sustainable," stating, in part:

I am pleased to update all of you that our business is continuing to perform well. I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness. . . . ***In short, our business is strong and I can assure you our operating model is both durable and sustainable.***

In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.

First, the products listed in the presentation are not Valeant's top 15 products by revenue. Only 6 of the products listed are in Valeant's top 15 products. ***The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price.***

(b) Pearson continued later in the call: "I think the other thing we will probably start doing again is price volume***. People- a lot of assertions are that it's all about price, but it's not."*** He additionally stated:

So I think what we're talking about earlier this morning is ***probably we will report what the volume and price parts of our organic growth are. And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is***; and

(c) Pearson further stated during the June 17, 2014 conference call that "[o]ur sales force in dermatology now has been stable for a few quarters and . ***. all our promoted products in dermatology are growing."***

D.   **Defendants' False or Misleading Statements from July 2014 To January 2015**

186.   On July 18, 2014, Valeant issued a press release announcing it had filed an investor presentation with the SEC that would be used in meetings with Allergan's institutional investors and proxy advisors. The presentation, entitled "Investor Presentation Regarding the Allergan Special Meeting Process/, included "Valeant Operating Principles/, emphasized Valeant's high ethical standing, focus on growth through targeting key products and geographies (rather than through price), and compliance. The presentation included the following statements:

- *Put patients and our customers first by maintaining the highest ethical standards in the industry*

- *Select high-growth business segments* (therapeutic areas and geographies) *where the healthcare professional is still the primary decision maker*

                                        \*\*\*

- *Ensure tight controls and rigorous compliance* standards while avoiding overspending[.]

187.   On July 31, 2014, Valeant issued a press release announcing its second quarter 2014 ("2Q14,') financial results and emphasized its organic growth. The release reported "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year." It quoted Pearson as stating "*Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter. As we look across the entire business, I have never been more confident about the growth trajectory across the entire company.*"

188.   On the same day, Pearson and Schiller represented Valeant in a conference call to discuss its 2Q14 financial results. During his opening remarks, Pearson stated, in part:

*Turning to medical dermatology.* .. The business has now stabilized, with a new management team. *And the branded market share has increased across all key*

*Medicis products since the beginning of 2014. This includes Solodyn, Ziana, and Zyclara.*

*In the US, dermatology grew approximately 7% in the quarter,* including the headwinds from generics, *driven by the continued growth of Acanya, Targretin, and Elidel.*

\*\*\*

*Given the strong reception from both physicians and patients of our recently launched products Jublia,* Ultra, and Luzu, each of them has exceeded our expectations. As I mentioned, *after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts. This trend is expected to accelerate,* as regulatory approval for marketing materials are received and *our dermatology sales forces is appropriately trained.*

189.    Later in the call, a Deutsche Bank analyst asked a "question on the alternative fulfillment initiatives" and whether Defendants could "just give us a sense of how much volume tends to run through that channel.'' In response, Pearson stated:

*We're not going to give specifics. It's - we think it's a competitive advantage that we have.* And it is still primarily the Medicis products, although not exclusively the Medicis products. And - *but I don't want to give specific numbers, but it is a very successful initiative.*

190.    On August 1, 2014, the Company filed its Form 10-Q Quarterly Report for 2Q14 ("2Q14 10-Q"), signed by Pearson and Schiller. The 2Q14 10-Q contained the Internal Controls Statement and SOX Certifications, signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above. It also included a statement regarding the Company's purportedly lower-risk business strategy, stating:

*The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

191.    The 2014 10-Q represented that ''pricing and sales volume of certain of our products …are distributed by third parties, over which we have no or limited control" while concealing that Valeant controlled and had significant influence over Philidor.

192.    On August 19, 2014, Valeant filed with the SEC a "[c]larification on assertions made about Valeant's business," which purported to respond to statements made by Allergan in its August 5, 2014 press release and in an August 15, 2014 *Financial Times* article. Among other things, Valeant stated that the Company's **"Promoted Pharmaceutical brands (i.e. Dermatology, Dental) are growing from a combination of price and volume"** and that**"[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established."**

193.    On September 11, 2014, Valeant filed with the SEC a letter sent by Pearson to Valeant's employees referencing Allergan's "attack[s] [o]n our business" and "our business model and our track record of organic growth." In the letter, Pearson responded that "[h]ighlights across Valeant's businesses include **. . . return to growth of our U.S. Prescription Dermatology business, including the Obagi Medical business, coupled with the early, but exciting launch successes of Jublia and Luzu"** and **"continued tremendous growth in our U.S. Neuro** & **Other and OraPharma businesses."**

194.    On October 20, 2014, the Company issued a press release announcing its third quarter 2014 ("3Q14") financial results, which stated, in relevant part: **"Total Revenue [of] $2.1 billion … GAAP EPS foB $0.81, [and} Cash EPS $2.11."** The release also reported **net income of $275.4** million. The release further conveyed that **''[t}otal same store sales organic growth was 19%,** including impact from generics."

195.    The same day, Pearson, Schiller, and Kellen hosted a conference call on behalf of Valeant to discuss its 3Q14 financial results. In his opening remarks, Pearson emphasized improved marketing and increased dermatology sales as the source of Valeant's earnings growth, stating, in part:

> *Revenues for our dermatology business,* including the recent Precision acquisition, *grew 33% quarter over quarter. The turnaround of our dermatology business is continuing. New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well. This has resulted in market share and revenue gains across the portfolio, including launch products.*
>
> *Elidel, Acanya, Zycltzra, and Zillna have all gained market share since the beginning of 2014. Elidel has had an exceptional year, increasing market share from 45% to 52%.* And it has overtaken Protopic as the leader in this category.
>
> *After years of declines Solodyn market share has stabilized. On the new products side, both Jublill and Luzu quickly gained share, with Jublia reaching* 7% *script share of the total onychomycosis market, both branded and generics. And Luzu accelerated its script share to 13% of the branded topical antifungal market. In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%.*

196.    On October 20, 2014, Allergan filed a response to Valeant's 3Q14 financial results with the SEC and Valeant responded by filing a document entitled "October 20th rebuttal items."  In the document, Valeant rebutted Allergan's assertion that ''price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses" by stating, in part:

- *Overall price/volume for the Valeant business was -50% volume and -50% price.*

- *Like all PhRMA* [Pharmaceutical Research and Manufacturers of America] *companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.*

- *Gross price increases could be seen as higher but do not contribute to our reported net sales growth.*

197.    On October 24, 2014, Valeant filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2014 ("3Q14 10-Q"). The 3Q14 10-Q was signed by Pearson and Schiller. The 3Q14 10-Q reported *3Q14 revenue of $2.056 billion, net income of $275.4 million, and GAAP EPS of $0.81* and included a statement regarding the Company's purportedly lower-

risk business strategy, stating:

> ***The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*** We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

198.    The 3Q14 10-Q also represented that ''pricing and sales volume of certain of our products …are distributed by third parties, over which we have no or limited control" while concealing that Valeant controlled and had significant influence over Philidor.

199.    The 3Q14 10-Q included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

200.    On January 8, 2015, Valeant hosted a guidance call to discuss its expected 2015 financial performance and strategies for the year, which again emphasized the Company's organic growth. Pearson, Schiller, and Kellen attended on behalf of the Company. During the call, Pearson stated, in relevant part:

> ***We demonstrated tremendous organic growth improvement in 2014***
>
> ***
>
> In conclusion, ***all the successes from 2014*** and our [process] for 2015 and beyond ***continue to validate that Valeant's business model is both sustainable and value creating. Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014 and 2015 but strong organic growth for the foreseeable future***.

### E.    DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM FEBRUARY TO APRIL 2015

201.    On February 22, 2015, Valeant issued a press release announcing its fourth quarter 2014 ("4Q14") and full year 2014 financial results. For 4Q14, the release reported

*"Revenue [of] $2.3 billion ••• GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58."* For the full year 2014, the press release reported: *"Revenue [of] $8.3 billion. . . GAAP EPS [of] $2.67,[and] Cash EPS for $8.34,* (excluding Allergan gain).'' The release also reported *4Q14 net income of $534.9 million and 2014 net income of $913.5 million*. The press release further reported that *"Total Same Store Sales organic growth" was 16% and 13% for the 4Q14 and FY 2014, respectively* and quoted Pearson as claiming Valeant's strategy "is paying off for all of our stakeholders" and reporting *"Outstanding growth in the U.S., most notably dermatology."*

202.    On February 23, 2015, Pearson and Schiller hosted a conference call on behalf of Valeant to discuss Valeant's 4Q14 and full year 2014 financial results. During the call, Schiller highlighted Valeant's sources of growth, including that *"[r]evenues for our dermatology business were very strong and increased 70% year-over-year"* and:

> *The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our*
> *four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.*
>
> *Core products such as Zyclara, Elide/, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.*
>
> *Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report.* This yields an annualized run rate of greater than $250 million for the product.

203.    On February 25, 2015, the Company filed with the SEC its Form 10-K Annual Report for the year ended December 31, 2014 ("2014 10-K''), which Parson, Schiller, and the relevant third parties signed, and it contained the following statements:

a)    reported the Company's *4Q14 revenue of $2.28 billion, net income of $534.9 million, GAAP EPS of $1.56, full year 2014 revenues of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67;*

(b)   attributed the source of Valeant's growth to *"our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense"*;

(c)   claimed *"[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care...."*;

(d)   stated that *"[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary,"* while omitting any mention of Philidor;

(e)   stated, under the heading "Business Combinations":

*During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate. These acquisitions are included in the aggregated amounts* presented below;

(f)   included "Reports of Management on Financial Statements and Internal Control over Financial Reporting" signed by Pearson and Schiller, stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, *management selects appropriate accounting policies and uses its judgment and best estimates to report events and transactions as they occur. Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.*

**Internal Control Over Financial Reporting**

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014;***

(g)   represented that "pricing and sales volume of certain of our products are distributed or marketed by third parties, over which we have no or limited control," while omitting mention of its control of Philidor; and

(h)   also included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

204.   On March 16, 2015, Valeant announced a $1.45 billion public offering of 7.3 million shares of common stock at a price of $199 per share, the proceeds of which were used to fund the acquisition of Salix and related costs (see Section V above). The March 2015 Stock Offering was conducted pursuant to the March 2015 Stock Offering Materials, including the Registration Statement and Prospectus Supplement.

205.   The March 2015 Stock Offering Materials represented that:

(a) A "key element" of Valeant's business strategy, which allowed it to ***"improve both the growth rate and profitability of the Company"*** and ***"enhance shareholder value," was*** its ***"low-risk research and development ('R&D') model";***

(b) Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were ***"high-growth businesses"*** with "sustainable organic growth" where the ***"healthcare professional or patient is still the primary decision maker,"*** and similarly stated that Valeant's business strategy operated ***"to***

*ensure decisions are made close to the customer"* and that there was *"significant opportunity to create value through application of the Valeant business model";*

(c) Valeant's *"inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence"* and the *"pricing and sales volume of certain of our products (or Salix's products) • •• are distributed or marketed by third parties, over which we have no or limited control";* and

(d) Valeant's financial results for the year ended December 31, 2014: *total revenues of $8.264 billion; net income of $913.5 million; and basic and diluted EPS of $2.72 and $2.67, respectively,* and stated that revenues had grown by approximately 43% year-over-year.

206. The March 2015 Stock Offering Materials also discussed the Company's "Other Recent Acquisitions," but failed to mention Valeant paid $100 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed that the Company was "not currently a party to any significant transactions, other than the [Salix merger]."

207. Valeant's 2014 10-K, which was expressly incorporated into the March 2015 Stock Offering Materials, included the same Internal Controls Statement and SOX Certifications as set forth above.

208. On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter 2015 ("1Q15"), as well as increased guidance for full year 2015, which emphasized that: *"[s]ame Store Sales Organic Growth was 15%, driven by":*

- *Growth from launch brands,* including BioTrue Multipurpose Solution, BioTrue ONE day Contact Lens, *Jublia, Luzu,* and Ultra Contact Lens, and

- **Double digit growth in U.S. businesses such as** Contact Lens, **Dermatology, Neurology and Other,** Obagi, and Oral Health[.]

209.   On April 29, 2015, Pearson, Schiller and Kellen hosted a conference call to discuss Valeant's 1Ql5 financial results with investors and analysts, where they again emphasized Valeant's organic growth through volume and de-emphasized the part that came from price increases. During the call, Pearson in particular made the following statements:

(a)   Pearson stated, in part:

> **Our US dermatology business had an outstanding quarter. Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year;** and

(b)   An analyst asked "if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q? And what do you factor in your full-year guidance price versus volume?" Pearson responded:

> **In terms of price volume, actually volume was greater than price in terms of our growth.** Outside the United States it's all volume •••• **And in the US it's shifting more to volume than price, and we expect that to continue** with our launch brands. A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take.

210.   On April 30, 2015, Valeant filed its Form 10-Q Quarterly Report with the SEC for the period ended March 31, 2015 ("2015 10-Q"), which Pearson and Schiller signed, and: (a) reported the Company's 2015 **revenue of $2.191 billion;** (b) included the same statement related to Valeant's **"Business Combinations"** as in the Company's 2014 10-K, discussed above at -,r205(e), which failed to mention the existence of Philidor as a VIE; and (c) included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

211.   The 2015 10-Q also included a statement regarding the Company's purportedly lower-risk business strategy, stating:

*The growth of our business is further augmented through our lower risk, output- focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.* We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

212.   The 1Q15 10-Q represented that ''pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control'' while concealing that Valeant controlled and had significant influence over Philidor.

### F.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM MAY TO JULY 2015

213.   On May 19, 2015, Pearson addressed investors at Valeant's 2015 annual shareholder meeting. Pearson made numerous statements about the business strategy, source of growth, pricing, and stock price including:

(a) Pearson said that *"we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors" adding that "[w]e've delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively";* and

(b) Valeant had a *"unique executive compensation system tied to generating disproportionate returns for our shareholders."*

214.   On May 21, 2015, Pearson attended an RBC Capital Markets, LLC ("RBC") Investor Meeting on Valeant's behalf and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

(a) when asked to discuss pricing in the United States, Pearson concealed the full extent of Valeant's price increases by observing that due to managed care contracts, Valeant was *"contractually not allowed to raise prices beyond"* an average of "5%," including in its Dermatology business;

(b) while discussing pricing, Pearson said of the Neurology and Other business segment *"that's where we have the most ability to raise price[s] and play with price"* and raising prices *"is I believe not, at least from [an investor's] standpoint a bad thing."* Pearson stated that orphan products provided him with the opportunity to be flexible with pricing. He said Valeant's base plan was around 5% price increases adding that Valeant had raised prices more in certain areas but that *"we don't plan for them, but again if we can take advantage* of *–during times we've had significant price increases in acquisitions."* Rather than disclosing the deceptive tactics to implement the price increases, Pearson claimed Valeant was able to raise prices by buying products from companies *"that did not price their product the right way";*

(c) Pearson said they raised the prices of Isuprel and Nitropress because Marathon left money "on the table" and claimed the drugs were priced much lower than competitive products, stating they raised prices *"because the drugs were mispriced vs. comparative products"* and adding *"that can create lot of value[] for shareholders";*

(d) Pearson added that *"we've been accused of our growth being price and not volume"* but claimed that *"organic growth is more volume than price and will continue to be'';[4]* and

(e) turning to Valeant's accounting practices and financial status, Pearson reassured investors *"our accounting practices are fine"* and added *"[w]e get audited all the time, by the SEC…and we have absolutely no issue from a government standpoint'* and

---

[4] In contrast to Pearson's public representations, on May 21, 2015, Schiller, in an email with the subject "price/volume," wrote to Pearson, "Last night, one of the investors asked about price versus volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." In addition, on May 26, 2015, an RBC analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson, was ''volume not price is fueling organic growth."

that "*we never had a financial irregularity*."

215.    On July 23, 2015, the Company issued a press release announcing its second quarter 2015 ("2Q15") financial results and increasing the Company's full year 2015 guidance. The release reported that **"Same Store Sales Organic Growth was 19%, driven by: U.S. businesses, driven by the strength of dermatology,** contact lenses, dental and Obagi."

216.    The July 23, 2015 press release also quoted Pearson as stating: "We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% *organic growth*. Our strong second quarter results were driven by outperformance in our U.S. businesses."

217.    On July 23, 2015, Pearson, Rosiello, and Kellen attended and hosted a conference call on Valeant's behalf to discuss its 2Ql5 financial results. Commenting on the Company's results, Pearson stated, in relevant part:

> *We have now delivered four consecutive quarters of more than 15% same-store organic growth. Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.*
>
> ***
>
> *Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter. The exceptional growth of our US businesses driven by the strength of dermatology,* contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.
>
> ***
>
> *Jublia is now our second largest product with annual run-rates sales of approximately $450 million....*
>
> *Our US dermatology business had another excellent quarter* with our launch brands leading the way. *Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1…*

218.    During the question and answer session of the Company's July 23, 2015

conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy channels had improved. In response, Kellen, Valeant's Company Group Chairman, concealed Valeant's control over the Philidor network, and stated:

> **Yes, the adoption through multiple specialty pharmacies continues.** I think last time we said Jublia was around 50%. That trend continues. For derm[atology] overall, it varies by product, but it's around 40%.

219. As the call continued, Pearson was asked about the price increase on Glumetza and the "extent to which you envision more pricing power ... broadly speaking, in the U.S.?" In response, Pearson again emphasized organic growth and de-emphasized the role of price increases, stating:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza --we're going to lose Glumetza within six months -- often price increases are taken at the end. **So that was just consistent with what most companies do.**
>
> **Our view on pricing** -- across most of our portfolio, **we do not take prices**. Outside the US, there's like zero price. I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. **But our base strategy is, how dp we grow organically through volume, which is -I think this quarter, we once again exhibited our ability to do so.**

220. On July 28, 2015, the Company filed its Form 10-Q Quarterly Report with the SEC for its 2Q15, ended June 30, 2015 ("2Q15 10-Q"). The 2Q15 10-Q was signed by Pearson and Rosiello. The 2Q15 10-Q **reported the Company's revenues for the six months ended June 30, 1015 of $4.913 billion.** The 2Q15 10-Q also stated:

> **As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions** in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . **Provisions as a percentage of gross sales increased to 31% and 33% for the second quarter and first half of 1015,**

respectively, compared with 27% and 26% in the second quarter and first half of 2014. ***The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere    0.08% (''RAM 0.08'')* ...**

221.   The 2Q15 10-Q also included a statement regarding the Company's purportedly lower-risk business strategy, stating:

> ***The growth of our business is further augmented through our lower risk, output- focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.***

222.   The 2Q15 10-Q represented that ''pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control'' while concealing that Valeant controlled and had significant influence over Philidor.

223.   The 2Q15 10-Q also included the Internal Controls Statement and SOX Certifications, but signed by Rosiello and Pearson, which in all material respects are identical to the ones quoted above.

## G.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS FROM SEPTEMBER TO DECEMBER 2015

224.   On September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees responding to claims that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business'' and "[c]oncern around our exposure to U.S. government drug price reimbursement." In his letter:

(a) Denying Citron's allegations, Pearson referred to these concerns as a "bear thesis," claimed they were ***"incorrect on both accounts,"*** and dismissed the dependency on price increases stating ***"Valeant is well-positioned for strong organic growth, even assuming little to no price increases";***

(b) Pearson added, "[a]s we have stated many times, *Valeant's core operating principles include a focus on volume growth* and a concentration on private and cash pay markets that avoid government reimbursement in the U.S.'' and ''the majority of our portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases";*

(c) Pearson went on to "lay out the facts" noting, in part, that: (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having *"delivered over 30% script growth year to date,"* and (ii) they expected *"double-digit script growth and corresponding revenue growth trends to continue''* in the "Salix business; and

(d) Pearson added, *"we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals* ... ''

225.   On October 14, 2015, Valeant issued a press release noting it received subpoenas from the DOJ for documents regarding its patient assistance and distribution practices. The release quoted Pearson as stating that *"All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."*

226.   On October 19, 2015, Valeant issued a press release announcing its third quarter 2015 ("3Q15") financial results and hosted an earnings conference call that began before the market opened. The release stated, in part, *"Same store sales organic growth of 13%; 5th consecutive quarter of 10% organic growth,* driven by: *Continued outperformance of U.S. businesses, particularly dermatology* and contact lens...."

(a) As discussed in ¶¶ 261-277, by this time Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship. To offset the negative impact on the price of Valeant securities, the

Company raised revenue and EPS guidance for the fourth quarter 2015 ("4Q15") and full year

2015, stating:

<u>4Q15 Guidance</u>

- Total Revenue increased to $3.25- $3.45 billion {midpoint of $3.35 billion] from $3.2 - $3.4 billion {midpoint of $3.3 billion]

- Cash EPS increased to $4.00- $4.2 0 {midpoint of $4.10] from $3.98- $4.18/midpoint of $4.08]

<u>Full Year 2015 Guidance</u>

- ***Total Revenue increased to $11.0- $11.2 billion [midpoint of $11.1 billion] from $10.7- $11.1 billion {midpoint of $10.9 billion]***

                                          ***

- Cash EPS increased to $11.67- $11.87/midpoint of $11.77] from $11.50- $11.80 {midpoint of $11.65],· and

     (b) In addition, the press release quoted Pearson as stating, in part, ***"With***

***our strong product portfolio and growth prospects, we feel very confident in our future***

***outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016."***

     227.   That same day, Pearson, Rosiello, and Kellen hosted a conference call. In the

slide presentation accompanying the earnings conference call, Valeant included a list of

anticipated "Questions from Investors." One of the "anticipated" questions was "How does

Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor'' to

which the presentation asserted:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to

medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

**We understand that Philidor:**

- Provides services under our programs for commercially insured and cash- paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

- Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)5

- Dispenses generic products as specified in patient's prescription or as requested by patient

228.    During the call, Pearson repeated some of the same claims, saying that the relationship with Philidor had not been disclosed previously for "competitive reasons" and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in relevant part:

> **The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions** by some, we will provide an update to this call.
>
> **Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.**

229.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional

---

[5] As Defendants knew, and as Philidor admitted on November 25, 2015, Valeant was Philidor's only customer.

distribution channels."

230.    Regarding the media and government scrutiny of Valeant's pricing practices, Pearson asserted that the criticism was industry-wide and told investors that Valeant's forecast was appropriately discounted for such scrutiny, claiming *"it's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies.* I do think given that environment, the pricing that pharmaceutical companies will take in the future will be more modest, and *we built that into our forecast for next year."*

231.    Regarding the lawsuit filed by R&O, Pearson reassured investors that the business practices of Valeant and Philidor were proper by claiming:

> *R&O is one of the specialty pharmacies in our network,* and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. *R&O is currently improperly holding significant amounts it receives from payers.* We will refrain from comment on active litigation, and *look forward to showing in court that we are owed the money.*

232.    During the conference call, Rosiello repeated the increased guidance from the press release, ¶228, and added that "[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi, and decreased sales of Xenaxine." His statements were accompanied by the following chart in the slide presentation:

|  | Previous Q4 2015 | New Q4 2015 | Previous full year | New full year |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4B | $3.25 - $3.45B | $10.7 - $11.1B | $11.0 - $11.2B |
| Cash EPS | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj. Cash Flow From Operations | NA | NA | >$3.2B | >$3.35B |

233.    To further assuage investor concern, and buoy the price of Valeant's securities, the slide presentation also stated that Valeant was ***"reaffirming our expectations to exceed $7.5 [billion] in EBITDA in 1016."*** When Pearson was asked during the conference call how the lack of price increases going forward may affect the Company's ability to meet EBITDA guidance in 2016, he responded, in part, ***"today…we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that."***

234.    On October 21, 2015, Valeant issued a press release responding "to recent accusations made regarding its financial reporting and operations" by Citron Research ("Citron") that Valeant was inflating revenues through its secret network of pharmacies to refute such allegations and confirm it was complying with GAAP stating, in part:

- ***All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient.  All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.***

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances-***there is no sales benefit from any inventory held at these specialty pharmacies and inventory held at the Philidor network pharmacies*** is reflected in Valeant's reported inventory levels.

- T***he timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.***

235.    On October 26, 2015, the Company filed its Form 10-Q Quarterly Report with the SEC for the period ended September 30, 2015 ("3Q15 10-Q"), which Pearson and Rosiello signed. The 3Q15 10-Q reported the Company's ***revenue for the nine months ended September 30, 2015 of $7.71 billion.***

236.    The 3Q15 10-Q disclosed that Valeant had the "***power to direct Philidor's activities***" and stated that Valeant's entire Board of Directors had reviewed Valeant's accounting for Philidor and had confirmed its appropriateness.

(a)    Specifically, the 3Q15 10-Q stated:" During (a) the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, ***which were not material individually or in the aggregate.*** These acquisitions are included in the aggregated amounts presented below. Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC. The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits. As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements. Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015. ***The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.***

(b)    The 3Q15 10-Q report further stated:

> On October 26, 2015, the Company also announced that its ***Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and halve confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.***

> *As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, charge backs, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers…* **Gross product sales for products dispensed through Philidor Rx Services, LLC** ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) *are recognized when a prescription is dispensed to a patient.* Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively;

(c) The 3Q15 10-Q also described the Company's performance:

"Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively.

> *The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor),reflected (1) higher sales of (i) Jublia®* (launched in mid-2014), (ii) the **Retin-A®** franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) **Solodyn®**, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®;

(d) The 3Q15 10-Q also included a statement regarding the Company's purportedly lower-risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk, output- focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense;* and

(e) The 3Q15 10-Q included the Internal Controls Statement and SOX Certifications (this time signed by Pearson and Rosiello), which in all material respects are identical to the ones quoted above.

237.    On October 26, 2015, Valeant issued a press release designed to alleviate investor concerns and re-inflate the price of Valeant stock, which:

(a)    repeated that Valeant's ''Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting treatment';

(b)    quoted Pearson as stating that "As we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and "We operate our business based on the highest standard of ethics, and we are committed to transparency"; and quoted Ingram as stating that the Board of Directors "has fully supported the company's specialty pharmacy strategy," adding that Pearson "operates with the highest degree of ethics."

238.    Also on October 26, 2015, the Company hosted a conference call with investors that was accompanied by a presentation. Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen attended on behalf of Valeant. The presentation disclosed that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program." Among other things, the presentation also stated that:

(a)    "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels"

(b)    "*We do not own or control Philidor* ..." and "*Philidor employees do not report to Valeant* ...";

(c)    "*Philidor is independent* ..."; and

(d)　　"Unless and until Valeant exercises the option to acquire Philidor, Philidor remains independent *and Valeant has no rights to remove CEO or management*.''

239.　Pearson assured investors there was no improper accounting or other improper practices involving Philidor stating:

(a)　　*"we stand by our accounting treatment of Philidor completely";*

(b)　　*"[w]e follow the law and we comply with accounting and disclosure rules";*

(c)　　*"the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue. His motivation is the same as someone who runs into a crowded theater to falsely yell fire. He wanted people to run";*

(d)　　*"after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron";6*

(e)*"We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. There have been no issues with regards to the accounting or revenue recognition of the business"; and*

(f)　　*"We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor."*

240.　Ingram, Valeant's lead independent director, speaking on behalf of the entire Board of Directors, reaffirmed these statements, saying:

Thank you, Mike [Pearson]. *As Mike stated, the Company stands by its accounting completely. The audit committee of the Board and the full*

---

[6] This request instead led the SEC to investigate Valeant's accounting, which as noted below, resulted in a restatement.

*Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment.*

241.    Rosiello reinforced the statements by Pearson and Ingram adding:

(a) *"Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate"*;

(b) *"Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price"*;

(c) *"There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients";* and

(d) "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014. *The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."*

242.    Carro, Valeant's corporate controller, also defended Valeant's accounting and lack of prior disclosure regarding Philidor. Specifically:

(a)      Carro claimed that, as of year-end 2014, *"Philidor is not considered to be material to Valeant's business for reporting purposes"* at the end of 2014 because the "GAAP requirement for disclosing sales to large customers is 10% of

revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

(b)    Carro claimed that for the first two quarters of 2015 ***Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements/,*** because "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

243.    Schiller reassured investors that there was no evidence of wrongdoing by Pearson, stating "if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board. It's as simple as that. When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

244.    To mitigate the impact of the negative news, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating: "Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, **we expect to meet or exceed our fourth-quarter projections**, excluding the one-time expenses associated with recent events." He added, "**we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion**."

245.    On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to ''update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."[7] Pearson stated, in relevant part:

---

[7] As discussed herein, in late October 2015 Valeant announced that it would be terminating its relationship with Philidor and that Philidor would be shut down.

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better*, faster customer service for doctors and patients. We were also looking for a pharmacy *which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.*

246.     An analyst noted that there were ''two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and noted that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor." With regard to Philidor, Pearson responded in part:

> Well Philidor was very specific. *First, there was the Citron report which claimed financial fraud and other things.     They quickly came out and there was no financial fraud, in terms of Valeant had to do.* But then other allegations were made in terms of the practices of Philidor. And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

247.     On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it issued less than two months earlier on October 19, 2015. Attempting to offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payers, Valeant's December 16, 2015 press release projected robust 2016 growth with revenue of *$12.5- $12.7 billion, Cash EPS of $13.25- $13.75, and EBITDA of $6.9- $7.1 billion.*

248.     The same day, Valeant hosted a conference call. Pearson, Rosiello, Jorn, and Kellen participated on behalf of the Company. Rosiello repeated the 2016 guidance and Pearson stressed how conservative Valeant's estimates were: *"I feel very comfortable with the guidance.* But each little pieces [sic], I feel little less comfortable this year just given - *so we put an extra dose of conservatism in."* Pearson added: *"Addyi ...*a lot of people have said, Addyi is a disaster; *today you'll see it's not a disaster. So we believe we'll sell between $100 million and $150*

*million in sales of Addyi next year."*

## VI. THE TRUTH EMERGES REGARDING VALEANT'S PRICING PRACTICES AND ITS OTHER MISREPRESENTATIONS

249.     Through a series of partial disclosures coming from the general media, investment research, and Congressional reports, the truth gradually emerged regarding Valeant's pricing practices, business operations, and prospects.  Valeant itself began to offer substantive corrective disclosures on October 19, 2015.  The full disclosure of the facts, and materialization of the risks associated with Defendants' misstatements, did not occur until August 10, 2016, when the *Wall Street Journal* reported that the U.S. Attorney was considering bringing criminal charges against Defendants.

### A.     INQUIRY INTO VALEANT'S PRICE GOUGING PRACTICES

250.     Beginning in September 2015, public attention began to focus on the practices of certain pharmaceutical firms of acquiring drugs and then massively increasing their prices. While the initial public scrutiny centered on Turing Pharmaceuticals ("Turing"), it soon broadened to include other companies, including Valeant.  On September 28, 2015, *Bloomberg* reported that Valeant was the subject of a letter by all Democratic members of the U.S. House of Representatives Committee on Oversight and Government Reform ("House Oversight Committee") sent to Chairman Jason Chaffetz urging the investigation of Valeant and its price gouging practices. In particular, these Congressmen highlighted Valeant's price increases of two drugs:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm. The same day, Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%). When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

251.    The September 28, 2015 letter also revealed that on July 31, 2015, staff members from the House Oversight Committee participated in a call in which Valeant representatives "failed to adequately answer our questions about the basis for their skyrocketing prices." On August 12, 2015, "Ranking Member Cummings sent [a] document request to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

252.    On the same day, *The Washington Post* disclosed that Senator McCaskill "sent a detailed list of 22 questions to [Valeant], probing its simple explanation that it increased two heart drug prices because they were 'significantly underpriced.'" Indeed, the media reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice of "engag[ing] in a business strategy of buying old neglected drugs and turning them into high-price specialty drugs," noting that Valeant was using the same business model as Turing.[8]

253.    Not only were media scrutinizing Valeant, but investors were, as well. On September 28, 2015, Citron published a report revealing that Valeant had more than doubled the price of 30 drugs during the Relevant Period.  Moreover, Citron observed, "Martin Shkreli was created by the system.  Shkreli is merely a rogue trying to play the gambit that Valeant has perfected."  The report also highlighted that "Valeant has made little to no effort to improve these products."

254.    In response to these developments, Valeant issued a press release on September 28, 2015, disclosing that Pearson had distributed a letter to its employees in an attempt to address concerns that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug

---

[8] Turing's CEO, former hedge fund manager Martin Shkreli, resigned three months later following his indictment by federal authorities on securities fraud charges.

price reimbursement."

255.    Yet the letter did little to calm the public's concerns.  On October 4, 2015, *The New York Times* published an article that questioned Pearson's employee letter.  *The New York Times* article called into doubt, among other things, Pearson's claim that Valeant was well-positioned for growth even without price increases.  The article provided insight into Valeant's dependency on price gouging compared to its industry peers, citing a Deutsche Bank analysis finding that in 2015, "Valeant raised prices on its brand-name drugs an average of 66 percent ... about five times as much as its closest industry peers."  The article also cited examples of drugs that Valeant had dramatically raised prices on, including clotting agent Mephyton, which Valeant raised the price on eight times since July 2014, from $9.37 to $58.76 per tablet, and diabetes drug Glumetza, which Valeant had acquired from Salix whose price Valeant raised by 800% during the year, with a month's supply rising from approximately $500 to $4,600.

256.    Publicity over pricing gouging was not Valeant's only worry.  During the same period, on October 14, 2015, Valeant issued a press release disclosing that the Company had recently received subpoenas from prosecutors in the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York, which related not only to the Company's drug pricing practices, but also to the Company's patient assistance programs and distribution practices, which reduced patients' copays for the high-priced drugs and potentially circumvented rules that reduced over-prescription of these drugs.

257.    Following disclosure of the subpoenas, Pearson assured investors that the Company believes in "maintaining strong regulatory and financial controls and believe[s] we have operated our business in a fully compliant manner."  The Company further stated that it had "responded to a letter from Senator Claire McCaskill" regarding the pricing of Nitropress and

Isuprel and the "reimbursement process for hospital procedures involving Nitropress and Isuprel, [as well as] the analysis and reasons underlying Valeant's pricing decisions." The Company noted it was ''beginning outreach to hospitals where the impact of a price change was significantly greater than average."

258.    But on October 15, 2015, news outlets reported that Senator McCaskill condemned Valeant's response to her letter, stating: "It appears obvious to me that Valeant has been anything but responsive or transparent - it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

### B.    VALEANT'S SECRET RELATIONSHIP WITH PHILIDOR

259.    On October 19, 2015, Valeant's control over a secret network of pharmacies began to come to light.  Early that morning, Bill Ackman, CEO of Pershing Square and a Director of Valeant, sent an email to Laurie Little, Valeant's Senior Vice President, Investor Relations, and Pearson regarding a Southern Investigating Reporting Foundation ("SIRF") report on Valeant, which described the connection between Valeant and Philidor.  Little responded, "We knew it was coming and will address on today's call."

260.    On the same day, Valeant issued a press release announcing its 3Ql5 financial results and hosted a conference call with a presentation by Pearson, Rosiello, and Kellen. Pearson sought to address ''the turmoil over the past few weeks from both governmental and media scrutiny."  The Company made limited disclosures, such as confirming its relationship with Philidor, the option to acquire Philidor, and that it had been consolidating Philidor's financial results with its own.  Valeant also effectively conceded its business strategy was neither sustainable nor less risky by disclosing it would rely less on acquisitions and more on R&D (by announcing that it would double its R&D spending from $56 million in 1Q15 to $102 million in

3Q15). Pearson added that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products.''

261. During this call, Pearson also disclosed the outsized role that price played in Valeant's growth, in contrast to his earlier statements about "organic growth," implying that volume had driven Valeant's profits. Pearson noted that price of drugs accounted for approximately 60% of growth in 2014 and 2015. Those years saw Valeant grow by 20% and 41%, respectively, with the contribution of increased prices outweighing the contribution of volume growth 20% to 12% in 2014, and 24% to 15% in 2015. The slide presentation stated that 85 of Valeant's 156 U.S.-branded Pharma products had an average price increase of 36%. With respect to the ''Neuro and Other'' portfolio, the presentation further provided that the year to date volume had declined by 7% but the net realized price had increased by 30%. Pearson repeated during the call that the Company was "seriously considering spinning off or selling" the ''Neuro and Other portfolio, which is dependent on price," and that "internal R&D will become more of a focus."

262. Pearson refused to discuss the subpoenas from federal prosecutors, stating "[w]e will not be answering questions." Regarding the government inquiries on price gouging, Pearson stated:

> As you all know, Valeant has responded to Senator McCaskill, and addressed her questions regarding Nitropress and Isuprel. In a letter to her last Wednesday, we discussed ... , the analysis and reasons underlying Valeant's pricing decision, and Valeant's programs designed to improve patient access, among other topics. We also noted that we are beginning an outreach to hospitals where the impact of a price change was significantly greater than average.

263. When asked what percentage of U.S.-branded prescription business flowed through "alternative fulfillment" and "how much of that is Philidor'' Pearson stated:

Sure. It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin, and some of the other orphan drugs. For certain products it's quite large. For Jublia it's probably 15%. For a lot of other dermatologies it's much less. I'm sorry, I can't- it's significant but it's - I don't know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe. Tanya's nodding[;] probably closer to 10%.

264.    After the market closed on October 19, 2015, *The New York Times* reported further revelations into Valeant and its use of Philidor in an article entitled "Drug Makers Sidestep Barriers on Pricing."  The article discussed how Philidor's application for a license in California had been rejected because it had concealed its owners. The article reported that Valeant used Philidor to "keep the health system paying for high-priced drugs" and to keep prices high for its dermatology products.  The article quoted a Florida dermatologist as stating that Valeant's program was designed to buffer physicians and insurers from complaints about high prices. Discussing Philidor, the article stated, in part:

Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports.

\*\*\*

Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by ... Valeant are for common ailments like arthritis pain, acne, and toenail fungus. What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs.

265.    The early negative publicity into Valeant's deceptive practices culminated in a bombshell report from Citron on October 21, 2015.  Citron's report questioned Valeant's accounting and prior disclosures, asking, "Valeant: Could this be the Pharmaceutical Enron?"

The reported wondered, "Why would Valeant, a major big cap pharma, a darling of the hedge fund crowd... be secretly maneuvering to buy a little known pharmacy [Philidor] with a dubious ownership structure," and inquired as to why this entity was "NEVER disclosed in any prior company disclosure?"  The Citron report asserted that Valeant was using a network of mail-order pharmacies under its control to prop up sales and keep patients and their insurance companies from switching to less costly generics.  Citron also questioned whether Valeant's revenues were inflated through Philidor.

266.   The Citron report linked Philidor to other pharmacies through shared phone numbers, identical privacy notices, a shared facsimile number, and shared websites. Citron claimed "that Valeant/Philidor have created an entire network of phantom captive pharmacies," which included West Wilshire, SafeRx and Orbit Pharmacy.  The report also provided investors with details of the R&O lawsuit, noting that Valeant resembled a "house of cards" and could be "Enron part Deux."

267.   Upon publication of this report, Valeant suffered a rapid decline in its stock price and had to have trading halted.  When trading resumed, Valeant shares plummeted nearly 40%, resulting in another trading suspension.

268.   In response, Philidor issued a press release on October 21, 2015, disclosing that it had a contractual relationship with "affiliated pharmacies," including R&O, and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

269.   Following Citron's report, other analysts also began to downgrade Valeant. For example, on the following day, October 22, 2015, BMO Capital Markets Corp. ("BMO'') stated

that it "cannot defend the specialty Pharmacy structure" Valeant was using and downgraded the shares to "market perform."  The BMO report further stated: "We've been strong, vocal Valeant bulls," but ''we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."

270.    The same day, a *Bloomberg* article titled, "Valeant Still Has Explaining to Do, Citron Research's [Andrew] Left Says," reported on Valeant's option to buy Philidor and noted it was "a relationship other [drug] companies don't appear to have" with pharmacies.  The article noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because these arrangements were "perceived" to be conflicts of interest.

271.    Revelations of Valeant's improper practices continued as Philidor employees came forward disclosing the improper business practices employed by Philidor.  On October 25, 2015, *The Wall Street Journal* reported that it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products ...." A former employee interviewed by *The Wall Street Journal* noted that the Valeant employees' "real identities were well known to the other Philidor employees."

272.    That night, Ackman expressed his concern to Valeant executives by forwarding a media article to Pearson, Schiller, Rosiello, Ingram, and Little, which found to be unsatisfying Pearson's explanation that Valeant concealed its relationship with Philidor as a competitive advantage. The article noted that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise. And since materiality is a qualitative, not a quantitative, concept the company shouldn't try to stonewall ...." Ackman suggested that Pearson as the CEO and Ingram as a representative of the Board lead

Valeant to admit that "some mistakes were made." As an example, Ackman wrote "is it a mistake not to disclose Philador [sic]? In retrospect, it certainly appears to have been a mistake as the lack of disclosure made the company a potential target for a short attack which implied the company was hiding something." He added that "the lack of disclosure on Philidor was a big surprise and raised concerns among shareholders." Ackman suggested that they "explain whether or not the board, audit committee, auditors understood and agreed with the accounting, strategy, and disclosure of this business," adding that "Investors fear fraud."

273.   On October 26, 2015, the Company filed its 3Q15 10-Q which included further disclosures related to Philidor, including that the Company now had the "power to direct Philidor's activities."  The 3Ql5 10-Q also revealed that Valeant established a special "ad hoc" committee of the Board of Directors to investigate Valeant's relationship with Philidor to be led by Ingram, the Company's lead outside director, and to include Provencio, chairman of the Audit and Risk Committee, Colleen Goggins, and Mason Morfit, the President of ValueAct Capital (one of Valeant's largest shareholders), who had been added to the Valeant Board that morning and immediately placed on the ad hoc committee (the "Ad Hoc Committee").

274.   As discussed above, on October 26, 2015, the Company hosted a conference call which included a presentation that stated, among other things:

- That "44% of Jublia revenue flowed through Philidor in Q3 2015";

- That ''we maintain regular communication, have a joint steering committee, have rights (and have utilized them) to approve key positions (*e.g.,* in-house lawyer, chief compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit program for 2015";

- That "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, Right to require hires for certain positions, Substantial information rights, Covenants respecting Philidor's compliance with all applicable laws"; and

- In a section addressing Valeant's "Management Rights" over Philidor, that "Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

275.    On the conference call, Rosiello disclosed Philidor's status as a VIE, and stated: "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014." Moreover, Carro admitted that "Valeant reviews the financials of the Philidor network pharmacies on a regular basis." Shortly after the call, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."

C.    **VALEANT'S SHUTDOWN OF PHILIDOR AND ADDITIONAL ATTEMPTS AT CRISIS MANAGEMENT**

276.    As a reflection of these continued concerns, on October 27, 2015, Bill Ackman, CEO of Pershing Square and a Director of Valeant, told Pearson and Schiller via e-mail, "I don't think you are handling this correctly and the company is at risk of getting into a death spiral as a result."

277.    In another email that same day, Ackman reacted to *The New York Times* article by Joe Nocera on whether Valeant was the ''Next Enron?" which stated that "Valeant . . . is a sleazy company." Addressing Ingram, Pearson, Schiller, Morfit, and Little, Ackman said, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short." He warned that "[y]our reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis." Ackman criticized Pearson for ending the last conference call abruptly, and said: "When Mike said that you were running out of time on

the call, he was right in that the company is running out of time to save itself.  When shareholders hear that management doesn't have time to address their concerns, they assume the worst.  There is no amount of time that should [be] spared addressing shareholders [sic] concerns."  Ackman noted that it took a "short seller to bring Philador [sic] to light and that has destroyed managements [sic] compact with shareholders."  Ackman further advised, "I strongly recommend you immediately hold a conference call to address every remaining question from shareholders" of "unlimited duration."  Ackman pleaded with the executives to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are."  Ackman noted the business and regulatory risks, including, "Valeant has become toxic.  Doctors will stop prescribing your products" and "Regulators around the world will start investigating and competing to find problems with every element of your business." Ackman further encouraged candor by cautioning, "The only people that need scripts and limited questions are crooks.  Joe Nocera is right.  You look like Enron."  Ackman added, "You should assume that the truth will come out eventually so there is zero downside to having it out now" and **"If mistakes have been made, admit them immediately and apologize."**  Ackman closed the email by stating: **"You have previously made the mistake of waiting while Rome was burning. There is now a conflagration.  It takes no time to prepare for a conference call to tell the truth.  The time to do it is today.  We are on the brink of tragedy.  Please do the right thing**."  Afterwards, Ackman continued to have these concerns, expressing his disappointment to Pearson in an October 29, 2015 e-mail that Pearson "ha[s] not been willing to do an open line q&a with all . . . shareholders, and as a result, certain important questions remain unanswered."  Ackman also reportedly told Ingram, "What the company needs now is a reputational recovery, someone who can deal with the press and testify before Congress, and

that's not Mike's strength."

278.    Pearson did not follow Ackman's advice.  And despite his efforts to contain the fallout, additional facts emerged.  After the market closed on October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim- to essentially shop around for one that would be accepted."

279.    On October 29, 2015, *Bloomberg BusinessWeek* reported additional accounts by former Philidor employees of the improper tactics by Philidor, some of which were formally documented. The article reported that, in order "to fill more prescriptions with Valeant products instead of generics":

- "[w]orkers at ... Philidor ... were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs -not less expensive generic versions - be dispensed, the former employees said";

- that "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels ... is rejected"; and

- that an October 2014 employee manual noted that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."

280.    Later that day, while the market was still open, reports disclosed that CVS Caremark (one of the three largest PBMs in the United States) terminated its relationship with Philidor, citing "noncompliance" with its provider agreement after an audit of Philidor's practices.

281.    On October 29, 2015, Express Scripts and United Health's OptumRx, the other

two largest PBMs, similarly announced that they had terminated their relationships with Philidor. Thus, in the same day, the three largest PBMs in the country announced they would no longer pay for medication dispensed by Philidor.

282.    In light of the revelation of Philidor and the secret pharmacy network, on that day, Valeant announced it would cut all ties with Philidor.  The following day, October 30, 2015, shortly after underscoring the purported benefits and independence of Philidor, Valeant announced that Philidor would be shutting down as soon as possible.  Pearson stated that Valeant had "lost confidence in Philidor's ability to continue to operate in a manner that is acceptable."

283.    Just a few days later, on November 4, 2015, the U.S. Senate reportedly formally launched a probe into Valeant's price increases for three drugs.  On the same day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, disclosing that, just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy.  Also on that day, *The Wall Street Journal* reported that Ackman told Valeant's lead director, Ingram, that Pearson might need to leave Valeant and that Ackman was considering liquidating his hedge fund's entire $3.8 billion investment in the Company.  *The Wall Street Journal* article further noted that Ackman had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

284.    On November 10, 2015, the Company finally addressed investor concerns through a conference call to ''update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."  Pearson, Rosiello, Carro, and Kellen participated on Valeant's behalf.  Pearson stated that, "As of last week,

Philidor has stopped adjudicating claims.... Philidor has committed to cease operations by January 30, 2016 at the latest."

285.    Pearson also began to disclose the negative financial impact resulting from the closing of Philidor and the government inquiries into its practices:

> In the very short term, disruption in our dermatology business will be significant. Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week.
>
> Turning to Neuro, we are also seeing some short-term pressure in our Neuro business, in particular with respect to Nitropress and lsupre1, given all the publicity around those two drugs. We're working with our large customers and providing direct discounts to protect volume.

286.    As further fallout from the negative publicity and from the closure of Philidor, Pearson suggested that Valeant would have to withdraw and lower guidance that it had raised less than a month before on October 19, 2015:

> Turning to guidance.  In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship with Philidor. Specifically, the downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology RX. Obviously, what has happened will impact Q4.  We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

287.    During the call, Pearson was asked about the impact the Company would see in 2015 in the dermatology division and responded:

> So, again, based on the data we have, we've not seen volume declines. It's largely the value of the average selling price for a script.  Now, I would not be shocked to see some volume declines over the next few weeks.
>
> In fact, I would expect that. But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

288.    In response to an analyst question regarding pricing scrutiny, Pearson stated, "if we're viewed as aggressive, we're going to have to listen to that."  Pearson acknowledged ''the

past few weeks have been a painful learning experience for me personally" and that "[t]he other things I'm dedicated to doing going forward is listening more to our patients, our partners, and our critics."

289.    Valeant's call served only to raise additional investor concerns.  On November 11, 2015, *Bloomberg* reported that Valeant creditors were "spooked by [the] possibility of [a] revenue squeeze" and that concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." According to one creditor, "The Big question is: What is the true cash-flow generation nature of the company? Will it be materially different?" The report noted that Valeant's dermatology and neurology business accounted for 24 percent of company revenue, which Pearson stated would be "significantly" disrupted. The next day, November 12, 2015, *Bloomberg* released another article regarding Valeant's relationship with Philidor and media reports recounted how numerous analysts had lowered their price targets for the Company.

290.    The media also reported new Congressional inquiries into Valeant's practices.  On November 16, 2015, *Bloomberg* reported that U.S. Representative Elijah Cummings wrote Pearson, requesting that Pearson make Tanner, Patel, and Alison Pritchett available for interviews based on allegations ''that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations." Representative Cummings also asked for contact information for Komwasser, who recently left the Company.  Later that day, *The Washington Post* published an article entitled "House Committee to hold hearing on prescription drug pricing." The article reported that the House Oversight Committee would hold a formal hearing in early 2016 focusing on prescription drug pricing, the Committee had reached out to Valeant to gather information, and Committee members were calling for Valeant's

executives to testify at the hearing.

291.    Furthermore, the public was still paying attention to the Philidor story.   On November 17, 2015, Deutsche Bank published a report detailing a survey it commissioned of 25 dermatologists in light of the disclosures relating to Philidor.   The vast majority of them noted that they were prescribing fewer Valeant products and expected to write fewer prescriptions in the future. One added, "Did not know clearly about the Philidor-Valeant relationships. Somewhat misleading and dishonest."   Another more bluntly stated that Valeant had "[v]ery shady business practices."

### D.    FURTHER DISCLOSURES OF THE FINANCIAL IMPACT OF THE FRAUD

292.    On December 15, 2015, Valeant issued a press release announcing that it had entered into a deal with Walgreens to distribute its products which included 10% price reductions for its branded prescription-based dermatological and ophthalmological products.

293.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it issued on October 19, 2015.   Valeant issued new fourth quarter revenue guidance of $2.7 - $2.8 billion (a reduction of approximately $600 million and 17% from $3.25 - $3.45 billion) and new fourth quarter Cash EPS guidance of $2.55 - $2.65 (a reduction of approximately $1.50 and 37% from $4.00 - $4.20).   Valeant also issued new 2015 full year revenue guidance of $10.4- $10.5 billion (a reduction of approximately $700 million and 16% from $11.0 - $11.2 billion) and new 2015 Cash EPS guidance of $ 10.23 - $10.33 (an approximately $1.50, or 13% decline from $11.67- $11.87).   Finally, Defendants issued new 2016 EBITDA guidance of $6.9 - $7.1 billion (a reduction of approximately $500 million and 7% from $7.5 billion).

294.    On December 16, 2015, an analyst for Piper Jaffray reported that Valeant was not "well positioned for significant [price/earnings] recovery anytime soon given the credibility gap associated with senior management."   The next day, Mizuho Securities USA ("Mizuho") cut its rating on Valeant stock to ''neutral" from ''buy" pointing to a lack of clarity regarding Valeant's agreement with Walgreens and stating that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."

295.    On December 28, 2015, Valeant announced that Pearson had left the Company, effective immediately, on a medical leave of absence. To fill the gap, Valeant created an "Office of the CEO," which included Robert Chai-Onn, Kellen, and Rosiello to serve in an interim capacity. The Board also formed a committee to "oversee and support" the Office of the CEO, which included Ingram, Morfit, and Schiller.

296.    On January 6, 2016, Valeant announced that Schiller would serve as the Company's interim CEO while Pearson remained on medical leave and that Ingram would serve as the interim Chairman of the Board of Directors.

297.    On January 22, 2016, but undisclosed to investors, Valeant entered into a termination agreement with Philidor that was effective as of November 1, 2015.  Schiller signed on behalf of Valeant and Rosiello signed on behalf of KGA. The agreement included a retroactive mutual release dated November 1, 2015.

298.    On February 19, 2016, a Wells Fargo report by analyst David Maris ("Maris") providing a detailed analysis of Valeant drew significant media attention.  The media noted that Maris had identified inconsistencies with regard to Defendants' disclosures concerning Philidor's impact on the business.  Specifically, Maris found that Valeant initially claimed that Philidor

accounted for 7% of sales, yet lowered 4Q15 revenue guidance by 17%-19% (from $3.25-$3.45 to $2.7-$2.8 billion) and EPS guidance by nearly 37% (from $4.00-$4.20 to $2.55-$2.65).  The analyst commented that "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS."  Maris added that at approximately 7% of revenue, Philidor would have represented approximately $227.8 million in revenue for 4Q15, yet guidance was lowered by $526.5 million.  The analyst concluded that ''the new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact, as described by Valeant."

299.   Second, according to media reports, Maris commented on the Company's management, stating "we believe investors are likely questioning the judgment and decision making of [the] management team and board," adding that "corporate cultures ... are difficult to change without management and board changes."  Maris noted that ''the slide in Valeant's shares is directly related to decisions that the board and management have made" including ''the board review and approval of a relationship with Philidor, which later caused a significant decline in shareholder value and corporate reputation."

300.   Third, according to media reports, Maris discussed the reduced financial outlook for Valeant. Maris noted that "management has said that it is not planning to complete any acquisitions in 2016, nor is it planning to raise prices excessively" and concluded that ''this will pose significant risk for a company that was dependent on both." The Wells Fargo analyst commented that ''the model of cutting R&D and spending, and dramatically raising prices, in pursuit of higher and higher EPS to fuel a roll-up strategy built on earnings accretion for deals is shortsighted, as often the cuts undermine the longer- term prospects of the business."

301.    Fourth, according to media reports, Maris identified how Valeant's accounting was misaligned with Valeant's purported performance. The analyst said ''receivables growth has outstripped sales growth over the past several years." Maris noted that a screening tool it uses ''to predict the likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category," adding that when ''receivables are increasing faster than revenue, it can often indicate that customers are hesitant to pay for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue." Maris stated that "gross-to-net revenue adjustments" in 2012 were 19.1% of gross revenues but had steadily increased to 41.1% of gross revenues by 3Q15, and that "Valeant suggests the reason for the increasing provision is growing returns, rebates, and co-pay assistance programs related to select dermatology products ...."

### E.    VALEANT'S FRAUDULENT ACCOUNTING

302.    Following up on Maris's warnings, on February 22, 2016, *Market Watch* reported that Valeant "likely needs to restate some of its previous financial results based on the findings of an internal investigation into its business, according to people familiar with the matter." *Market Watch* noted that the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

303.    That evening, Valeant issued a release confirming the financial restatement. In the release, Valeant admitted that ''the Company has preliminarily identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor." This statement runs contrary to Defendants' earlier statements in October 2015 that Valeant was not inflating revenues through Philidor. The release stated that the "Company currently believes that

approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10."

304. Valeant also revealed internal control problems, stating that the Company would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee ...and the Company's ongoing assessment of the impact on financial reporting and internal controls." Schiller assured investors that the Company was "committed to improving reporting procedures, internal controls and transparency for our investors" and "[w]e have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."

305. On February 28, 2016, Valeant issued a press release announcing that Pearson was returning from his medical leave but that the Company was separating the role of CEO and Chairman of the Board, naming Ingram as Chairman. The release further disclosed that "[i]n the interim, the Company is withdrawing its prior financial guidance," adding that "[a]s previously announced, the Company will delay filing its 2015 10-K pending completion of the review of certain accounting matters by the Ad Hoc Committee" and ''the Company's ongoing assessment of the impact on financial reporting and internal controls." Pearson was quoted as admitting that "I realize that recent events are disappointing to everyone'' and that among his priorities would be "improving Valeant's reporting procedures, internal controls and transparency."

306. In the early afternoon on February 29, 2016, *Bloomberg* reported that although the scheduled call was canceled, Valeant "will hold a call for sell-side analysts later Monday that will include Pearson," noting the call was not publicly announced. According to a *Bloomberg* article, on March 2, 2016, Pearson held a meeting with certain Valeant employees in the second-

floor conference room at Valeant's headquarters in Bridgewater, New Jersey. Pearson claimed, "We're under a barrage of external government and media and everything else," adding that "Everyone is nervous. The board is nervous." That same day, *Moody's* reported that it had placed Valeant's corporate credit ratings "under review for downgrade," which it stated "reflect[ed] concerns that Valeant's underlying operating performance is weaker than Moody's previous expectations," potentially impeding the Company's deleveraging plans. Then, within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, it was reported that the call was canceled as a result of "media interest." Moreover, Valeant announced later in the day that it was under investigation by the SEC since 4Q15.

307.    On March 15, 2016, Valeant reduced its financial guidance for 2016 and provided unaudited financial information regarding its 2015 performance. With regard to 2016 guidance, Valeant lowered revenue guidance to $11-$11.2 billion (a reduction of approximately $1.5 billion and 12% from the full year 2016 $12.5-$12.7 billion guidance given on December 16, 2015), Cash EPS guidance to $9.50-$10.50 (a reduction of approximately $3.50 and26% from the prior $13.25 - $13.75 guidance), and full year 2016 EBITDA guidance to $5.6-$5.8 billion (an approximately $1.3 billion and 19% reduction from the prior $6.9-$7.1 billion guidance). The Company blamed ''reduced revenue assumptions for certain businesses, new managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."

308.    The Company hosted a conference call that same day, which Pearson, Rosiello, and Kellen attended on its behalf. During the call, Rosiello stated that Valeant's first quarter results were below guidance in part due to ''realizing a slower-than-expected rebound in dermatology," and Pearson added that "increases in rebates are due to more competitive pressure

in response to our store price increases for our late life cycle products." In a press release that was also issued on March 15, 2016, Valeant disclosed $51.3 million in ''wind down costs" for Philidor which included write-downs of fixed assets and bad debt expenses during the "wind down period November 1, 2015 through December 31, 2015." Furthermore, the Company disclosed a "$79.0 million impairment charge related to Philidor Rx Services."

309.    During the conference call, Pearson explained why the guidance was being lowered. In particular, Pearson cited "higher-than-expected inventory reductions that transition from Philidor to Walgreens and the cancellation of almost all price increases." Pearson added that "any future price increases will be more modest and in line with industry practices and managed-care contracts. We have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia ...." Pearson revealed that the Company had already committed to reducing pricing on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on WAC and will impact and will be taken across all channels, not just Walgreens."

310.    During the March 15, 2016 conference call, an analyst noted "the fact that management needs to rebuild credibility with investors" and that the guidance was "lowered far more than any investor anticipated." The analyst asked "how can we be confident in what you're saying today about the business, given that you were positive in December and January?" Pearson responded, in part ''we have to earn back the credibility." In a publicly disclosed message to Valeant employees the next day, Pearson reiterated that "Restoring the public's confidence will take time.''

311.    On March 21, 2016, Valeant filed a Form 8-K announcing the restatement of its prior financial statements. The Company disclosed that in light of the Ad Hoc Committee's

review of recent allegations and related matters it determined that "approximately $58 million in net revenues relating to sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor." Valeant therefore disclosed that the Company's last four financial statements, the 2014 10-K and the 10-Qs for the first, second, and third quarters of 2015, along with Pricewaterhouse Cooper's audit report on the 2014 10-K, should no longer be relied upon.

312.    Specifically, the Ad Hoc Committee determined that the Company's revenue recognition "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to Philidor)" prior to the Company's purchase option agreement with Philidor was improper. Instead, ''revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record[ed] revenue when Philidor dispensed the products to patients) prior to entry into the option agreement." As a result, the Company was no longer able to record revenues for shipments to Philidor and could only record revenues on shipments to the patient. The March 21, 2016 press release further disclosed that:

> Management, in consultation with the [Ad Hoc] committee, has concluded that ***one or more material weaknesses exist in the Company's internal control over financial reporting*** and that, as a result, ***internal control over financial reporting and disclosure controls and procedures were not effective*** as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

313.    Significantly, the Company admitted that its "improper revenue recognition" related to Philidor was not innocently made, but rather was the result of the ***"improper conduct"*** of the Company's former CFO and former Corporate Controller. Additionally, the Company specifically attributed as a ***"contributing factor"*** to its ineffective controls over financial reporting the unethical ***"tone at the top"*** by senior management. Specifically, Valeant's March

21, 2016 press release stated that:

> "The *improper conduct* of the company's former chief financial officer and former corporate controller, which resulted in the provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results. In addition, as part of this assessment of internal control over financial reporting, the company has determined that the *tone at the top of the organization* and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition."

The Company further stated it would begin searching for a new CEO to replace Pearson, who would continue to serve as CEO and as Director until his replacement was appointed.

### F.   ADDITIONAL REVELATIONS REGARDING THE FRAUD AND ITS IMPACT

314.   In a March 22, 2016 article entitled "Bill Ackman's Plan to Fix Valeant Is Doomed," the *Business Insider* attempted to quantify what the financial impact would be if Valeant were to transition from its non-traditional approach to that of a traditional pharmaceutical company.  The article noted that without price hikes, "Valeant would lose 10% of its revenue."  The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D spending to 13% instead of 3% that "Valeant would be losing money. *A lot of money."* (Emphasis in original.) The article noted that, according to an analysis conducted by *Bloomberg,* "[i]f Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12- month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53. Ebit could have dropped to $606 million from $2.5 billion ...Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

315.   On April 9, 2016, *The New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction," which noted that "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February."  Citing interviews with former employees, analysts, investors and doctors, the

article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor.   The article explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price." However, once Valeant acquired the drug, it doubled the price to $800 causing payers to reconsider their coverage.   Valeant also terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

316.   On April 29, 2016, Valeant released its Form 10-K Annual Report for the year ended December 31, 2015 ("2015 10-K") which confirmed the financial restatement and the Company's material weaknesses.   Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.   For example, the 2015 10-K revealed that while the Company historically depended on acquisitions, that the volume and size of acquisitions in 2016 and beyond was expected to be minimal and this "could have a material adverse effect on our business, financial condition, cash flows and results of operations and could cause the market value of our common shares and/or debt securities to decline."

317.   In an attempt to rebuild its image, on May 3, 2016, Valeant announced the appointment of Joseph C. Papa as its CEO and Chairman of the Board, reuniting the roles it recently separated.   Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference.   While answering questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited. Papa acknowledged that with Philidor "clearly we had some question marks" and that ''there were some pricing mistakes that were made" and "some transparency things that [could be] improve[d] on at Valeant." Regarding internal controls, Papa recognized ''there are some functions that we need to put some additional [] controls [on]" and "there is some investment that

needs to happen in areas . . . where [Valeant] just need[s] to bring some additional financial capabilities."   To that end, Papa disclosed that the Company "just recently hired a new Controller."

318.   However, the change in management could not immediately alter Valeant's prospects.  On June 7, 2016, Valeant made additional disclosures regarding the financial impact of shutting down its captive pharmacy network, shedding light on the extent to which the Company's performance had depended on its price gouging and related deceptive practices. That day, Valeant filed its first quarter 2016 10-Q ("1Q16 10-Q"), issued a press release, and hosted a conference call regarding the Company's long-awaited first quarter 2016 ("1Q16") financial results, which had been delayed by several months.  Valeant disclosed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance again to total revenue of $9.9-$10.1 billion (down from $11-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80-$4.95 billion (down from $5.6-$5.8 billion).  During the conference call that day, Rosiello stated that "[t]he base business in Q1 declined by $289 million, driven by dermatology . . .  and the transition to Walgreens...."

319.   Further revealing the detrimental effect that the loss of Philidor was having on Valeant's pricing, volume, and drug refills, Rosiello added that:

> *Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling price] declining post launch. Overall volume challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship*, as well as the negative external narrative and some internal disruptions...

320.   Papa added that the "vast majority'' of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall." During the

question and answer portion of the call, Papa further revealed how much the Company's drug

pricing and profitability were suffering as a result of its cessation of price gouging and deceptive

practices and the termination of its relationship with Philidor:

> The issue is that there is a percentage of the business where the average
> selling price is significantly below what we had previously expected as
> we put the program together. And in fact, in some places that average
> selling price is negative and by that [it] means, every time a prescription
> goes out the door we're taping dollar bills to that prescription as it goes
> out the door. That's something that we have to get fixed.

321.    On July 31, 2016, *The New York Times* published an article titled, "How Valeant

Cashed In Twice on Higher Drug Prices," which detailed Valeant's use of ''price appreciation

credits" to inflate the Company's revenues. The article explained that the credits – which come

about when a drug company increases the cost that its wholesalers must pay for a product they

have contracted to distribute – were "an obscure but vital source of cash to Valeant that is

directly linked to its pricing practices." As reported by *The New York Times,* "[n]ow that those

practices are under scrutiny, the money Valeant receives from these credits is likely to decline

substantially or disappear outright," noting the ''unique" and "outsize contributions" of the

credits to Valeant's cash flows. "In recent periods, they have equaled one-fifth or more of

Valeant's operating cash flow," the article emphasized, based on the Company's reported

financials.

322.    On August 9, 2016, Valeant issued a press release and hosted a conference call

regarding the Company's second quarter 2016 ("2Q16") financial results.  In the release, Valeant

disclosed a GAAP loss per share of ($0.88) for 2Q16 and a drop in revenue of 11.4%, with the

Company blaming the slow recovery in its dermatology division, which suffered greatly from

Philidor's closing.  The release disclosed that Valeant's dermatology revenue dropped **55%**

compared to 2Q15, with Solodyn and Jublia sales down 74% and 69%, respectively, year-over-

year.  The two Valeant drugs singled out by Congress at the start of its probes, the heart drugs Nitropress and lsuprel, experienced year-over-year revenue declines of 46% and 19%, respectively.  In the conference call that day, Papa stated: "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan."  Additionally, the Company cited lower price appreciation credits as one of the reasons revenues declined 14% in Developed Markets.

323.   Also on August 9, 2016, in an article titled, "Valeant Begins to Look Like A Normal Drug Company, But With Way Too Much Debt," *Forbes* reported on a Wells Fargo analysis by its analyst Maris.  *Forbes* noted that by Maris' calculations, "Papa will have to deliver a 55% sequential increase in adjusted EPS and a 30% increase in adjusted EBITDA in the second half of 2016 to meet guidance" and that "Xifaxan remains off pace to hit $1 billion in 2016 sales, a previous Valeant target."  Quoting Maris, *Forbes* added that: "If Papa falls short in coming quarters, it is likely many will see the company's new reign as 'just new paint on the same old shed' ...."

324.   Finally, on August 10, 2016, the *Wall Street Journal* reported that federal prosecutors at the U.S. Attorney's office in Manhattan are considering bringing ***criminal mail and wire fraud charges*** against Valeant and former Philidor executives.  According to sources with knowledge cited by *The Wall Street Journal,* federal prosecutors are investigating whether Valeant and Philidor "defrauded insurers by hiding their close relationship."  The sources added that prosecutors are also examining "some of Philidor's business practices, including rebates and other compensation provided by the pharmacy to customers who used Valeant products, as well as Philidor's efforts to seek reimbursement from insurers."  *The Wall Street Journal* reported that, based on its sources, ***the probe is expected to be the most serious Valeant faces."***

## VII. VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES

325. Throughout the Relevant Period, Valeant's periodic financial statements with the SEC represented that Valeant's financials were prepared in accordance with GAAP. This was not true. Financial statements, including interim financial statements, filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP. *See* Regulation S-X, 17 C.F.R. § 210.4-01(a)(1); 17 C.F.R. § 210.10-01.

| Financial Period: | Reported revenue overstated by: |
|---|---|
| 3 months ended Sept. 30, 2014 | $12.9 million |
| 3 months ended Dec. 31, 2014 | $44.6 million |
| 12 months ended Dec. 31, 2014 | $57.5 million |
| 3 months ended Mar. 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended Sept. 30, 2015 | $20.8 million |

326. Valeant's financial statements during the Relevant Period were materially misstated and violated GAAP (and certain of the Company's critical accounting policies) in numerous ways, including (i) by improperly recognizing Philidor revenue, in violation of GAAP; (ii) by concealing Philidor as a VIE, which violated of GAAP as well as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 810, *Consolidation;* (iii) by falsely certifying that the Company's internal controls over financial reporting and its disclosure controls were effective, in violation of SOX and SEC rules, as well as the Committee of Sponsoring Organizations, Internal Control-Integrated Framework; (iv) by concealing information regarding the Company's dependence on its relationship with Philidor and price increases, for its increased revenues and earnings; and (v) by reporting quantitatively and qualitatively false and misleading statements, according to SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality.*

### A.   VALEANT IMPROPERLY RECOGNIZED PHILIDOR REVENUE

327.   On March 21, 2016, Valeant confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements for fiscal year 2014 and the first nine months of fiscal year 2015. As a result, the Company's 2014 10-K, and its 10-Qs for first, second, and third quarter of 2015 could no longer be relied upon. Valeant concluded that, prior to the Company's purchase option agreement with Philidor in 4Q14, certain sales transactions involving Philidor were not executed in the normal course of business, and it could not reasonably assure that revenue would be collected at the time such revenue was recognized. See FASB Accounting Standards Codification Topic 605, Revenue Recognition; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

328.   As detailed above, Valeant entered into a purchase option agreement with Philidor on December 15, 2014. Before executing the option agreement, Valeant recognized revenue on sales to Philidor when Valeant delivered products to Philidor, *i.e.*, on a "sell-in" basis. After the option agreement was executed, Valeant was required to, but did not, recognize revenue when Philidor distributed the products to the end customers (patients), *i.e.*, on a sell-through basis.

329.   Furthermore, in 2014, leading up to the execution of the option agreement, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business. As admitted in Valeant's 2015 10-K, these purported sales transactions included: "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product." Valeant recorded revenue on these fictitious sales. In addition, Valeant double booked revenue on these sales, recognizing revenue for a second time once Philidor sold

the same products to end customers.

330.    Collectability of revenue was not reasonably assured for these fictitious sales. Despite that, Valeant improperly recognized the revenue prior to revenue collection. In a March 21, 2016 press release, Valeant announced that the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement as a result of these improper revenue bookings.

331.    Each Philidor-related misstatement and disclosure violation was material to Valeant's financial statements during the Relevant Period. As a qualitative matter, the improperly recognized revenue from Philidor allowed Valeant to meet its "Cash EPS" target of $2.58 for 4Q2014, and exceed its Cash EPS guidance of $2.55. Proper revenue recognition would have caused Valeant to fall short of its guidance. In addition, the misstatements were qualitatively material because Valeant had repeatedly emphasized that its revenue growth came from U.S. organic sales, as well as increased sales in its dermatology line.

### B.    VALEANT CONCEALED PHILIDOR AS A VIE

332.    Valeant also failed to disclose Philidor as a VIE. Pursuant to ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810"), a company must disclose in its financial statements both unconsolidated and consolidated VIEs. In its October 26, 2015 investor presentation, Valeant stated that it considered Philidor a VIE prior to the purchase agreement. Under ASC 810, Valeant was required to determine if Philidor needed to be consolidated in its financial statements from the time that Philidor became a VIE. The relevant test for determining if Philidor should have been consolidated is whether or not Valeant was the "primary beneficiary" of Philidor.

333.   On October 26, 2015, Valeant claimed that it did not become the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014.   Assuming that is correct, ASC 810's guidance still required Valeant to disclose all material unconsolidated VIEs.   Hence, before the execution of the December 15, 2014 option agreement, Valeant was required to disclose its unconsolidated relationship with Philidor. In particular, Valeant was required to disclose in its pre-December 2014 financial statements (i) quantitative and qualitative information about Valeant's involvement with Philidor, including Philidor's nature, size, purpose, activities, and how it was financed; and (ii) the rationales for its conclusion that Valeant was not the primary beneficiary of Philidor, including disclosure of key factors, assumptions, and significant judgments used in making the determination.   *See* ASC 810-10-50-5A. Valeant did not fulfill those disclosure obligations. Instead, Valeant stated in its 2013 10-K that: "There were no material arrangements determined to be variable interest entities.''

334.   Following the execution of the purchase option agreement, Valeant concluded it was the primary beneficiary of the Philidor VIE and finally began to consolidate Philidor's results. Because of this change, ASC 810 also required Valeant to disclose which factors caused it to change its reporting with respect to Philidor, and to set out the impact of the change on the Company's consolidated financial statements. See ASC 810-10-50-5A. Valeant failed to disclose this information in its 2014 10-K. Valeant also failed to make additional VIE disclosures necessary to comply with the principle disclosure objective of ASC 810, *i.e.*, to provide users of its financial statements with information concerning (i) significant judgments and assumptions made in determining whether it needs to consolidate the VIE and/or disclose information about its involvement with the VIE; (ii) the nature of and changes in the risks associated with its

involvement with the VIE; and (iii) how its involvement with the VIE affects its financial position, financial performance, and cash flows. *See* ASC 810-10-50-8. However, Valeant did not make any of these required disclosures related to its VIE relationship with Philidor until it issued its 3Q15 10-Q.

C.   DEFENDANTS' FALSE STATEMENTS REGARDING INTERNAL CONTROLS

335.   Valeant has admitted that Defendants' representations during the Relevant Period concerning the effectiveness of the Company's internal and disclosure controls were false.

336.   Valeant management was responsible for establishing and maintaining effective internal controls over financial reporting and disclosure controls pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). This requirement includes annual assessments of Valeant's financial and disclosure controls and a report examining whether such controls were effective and free from material weaknesses. SOX requires that these assessments be made in accordance with a pre-determined framework, such as the "COSO Framework," described below. *See* Committee of Sponsoring Organizations, Internal Control - Integrated Framework. During the Relevant Period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework.

337.   According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity. Circumstances that may indicate that a company's control environment is ineffective include, but are not limited to, "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee." *See* Exchange Act Release No. 54976 (Dec. 20, 2006). The concept of "tone at the top" has become widely accepted within the

accounting profession to describe the attitude and actions of a company's senior management toward internal financial controls and the control environment. Indeed, the SEC Staff has described the tone set by upper management-*i.e.*, "the corporate environment or culture within which financial reporting occurs" - as ''the most important factor contributing to the integrity of the financial reporting process." *See* SEC Staff Accounting Bulletin No. 99.

338.    Control deficiencies that are determined to be a material weakness[9] must be disclosed in management's annual report on its assessment of the effectiveness of the company's internal controls over financial reporting. Management may not disclose that it has assessed its internal financial controls as effective if one or more control deficiencies are determined to be a material weakness. *See* Exchange Act Release No. 54976. Indicators of material weaknesses in a company's internal controls over financial reporting include: (i) identification of fraud, whether or not material, on the part of senior management; (ii) restatement of previously issued :financial statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. *See* AS 5.

339.    As detailed above, Defendants repeatedly represented during the Relevant Period that Valeant's internal controls could properly prevent or detect material misstatements. This

---

[9] Pursuant to Public Company Accounting Oversight Board Auditing Standard No. *5* ("AS 5"), a "material deficiency" is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

included the SOX Certifications included in each of the Company's quarterly reports and annual

reports. However, in connection with the restatement, Valeant has admitted that material

weaknesses in its internal financial controls existed during the Relevant Period, and that its

disclosure controls and procedures were not effective. Specifically, on March 21, 2016, the

Company disclosed:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over :financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 312015.

***

> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

340.   Valeant's 2015 10-K, filed with the SEC on April 29, 2016, confirms the

Company's ineffective financial controls, including the existence of two separate material

weaknesses as of December 31, 2014 (i.e., the improper ''tone at the top" and the failure to

detect the Philidor accounting fraud).

### D.   DEFENDANTS CONCEALED VALEANT'S RELIANCE ON PHILIDOR AND PRICE GOUGING

341.   Valeant also failed to disclose its relationship with Philidor, and the Company's

dependence on price increases to drive its revenue and profit growth, in the Management's

Discussion and Analysis ("MD&A") section of each quarterly and annual report filed during the

Relevant Period.

342.    With regard to Philidor, Valeant was required to disclose, among other things, (i) Philidor's impact on Valeant's revenue growth; (ii) Philidor's existence as a distinct sales channel; and (iii) that Philidor sales were unsustainable. During the Relevant Period, Valeant repeatedly emphasized U.S. organic sales growth and sales growth in its dermatology segment, as well as the role of volume increases, as opposed to price increases, on its revenue growth.

343.    As detailed above, the Valeant pharmacy network and price increases were major drivers of the Company's purported revenue and profitability growth trends during the Relevant Period, including U.S. organic sales growth, dermatology and neurology sales growth, and overall prescription volume growth.  As a result, Valeant was required to disclose the impact of Philidor and price increases on its revenue growth trends.  *See* SAB 104. However, Valeant failed to disclose Philidor in its MD&A until 3Q15.

344.    Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's traditional sales channels. The SEC Staff provides specific examples of required MD&A disclosures regarding sales channels, including "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."  *See* SAB 104, Topic 13.B. During the Relevant Period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements. The sales provisions as a percentage of gross sales increased dramatically throughout the Relevant Period, including increases of 47%, 7%, and 28% in 2013, 2014, and 3Q15, respectively. However, Defendants concealed the fact that these significant increases in provisions were tied to deceptive practices, such as routing patients into Valeant's

secret pharmacy network and the improper use of PAPs.  Valeant failed to disclose Philidor as a distinct sales channel and, as a result, its reported growth was not indicative of future performance.

345.   As described above, Philidor also employed practices to deceive TPPs.  As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable.  When private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor.  Consequently, Valeant closed Philidor.  The significant financial impact that the Philidor closing ultimately had on Valeant's future financial results, including revenues and earnings, is precisely the type required to be disclosed by Valeant under the SEC's MD&A rules.[10]

346.   Finally, Valeant's price gouging was another major driver of Valeant's revenue and profitability growth trends requiring disclosure in the Company's annual and quarterly reports.  Indeed, at the April 27, 2016 Senate Hearing, Pearson testified that 1Q13 to 3Q15 revenue growth and profitability were driven primarily by price, not volume.  When asked if he could name a single drug that Valeant acquired where it did not raise the price, Pearson responded "[n]ot in the United States."  Valeant was required to disclose its dependency on and the impact of price increases on its reported revenues and earnings, as Item 303 explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues.  Moreover, in SAB 104, the SEC Staff makes it clear that an analysis of volume and price changes affecting changes in revenue are required MD&A disclosures.  As detailed above, Valeant's dependency on price increases and their impact on Valeant's reported revenues were concealed from investors during the Relevant Period.

---

[10] Valeant was required to warn investors that its results were not indicative of future results due to the significant financial impact Valeant would suffer upon Philidor closing.

347.    The SEC MD&A rules require disclosure of material events that would cause reported financial information to not necessarily be indicative of future operating performance. Because of the unsustainable nature of Valeant's deceptive practices, Valeant was required to disclose the practices and associated risks and that its financial performance was not indicative of future results.  In October 2015, Valeant provided certain price and volume disclosures as part of its 20l5 earnings presentation.  These disclosures of how price and volume impacted Valeant's sales growth were not provided throughout the Relevant Period.  The October 19, 2015 investor presentation showed that through the first nine months of 2015, volume had declined 7% while net realized price had increased 30% for Valeant's neurology business.  This showed that without price increases, revenues for neurology would have declined. As another example, Valeant doubled its revenues from Wellbutrin XL from 2013 to 2015, despite declining volume, by repeatedly increasing the drug's price.  Valeant provided similar disclosures about price and volume in its 1Q16 10-Q filed on June 7, 2016.  However, during the Relevant Period, in violation of SEC rules, Valeant failed to provide adequate disclosures showing how increases or decreases in price and volume impacted its revenue growth.

### E.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE QUANTITATIVELY AND QUALITATIVELY MATERIAL

348.    In evaluating the materiality of financial statement items, SEC rules require that both "quantitative" and "qualitative" factors be considered.  *See* SEC Topic 1-M. [11] SEC Topic 1- M notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law" and that the FASB ''has long emphasized that materiality cannot be reduced to a numerical formula." As alleged herein, each of Defendants' Relevant

---

[11] SEC Topic 1-M provides: ''there are numerous circumstances in which misstatements below **5%** could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material.

Period misstatements and disclosure violations were quantitatively and/or qualitatively material to investors as they related to central aspects of Valeant's business, operations, and prospects.

349. Valeant has restated its financial statements for the quarter and year ending December 31, 2014 and the first nine months of 2015 disclosing that, as originally reported, its financial statements should no longer be relied upon. Valeant's financial restatement is an admission that the financial statements it issued to investors during the Relevant Period were materially false and misleading, as only materially misstated financial statements and measures need be corrected and reissued on a retroactive basis. As discussed above, the material impact of Philidor on Valeant's revenue growth is further evident from Valeant's closing of Philidor. For example, Valeant disclosed that the "Philidor separation" would negatively impact 4Q15 financial results by approximately $250 million in revenue, $0.65 in EPS, and its dermatology prescriptions would decline by 20%.

350. Each of the Philidor-related misstatements and disclosure violations were also material from a qualitative perspective. First, SEC Topic 1-M provides that quantitatively small misstatements may be material if management has intentionally violated GAAP. Here, Valeant has acknowledged that an improper ''tone at the top" and "improper conduct" of its Controller and CFO contributed to the misstatements. Second, Philidor masked Valeant's sales trends throughout the Relevant Period. Philidor was a key driver of Valeant's publicly reported, and highly touted, dermatology segment revenue growth rate. As detailed above, Valeant emphasized U.S. organic sales growth and dermatology sales growth-each of which Philidor represented a material portion. Third, SEC Topic 1-M states that ''the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." Here, when Valeant

disclosed the existence of Philidor on October 19, 2015, the price of Valeant stock plummeted over 17% in just two trading days. As reported by *The Wall Street Journal* on October 25, 2015, "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise. And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that try to purport that it wasn't enough of assets to talk about it."

351.    Finally, in addition to the foregoing quantitative and qualitative considerations, the MD&A disclosure violations and omissions were also material under SEC disclosure rules, which place an emphasis on materiality in regards to MD&A disclosure.

> Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading.

352.    *See* SEC Release Nos. 33-8350, 34-48960; FR-72.  Each of the MD&A disclosure violations and omissions discussed above were either required MD&A disclosures on their own, or at a minimum, were required in light of the existing MD&A disclosures that Valeant made regarding revenue trends.  Valeant has conceded the materiality of Philidor and the Company's price increases by belatedly making additional MD&A disclosures.

353.    The Company's Forms 10-K and 10-Q were also materially false and misleading because they failed to, as required by Item 303 of Regulation S-K, disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## VIII.   ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

354.    The Executive Defendants participated in an intricate scheme that operated for

years to defraud investors by issuing false and misleading statements about Valeant and its operating performance.  They also defrauded PBMs, physicians, and payers by creating secretive improper practices to boost sales and sale prices of Valeant products.  The Executive Defendants were personally aware of, designed, and implemented the deceptive practices described herein. The Executive Defendants were also personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics employed by Philidor by virtue of their frequent meetings, effective control over, and contractual right to review and approve Philidor's records and policies.  Additionally, the Executive Defendants had significant motives to engage in the fraudulent conduct. The following facts demonstrate their scienter.

### A.   THE EXECUTIVE DEFENDANTS DESIGNED VALEANT'S BUSINESS STRATEGY

355.   The Executive Defendants were active and culpable participants in the fraudulent scheme and course of business alleged herein because they received information reflecting the true facts regarding Valeant, controlled and received Valeant's materially misleading misstatements, and owing to their associations with the Company were privy to confidential proprietary information concerning Valeant's unsustainable business model and its reliance on deceptive practices.  The ongoing fraud as described herein was pervasive, multi-faceted, and carefully designed.  Such a sophisticated fraudulent scheme could not have been perpetrated for so many years without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Executive Defendants.

356.   Pearson was the architect of the Company's business strategy and orchestrated the dramatic price increases and deceptive business practices along with the other Executive Defendants.  Pearson implemented the strategies discussed herein when he became Valeant's CEO, *i.e.,* acquiring existing drugs, eliminating traditional R&D, and engaging in price gouging

while intentionally concealing Valeant's network of captive pharmacies.  It was a strategy well known to the Executive Defendants who designed, implemented and/or approved of the strategy that allowed Defendants to claim profit margins as high as 99%.

357.    Further illustrating his knowledge of the deceptive practices, Pearson, according to a former Valeant executive in a conversation with *Forbes,* "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." According to *Forbes*, Pearson "liked to hire cronies like his former McKinsey partner Robert Rosiello, (now Valeant's chief financial officer)," his "brother-in-law [Robert Brabandt], who was paid $299,000 a year," and "Ryan Weldon, head of Valeant's U.S. dermatology operation," who was the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon.  Other members of the Board of Directors and additional executives also had prior ties to Pearson.

358.    In addition, Pearson's knowledge can be inferred from his hands-on management style, which former employees interviewed by *Bloomberg BusinessWeek* confirmed: they described how he "had his fingers in everything, from operations to making decisions about the salaries of individual employees."  *Forbes* also confirmed that Pearson "micromanaged things he deemed important."  In fact, Pearson held weekly calls with the leaders of Valeant's business groups on Tuesdays at 11:00 a.m., during which Valeant's senior management would assess the business, address developing issues, and ensure that there were no surprises facing the Company at each quarter end.

359.    Likewise, Schiller was involved in the design of and aware of the Company's overall strategy.  During the April 29, 2015 conference call, Schiller indicated his own knowledge of Valeant's deceptive practices when he commented on his resignation as CFO and confirmed the role that he and Pearson played in implementing the non-traditional practices,

stating that, "Mike [Pearson] sets the tone at Valeant" and adding, in part:

> I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our relentless focus on building a great Company and on creating shareholder value.
>
> . . . . Valeant's business has never been stronger and its prospects have never been brighter....

360.    In addition, Valeant documents, former Valeant/Philidor employees, and sworn testimony confirm that the Executive Defendants were directly involved in the business and pricing strategies implemented by Valeant.  In particular, they had extensive discussions about the role of price increases in feeding company growth.  For example, in a meeting in July 2015, Pearson met with Rosiello, Carro, Stolz (Senior Vice President of Neurology/Dentistry/Generics), Craig Olson (Vice President of Finance), and Lalilt, and decided to raise the price of Cuprimine by 400% from approximately $6,500 for 100 capsules to over $26,000.

361.    Another example of the Individual Defendants' role in setting prices occurred shortly after Valeant acquired Isuprel and Nitropress.  Pearson, Schiller, Komwasser, Andrew Davis, Steve Sembler (former Senior Vice President of Neurology and Other), and Sandeep Lalilt (Senior Director of Marketing) held a meeting to discuss pricing.  *The Wall Street Journal* reported that Pearson wanted to dramatically increase prices to reach profit targets, while the rest of the group recommended smaller price increases implemented over time.  At the Senate hearing, Schiller confirmed that despite the recommendation of the business unit, "Mr. Pearson made a decision to go with the higher price."  In a written statement to the Senate Committee, Pearson admitted that he, "as [Valeant's] leader, was too aggressive in pursuing price increases on certain drugs."  At the Senate hearing, Pearson confirmed his hands-on style, testifying in response to questions about patient complaints that ''we do track every patient that calls and

make sure that it's run to the ground" and "I read the reports."

362.    In a May 28, 2014 conference call with investors, as further evidence of the Executive Defendants' hands on approach, and therefore scienter, Schiller noted how carefully he and Pearson pay attention to each transaction, to the point that they "religiously track each deal on a quarterly basis. Our Board of Directors receives a report every quarter on each deal. We review every quarter and ask ourselves how are we doing, we are our own biggest critics." Later the same day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson reiterated Schiller's point by confirming, "we're tracking every product around the world."

363.    Moreover, throughout the Relevant Period, the Executive Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, and strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products.  The Executive Defendants voluntarily and repeatedly chose to discuss these issues throughout the Relevant Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein, while making the specific and detailed statements alleged herein.

364.    For example, during a May 21, 2016 RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do and our long-term investors appreciate it." He also said "I believe that our company is fundamentally undervalued" and that "last year when we were trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys rush in? Not just you guys but I mean investors clearly we weren't worth [only] 105."

365.    During the Relevant Period, the Executive Defendants, as senior executive officers and/or directors of Valeant, were privy to confidential and proprietary, non-public information concerning Valeant's operations, finances, financial condition, and present and future business prospects, including in connection with due diligence undertaken as part of Valeant's acquisitions, via internal documents and conversations with other officers and employees, and/or attendance at management and/or board of directors meetings and committees thereof.  Because of their possession of such information, the Executive Defendants had the ability and opportunity to prevent the issuance of the Company's reports and releases alleged herein to be false or misleading and/or to cause them to be corrected.  The Executive Defendants' materially false and misleading statements during the Relevant Period violated their duty to promptly disseminate accurate, full, and truthful information with respect to Valeant's operations, business, financial statements, and financial metrics, so that the market price of Valeant securities would be based upon truthful and accurate information.

366.    The level of involvement in the day to day operations of the Company goes beyond general awareness of corporate executives of the workings of their companies.  As explained above, Perason, Schiller, Rosiello and Carro held meetings to determining by how much to raise prices.  They also held meetings with Pearson's former employer, McKinsey, to strategize about pricing.  As his former employees stated, Pearson had his "fingers in everything."  Given these facts, and that the key Valeant executive who was on the ground at Philidor reported directly to Pearson, it is reasonable to infer that he was aware of the fraudulent practices that allowed for the price increases.

367.    Moreover, by executing SOX certifications in periodic reports, Pearson, Schiller, and Rosiello assumed the responsibility of obtaining the requisite knowledge to ensure the

Company's disclosures to the market were true.  Beyond signing the certifications, Pearson, Schiller and Rosiello also participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements complained of herein and because of their managerial positions had control over the information that was disclosed and the true facts relating to those disclosures.

### B.   THE EXECUTIVE DEFENDANTS CLOSELY MONITORED, AND ULTIMATELY CLOSED, PHILIDOR

368.    The Executive Defendants were personally aware that Valeant used Philidor and its secret network of pharmacies to engage in the deceptive practices that enabled Valeant to engage in price gouging to boost profits.  They also knew that the relationship was being concealed.

369.    For instance, from the start, the Executive Defendants were intimately involved in the acquisition of Medicis, which soon after led to the formation of Philidor.  Gary Tanner had been at the helm of Medicis's AF strategy.  The Executive Defendants decided to retain Tanner, and to promote him several times, so that he might implement the AF strategy within Valeant/Philidor.  The AF strategy was simply a euphemism for the deceptive practices that underlay Valeant's price gouging.  Additional information about Tanner's involvement at Philidor, and the Executive Defendants' knowledge thereof, is detailed *supra* Section IV. B.

370.    In addition, Komwasser served as a liaison to Philidor, and he reported directly to Pearson.  Komwasser's position and $8.8 million in total compensation in his first year of employment demonstrate that Philidor was of critical importance to Valeant.

371.    Additionally, Pearson, Schiller, and senior management signed the Philidor agreements.  While Philidor's relationship with Valeant was concealed from investors, the Executive Defendants knew that Valeant employees assisted in the formation of Philidor and

worked at Philidor, where these employees (both while still employed at Valeant and after transferring to Philidor) would oversee the deceptive business practices designed to artificially boost the sales and sale prices of Valeant drugs.

372.    Before obtaining the option to acquire Philidor, Pearson, Schiller, and Valeant's Board of Directors performed due diligence, including multiple site visits at Philidor.  Notably, before Valeant's $100 million payment to Philidor, Valeant's senior management and members of the Board, including the entire Audit Committee, went on site visits to Philidor.  On these visits, Valeant was provided further access and exposure to Philidor's business practices and operations.  After the payment, Valeant intentionally avoided disclosing its relationship with Philidor in its financial statements.  Additionally, Valeant's entire Board of Directors, including the Finance and Transactions Committee and the Audit and Risk Committee, reviewed and approved the Philidor transaction and accounting treatment that violated GAAP.

373.    Valeant effectively controlled Philidor from the day it was created.  Philidor was formed to orchestrate Defendants' fraudulent scheme to inflate revenues. Valeant had a contractual right to inspect Philidor's books, records, and facilities and to audit its practices for compliance and either did so, and knowingly approved of the deceptive practices, or was severely reckless in failing to do so.  As Philidor employees have confirmed, the deceptive practices were widely known, discussed, and even documented in Philidor's training manuals.

374.    Moreover, Valeant included Philidor in many of its own operations, procedures, and documentation.  Philidor was included in Valeant's internal control testing and internal audit program for 2015.  Valeant and Philidor formed a joint steering committee which held regular meetings to discuss, among other things, Philidor's "Strategic Plan," contractual obligations with TTPs, and "internal policies, manuals and processes."

375.    As a further example that Pearson was personally monitoring Philidor's practices, on March 9, 2015, Kellen sent an email to Pearson updating him on their earlier conversation stating "Met with Deb [Jorn].... Suggested we get all the DMs [District Managers] in for a day... goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out. That [sic] will help fuel growth."  Pearson responded, "Good stuff."  Philidor managers were invited to meet with Valeant's board in July 2015.

376.    Valeant also exercised more active control over its network of captive pharmacies because Defendants also monitored the network of pharmacies through which Philidor operated. For example, Valeant made approximately 75 shipments to R&O between January and August 2015 and received millions of dollars in payment directly from R&O in return.  On September 4, 2015, after R&O began withholding invoices upon suspicion of fraudulent conduct, Valeant's general counsel sent a letter to R&O's owner seeking "immediate payment."  In the October 19, 2015 conference call, Pearson told investors that R&O was a part of the Company's specialty pharmacy network and discussed the lawsuit.

377.    On October 19, 2015, as questions about Philidor arose, Pearson, at a conference attended by Rosiello and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors."  Pearson repeated this at the October 26th conference attended by Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen and added that Philidor was purportedly "independent" and sales through it were "less profitable."  But just days later, on October 30, 2015, Valeant announced Philidor would cease operations as Philidor's improper practices were publicly revealed. Defendants' decision to shut down Philidor so quickly, rather than

investigating to confirm the devastating allegations, shows they were aware of Philidor's deceptive practices.

378.    Pearson repeatedly spoke of the purported benefits of the AF strategy during the Relevant Period but refused to provide details of the particular practices when asked.    In addition, when Valeant's relationship with Philidor was uncovered, Pearson admitted that it was a conscious decision to conceal Philidor for purported "competitive" reasons, and Ingram made clear that the Board ''has fully supported the company's specialty pharmacy strategy."

379.    The Executive Defendants also had knowledge of the accounting violations associated with Philidor.    When Citron issued its report questioning whether Valeant was inflating revenue through Philidor, Pearson, Ingram, and Carro all publicly defended Valeant's accounting.    On October 26, 2015, Ingram noted that the entire Board and Audit Committee had reviewed and confirmed the appropriateness of the accounting relating to Philidor.    The 3Q15 10- Q Valeant filed that same day, signed by Pearson and Rosiello, repeated this fact. In a conference call with investors, Ingram forcefully defended Pearson, saying, "I also want to reiterate the Board's complete and total faith in Mike Pearson" because "[h]e operates with the highest degree of ethics and he has the Board's unanimous support."    However, once the SEC investigation was underway, Carro and Schiller were asked to leave for engaging in "improper conduct" related to the accounting.    Valeant admitted it had improperly inflated revenues through Philidor and would need to restate its previously issued financial statements.

380.    Finally, the efforts by Philidor to cover up its wrongdoing further support an inference of scienter considering Valeant's effective control over Philidor.    Specifically, as reported by Reuters, starting in September 2015, "Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information

about its activities."  The fact that Philidor compelled its employees to sign such agreements, two years after it began operations and just after the R&O dispute and government inquiries, demonstrates such efforts were intended to conceal wrongdoing rather than protect purported business secrets.

### C.   EVIDENCE OF SCIENTER FROM THE US ATTORNEY'S COMPLAINT AGAINST TANNER

381.    As explained above, Tanner had been employed at Medicis and was retained at a high level within Valeant to foster its AF program and its relationship with Philidor.  The US Attorney's complaint against Tanner, currently pending in the United States District Court for the Southern District of New York, sheds further light on the Executive Defendants' knowledge of the misconduct that was occurring at Philidor, as directed by Tanner's direct oversight.

382.    According to the US Attorney's complaint against Tanner and Davenport, Tanner "had direct access to senior management of Valeant."  Further, "[i]n documents that were later prepared for Valeant's Board of Directors, Valeant recognized Tanner as a 'key organization talent' that Valeant retained after acquiring Medicis."  The US Attorney's complaint further states:

> By April 2013, Valeant had appointed TANNER to be the Senior Director for the "Access Solutions Team," which was responsible for Valeant's AF initiatives and patient access programs, among other things.  TANNER was later promoted to the position of Vice President responsible for Access Solutions.
>
> During TANNER's employment by Valeant, TANNER occupied a managerial position of trust at the company.  In particular, TANNER supervised programs that were responsible for generating hundreds of millions of dollars in sales for Valeant; he reported to and had access to Valeant's top executives, including the company's CEO, on various issues; and he interacted directly with Valeant's customers, suppliers, and auditors as an executive of Valeant.
>
> Over the course of TANNER's work for Valeant, TANNER proposed and assumed responsibility for supporting and supervising the operation of Philidor, a new mail-order pharmacy that, as described in greater detail below, assumed an increasingly large role in Valeant's AF program and its financial performance.

As part of TANNER's work at Valeant on supporting and growing Philidor, TANNER interacted directly with Philidor's executives, including ADNREW DAVENPORT, the defendant.  TANNER also supervised employees who worked partially or wholly out of Philidor's out of Philidor's offices in Pennsylvania, including sales and managerial staff employed by Valeant and certain staff employed by Philidor.  Even while TANNER served in this capacity at Phildor, however, TANNER was still considered and treated as a Valeant employee, receiving compensation, performance ratings, and compliance training from Valeant.

*** 

During TANNER's time as a Valeant employee, Valeant paid TANNER millions of dollars in salary, bonuses, stock options, and restricted stock options to represent its interests.

383.    The US Attorney's complaint further explains that "From in or about 2013 until 2015, Valeant Executive-1 oversaw numerous business units within and affiliated with Valeant, including Philidor.  Valeant Executive-1 reported directly to Valeant's former CEO.  During the relevant time period, GARY TANNER, the defendant, reported to Valeant Executive-1, first indirectly and then directly for a period of time."

384.    Furthermore, during a Philidor site-visit, "Valeant Executive-1 noticed that TANNER appeared to have an office inside Philidor, had access to Philidor's entire office facility, and acted as if he had a managerial role at Philidor."  This executive "understood [TANNER] was providing advice to Philidor's sales team."  These observations purportedly caused the anonymous executive to be concerned, and he "shared his concerns about TANNER with other senior executives at Valeant."

385.    In addition to "Valeant Executive-1," Valeant's Chief Compliance Officer "also had concerns that TANNER may have a financial interest in Philidor," and he "raised these concerns to other Valeant executives."

386.    Moreover, Valeant Executive-1 repeatedly urged Tanner to diversify the pharmacies that would be used to dispense Valeant products, in large part to lessen the risks associated with becoming "overly dependent on Philidor."  These concerns were also raised by two other senior executives in emails to Tanner.  However, Tanner told the executives that "he was too busy building Philidor to enter into arrangements with other pharmacies, or that alternative arrangements would compare unfavorably to Philidor."  The US Attorney's complaint concluded that "[a]s a result of TANNER's failure and/or refusal to diversify the AF program, Valeant did not mitigate payer risk . . . and it became increasingly dependent on Philidor to achieve its sales and growth targets."

387.    According to the US Attorney's complaint, Tanner also provided updates regarding Philidor to Pearson and Schiller.  For example, on

> September 5, 2014, TANNER sent an email to Valeant's CEO, Chief Financial Officer, and other senior executives in which TANNER touted Philidor's performance and stated, "Given the performance through the first half of the year and specifically the significant update of the program yielding results far greater than expectation, I temporarily ceased publishing this summary knowing the performance was exceeding expectation."

In addition, "On September 17, 2014, TANNER met with Valeant's CEO and emailed the CEO a 20-page presentation which described Philidor's growth over time and touted its future prospects."

388.    It is unreasonable to infer that the Executive Defendants were unaware of Tanner's misconduct in interacting with Philidor when he reported directly to them, and had responsibility for such a large portion of Valeant's business.  In addition, they voiced concerns about Tanner, directly to Tanner and to each other, but did not follow through to ensure that their concerns were addressed.  Further, he sent them updates regarding Philidor, including that its growth was far ahead of expectations, which should have raised a red flag concerning Philidor's

operations.  Finally, they never disclosed their concerns regarding Tanner and his affiliation with Philidor, including the Company's reliance on Philidor, to investors.  At a minimum, they recklessly disregarded the risks that Valeant prescriptions filled by Philidor were tainted by deceptive and improper practices.

### D. VALEANT REFUSED TO PURSUE REMEDIES AGAINST WRONGDOERS

389.   Despite the availability of various remedies, Valeant failed to pursue them against Pearson, Schiller, Philidor and its executives.  This failure to pursue available remedies supports an inference that it approved the deceptive business practices alleged herein, because Valeant could not pursue remedies for the very wrongdoing it condoned.  Thus, it was limited to terminating the employment of the wrongdoers and shutting down Philidor.

390.   In 2014, Valeant instituted a clawback policy, allowing the Company to recover incentive compensation from management if a restatement is required within three years of the relevant period and an executive is found to have participated in fraudulent or illegal conduct.  However, as Ingram noted, the Board approved the accounting for Philidor and thus, notwithstanding this clawback right, Valeant's Board has taken no public action to recover payments to Pearson, Schiller, or the other executives.

391.   To the contrary, the Company retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, along with other financial benefits, although Pearson was only supposed to receive a performance bonus but no salary for 2016, a month after announcing that Pearson would be replaced as the CEO.  Valeant has since provided him a $9 million severance.

392.   Similarly, Valeant's purchase option agreement with Philidor provides Valeant with broad indemnification rights, including that Philidor "shall indemnify, defend, and hold

harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."   However, the purchase option agreement further provides that such liability "shall be reduced by the extent ... that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer."   Consistent with this exception, rather than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015.

### E.   VALEANT ADMITTED ITS WRONGDOING

393.   Valeant not only condoned wrongdoing, but it also actively engaged in and admitted to it. As detailed above, Valeant has admitted that several Defendants' Relevant Period statements were false and misleading, that Carro and Schiller engaged in improper conduct, and that Valeant had an unethical "tone at the top."

394.   On February 3, 2016, Valeant admitted that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false. On February 22, 2016, Valeant issued a press release wherein the Company stated it had improperly recognized revenues. Furthermore, on March 21, 2016, the Company issued a press release and Form 8-K disclosing that it had material weaknesses in internal controls and the 2014 10-K and three 10-Qs during 2015 could no longer be relied upon.

395.   Further, Schiller was accused of "improper conduct" and the Company "determined that the tone at the top of the organization and the performance-based environment ... may have been contributing factors resulting in improper revenue recognition."[12] Valeant

---

[12] Valeant regularly reported non-GAAP financial disclosures in an effort to make Valeant appear more profitable.  On December 4, 2015, the SEC raised concerns regarding the "overall format and presentation of the non-GAAP measures" and regarding the prominence given to such numbers. In a March 18, 2016 letter to the Company, the SEC noted that "over the past four years, you have reported approximately $9.8 billion of non-GAAP net income" compared to

asked Schiller to resign from the Board and forced Pearson and Carro out, quickly replacing them.

396.    Finally, during a conference call on October 26, 2015 in which the three members of the Audit Committee (Norma Provencio, Theo Melas-Kyriazi and Katherine Stevenson), Schiller, Pearson, Carro, Rosiello, and Kellen participated, Lead Independent Director Ingram admitted that the Audit Committee of the Board and the full Board had approved the Company's (improper) accounting for Philidor. Slides accompanying the call stated that the "Finance and Transactions Committee, Audit and Risk Committee and [the] Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

### F.    THE CONGRESSIONAL HEARINGS ARE FURTHER EVIDENCE OF VALEANT'S SCIENTER

397.    Congressional committees began investigating Valeant's business practices in 2015. Numerous admissions during the course of these investigations further support an inference of scienter.  In particular, Pearson acknowledged repeatedly that Valeant's business model was price gouging, which he stated was unsustainable.  It is reasonable to infer that, with such detailed knowledge of Valeant's pricing, Pearson and the other Executive Defendants were aware of the deceptive and fraudulent practices accomplished through Philidor and other captive pharmacies that permitted Valeant to charge such high prices.

### 1.    February 4, 2016 House Oversight Committee Hearing

398.    Valeant produced 75,000 pages of documents to the House Oversight Committee.

---

having "reported [a] GAAP net loss of approximately $330 million.'' The Executive Defendants' insistence on providing opaque and misleading disclosures and resistance to the SEC's  repeated requests for reform further supports an inference of scienter.  On April 8, 2016, the Company informed the SEC it would change its approach to non-GAAP financial measures.

A summary of those documents corroborates the allegations herein by confirming that the Defendants purposefully used price increases to foster growth: (i) "Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices;" (ii) "Valeant identified goals for revenues first, and then set drug prices to reach those goals;" (iii) "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems;" (iv) Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly;" and (v) "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress" as Valeant had increased the prices of 20 prescription drugs by more than 200% from 2014 to 2015.

399.    During this hearing, Schiller also demonstrated his intimate familiarity with and knowledge of Valeant's drug pricing practices.    In his prepared testimony, Schiller acknowledged that Valeant had acquired Nitropress and Isuprel in February 2015 and that even though they were only two of 1,800 total Valeant products (0.1%), they accounted for 4% of full year 2015 revenues (and even more of Valeant's profits given their 99% margins).    Schiller further acknowledged that federal anti-kickback laws prohibited the "patient assistance" programs Valeant provided.

400.    At the hearing, Schiller also admitted that the Company's price gouging practices concealed various risks, which included: "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

401.    In addition, Schiller effectively admitted that Valeant's business strategy was neither sustainable nor more profitable than a traditional R&D strategy, a notion which Defendants previously denied repeatedly during the Relevant Period.    Schiller did so by

acknowledging ''we made a lot of mistakes" and would no longer pursue such "aggressive" price increases, but would instead be lowering prices.  Schiller also admitted Defendants were ''too aggressive" in raising the prices of Nitropress and Isuprel, and said "[w]e are not going to be looking for those kinds of acquisitions going forward."  Furthermore, in contrast to Valeant's earlier business model and representations, Schiller also acknowledged that going forward, Valeant would spend more heavily on R&D.

402.  Schiller also admitted, when asked by Representative Maloney, that ''price increases represented 80 percent of [Valeant's] growth for the first quarter of 2015."  When asked if Pearson's statement, "do not bet on science, bet on management," was Valeant's operating philosophy, Schiller responded that the Company was "chang[ing] quite a bit."

403.  At one point, Chairman Chaffetz asked Schiller to identify all of the factors that Valeant considered when raising prices, and when Schiller omitted to mention that increasing profits was a factor, Chairman Chaffetz stated that Schiller was "lying" and being "disingenuous."

404.  Representative Cumming confronted Schiller with Valeant's price increases, and even though Schiller would not confirm each specific price increase, he confirmed their general thrust.  Representative Cummings said Valeant's documents showed "[t]heir basic strategy has been to buy drugs that are already on the market and then raise the prices astronomically [for a] temporary period of time before other competitors enter the market" and noted reports that "in 2014, Valeant led the industry in price hikes, raising prices on 62 [drugs]" by "an average of 50 percent" with Glumetza, a diabetes drug, increasing "by a whopping 800 percent over a mere six-week period."  Schiller said he was "not familiar with all those numbers" but "directionally, that is true."  Representative Cummings complained that Valeant had "refused my previous

request and obstructed our abilities to investigate their actions."

405.    After the hearing, members of the House Oversight Committee continued to emphasize that Valeant was not being cooperative.  For example, in September 2015, Valeant asserted privilege over various documents, but by March 2016 members of Congress complained that Valeant had still not produced a privilege log.

406.    In a further inquiry, on April 12, 2016, Representative Cummings sent another letter to Pearson stating "[y]our refusal to cooperate fully with Congress is extremely troubling and reflects a pattern of obstruction. . ." Cummings said he had asked on November 16, 2015 that Valeant make Tanner, Pritchett, and Patel available for interviews but that Valeant had "failed" to do so.

### 2.       Senate Aging Committee Hearing

407.    On April 27, 2016, the Senate Aging Committee also held hearings relating to Valeant. Pearson (who had been terminated as CEO after returning from a leave of absence) along with Schiller and Ackman testified. During the hearing, Pearson and Schiller displayed their intimate familiarity with and knowledge of the Company's drug pricing practices.

408.    In a written statement, Pearson admitted that "the company was too aggressive— and I, as its leader, was too aggressive—in pursuing price increases on certain drugs."  He said he "regret[ted] pursuing transactions where a central premise was a planned increase in the prices of the medicines, such as our acquisitions of Nitropress and Isuprel."

409.    Pearson further acknowledged in his written statement:

> **In retrospect, we relied too heavily on the industry practice of increasing the price of brand name drugs in the months before generic entry.** Instead, in my view, we should have abandoned the transaction with Marathon **when it became clear the expected arrival of generic competition made the economics of the deal dependent on significant price increases.**

410.    Pearson also admitted that Valeant's "pricing has driven more growth than volume, although that is changing over time."   He further admitted ''we have also made mistakes, including those that bring me here today."

411.    Senator Kaine noted that Pearson previously claimed Valeant's business model was not fully understood by all investors and the Company had "nothing to be ashamed of." When Senator Kaine asked if Pearson still felt that way, Pearson testified ''No . . . we have been too aggressive on pricing."   Pearson also admitted he had raised prices higher than Valeant's consultants recommended.

412.    Pearson confirmed the correctness of Senator McCaskill's observation that, since 2013, price had been more responsible for growth than volume in all quarters except one. This admission contradicted Pearson's April 29, 2015 statement and his October 14, 2015 letter to Senator McCaskill, wherein Pearson claimed "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

413.    As an example of this tension between Pearson's oral testimony and his previous written responses, Pearson's October 14, 2015 letter to Senator McCaskill claimed that Nitropress and Isuprel were only "two of the approximately 209 prescription products sold by Valeant" and that "[b]road conclusions about Valeant cannot be drawn from the pricing or history of any one drug or set of drugs." But this statement was misleading because far from raising prices on just two of 209 products, Valeant had raised prices (in just 2015 alone) on 85 of its 156 "U.S. Branded Pharma" products by an average of 36%. At the hearing, Pearson was asked if he could name a single drug that Valeant had acquired where it did not raise the prices and he conceded, "[n]ot in the United States."

414.    The Congressional committee hearings exposed other false and misleading statements that Defendants had made to investors during the Relevant Period. For example, Pearson claimed in his October 30, 2015 letter to Senator McCaskill that "for those institutions where the impact was significantly greater, we are beginning to reach out to hospitals to determine an appropriate pricing strategy." Soon thereafter, Valeant announced a 30% discount program for hospitals. Yet, at the hearing, Senator McCaskill noted that she had not found a single hospital that had received the discounts. Hospital-affiliated witnesses at the hearing also denied receiving the discounts and several more sent letters to the Senate Aging Committee also attesting to not receiving any such discounts.

415.    For example, Cleveland Clinic noted that it called Stolz of Valeant to ask about the discounts, and Stolz promised to get back to them but never did. Similarly, University of Utah Health Care wrote to the Senate Aging Committee that "Valeant noted in a letter to Ranking Member McCaskill that their company would be reaching out to hospitals that were impacted by the new pricing" but when they called "Valeant refused to talk to me about better contracted prices." Valeant essentially conceded that Pearson's claim was inaccurate, when, on April23, 2016, Stolz submitted a written response admitting that "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel" but had entered into contracts with only three hospital groups. Valeant issued a public statement that they formed a committee which was working to "develop solutions so any hospital that is eligible for discounts on Nitropress and lsuprel receives them," and Stolz left the Company.

416.    Moreover, Senator Collins during the hearing pointed out that Valeant did not merely raise prices haphazardly, but followed a systematic strategy that "appears to be based on

careful study of the FDA approval process.  The Company knows it often takes years before generic competitors can clear the hurdles imposed by that process to enter the market and to compete.  During that period, Valeant exploits its de facto monopoly."  Senator Collins further stated, "[i]t is also apparent that these medications make an out-sized contribution to the company's net income, we can find nothing to explain these dramatic price increases beyond Valeant's desire to take advantage of monopoly drugs."  As an example, she noted that in February 2015, "Valeant paid just $40,000 for the Isuprel [while] it sold and it made more than $17 million in net income on that one drug alone."  Pearson conceded that her "figures are correct from a gross margin standpoint."

417.    Senator McCaskill commented that "[e]ven Valeant's patient assistance program appears to be set up solely to increase Valeant's bottom line," with Senator Collins adding that Valeant's PAP was used "so that you can still get the payments primarily from commercial insurers, which dwarf the amount that you're giving in customer assistance."

418.    Senator Warren asked Pearson, "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid, "to which Pearson acknowledged "we're not allowed to."  Warren responded, "Yeah, because it's illegal . . . because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."

419.    Finally, in connection with the Congressional probes, Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0.  Philidor's counsel, in a written response, said that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor."  Thus, Philidor confirmed that Valeant knew PBMs would

refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship.

### G.   EXECUTIVE DEPARTURES

420.    An inference of scienter can also be drawn from the timing of widespread executive and director departures, including many of the Executive Defendants, just shortly before the public revelations of Valeant and Philidor's deceptive practices.  In total, 12 senior executives and board members were forced out of Valeant, including its CEO, CFO, controller, audit committee, head of dermatology and most members of its board of directors.

421.    On April 29, 2015, just a few months before the scandal would reach the public and just after it issued misleading 2014 financial statements, Valeant announced that Schiller would be leaving his position as CFO once a successor was appointed.

422.    Komwasser left the Company in July 2015.  CNBC subsequently attempted to contact Komwasser, but received a call from Valeant's crisis management department who said Komwasser was not interested in discussing Valeant or Philidor.  Representative Cummings noted Komwasser was never made available when the House Oversight Committee asked Valeant to produce him for an interview.

423.    On August 25, 2015, the Company issued a release announcing that Jeffrey W. Ubben, a Valeant Board member and founder of activist investor ValueAct (Valeant's fourth largest shareholder), had resigned from the board.  Notably, before his resignation, Ubben, through ValueAct, sold 4.2 million shares of Valeant stock on June 10, 2015 for nearly $1 billion at close to peak prices.  He had held these stocks for many years.

424.    On or about March 2, 2016, it was reported that Jorn, head of the U.S. Gastrointestinal and Dermatology divisions, was "leaving the company effective immediately." Jorn was responsible for some of Valeant's top selling drugs, including Jublia, a dermatology

drug which was sold in massive quantities through Philidor.

425.    On March 21, 2016, Valeant issued a press release regarding the restatement and material weaknesses of its internal controls.  It also confirmed Pearson would be leaving the Company.  Moreover, the Company admitted that Schiller and Carro engaged in "improper conduct" and provided inaccurate information to the Ad Hoc Committee investigating the false revenues.  Schiller was asked to resign from the Board.  Carro was replaced as controller.

426.    After joining the Board, Ackman was asked by media and Congress about the corrective actions Valeant was taking and he responded by noting Pearson's replacement as CEO and a "lot of the board is going to turn over, so we're going to have a new board for the most part."

427.    On April 29, 2016, Valeant announced that seven of its board members would not be standing for re-election.  This included Pearson and Schiller, as well as Morfit (of ValueAct), Provencio (chair of the Audit Committee), Goggins, Ronald Farmer, and Melas-Kyriazi (member of the Audit Committee).  Notably, Provencio, Goggins, and Morfit were also members of the Ad Hoc Committee.

428.    On May 20, 2016, Valeant stated in a filing with the SEC that Stolz had resigned as Senior Vice President of Neurology, Dentistry and Generics.  Stolz had been involved in both the price increases and the purported pricing discounts Pearson promised Congress but failed to deliver.

### H.    PEARSON'S MISREPRESENTATIONS TO ACKMAN

429.    Further evidence of scienter can be found in the fact that Pearson concealed his deceptive practices from Ackman, a large investor with whom Pearson had a cooperative business relationship.  For instance, during the Allergan takeover fight, although Ackman met

with Pearson on many occasions to discuss Valeant's business, Pearson kept him in the dark regarding its deceptive practices, while using him to defend Valeant's business model and to refute Allergan's claims.

430. As background, in 2014, Ackman, who controlled one of the Company's largest stakeholders (Pershing Square), met with Pearson to form a partnership between Valeant and Pershing Square in an effort to take over Allergan. According to the plan, Pershing Square would acquire stock in Allergan both to assist in providing shareholder support and to validate the value of Valeant's stock.

431. Pershing Square is, as Ackman has described, an investment company whose business is to thoroughly investigate companies before taking large investment positions. In an October 2014 deposition, Ackman testified that because Valeant was attempting to acquire Allergan with Valeant stock, Pershing Square "had the benefit really for the first time of doing due diligence on a company with full access to management and access to inside information, so we could vet Valeant as a company, we could assess its value and we could have helped, you know, vet the credibility of the currency [Valeant's stock]."

432. When Allergan resisted Va1eant's takeover attempt and challenged the sustainability of Valeant's business and its pricing practices (which claims Valeant denied), Pershing Square engaged in further due diligence before investing $4 billion in Valeant in early 2015. Ackman and Pearson had frequent contact, through calls, emails, and dinners. Ackman also introduced other investors to Pearson, offered to help Pearson prepare for earnings calls, and gave advice after those calls. In short, during 2014 and 2015, Ackman had numerous conversations with Pearson about Valeant's business.

433.    Despite these extensive contacts and Ackman's "full access to management,'' Pearson concealed the extent of Valeant's price gouging and other deceptive practices from Ackman, in order to have Ackman publicly endorse Valeant's "currency," i.e., stock value, during the attempted Allergan acquisition and defend Pearson and Valeant's business practices. For example, on April 22, 2014, Pearson emailed Ackman, asking him to "emphasize [the] quality of our company" to the media.

434.    Pearson used Ackman to defend Valeant against others' criticism, as well. On April 9, 2015, Ackman emailed Warren Buffett in response to criticism of Valeant and Pearson by Buffett's partner, Charlie Munger, vice-chairman of Berkshire Hathaway. Ackman mounted a vigorous defense of Valeant, writing that Munger "has gotten this one wrong," that "[w]e have gotten to know Valeant and Pearson well over the last year," and that others also "hold Mike Pearson in extremely high regard." Ironically, Ackman claimed that Pearson was "an extremely direct person," and offered to set up a meeting to "meet Mike Pearson and ask him anything you would like." Ackman continued stating "Mike would like the opportunity to clear his reputation in response to Charlie's recent comments." Buffett suggested that Ackman contact Munger directly.

435.    Ackman believed in Valeant's fundamental strength because of Pearson's misrepresentations and omissions. Thus, Ackman defended Valeant all the more vigorously. On April 11, 2015, in an e-mail to Munger, Ackman claimed there "was a lot of misinformation disseminated by Allergan about Valeant," and "[p]erhaps that is the source of your misinformation." Ackman asked him to meet with Pearson, stating, "I think you have the facts wrong,'' and "it seems fair that you would give Mike an opportunity to respond to your concerns . . ." Further demonstrating Ackman's belief that Allergan's claims were false and revealing the

extent of his ignorance about the true state of affairs at Valeant, Ackman even claimed that Pearson followed a "rational approach to operations," and that "Valeant stock has been and continues to remain perennially undervalued," even though it was trading at over $200 per share.

436.    Even as late as October 6, 2015, Ackman had not been told of the extent of Valeant's price gouging. In a media interview that day, Ackman claimed a "[v]ery small part of Valeant's business is repricing drugs" and said it was price increases by other companies that were resulting in Valeant getting "dragged into the story." Ackman went on to claim that Valeant was "the most undervalued" stock Pershing Square owned at the time.

437.    After the truth regarding Valeant's deceptive practices came to light and Ackman joined the Board, he dramatically reversed course in his defense of Pearson and Valeant's business practices. Ackman testified to the Senate under oath that he was unaware of what he called the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cuprimine, Isuprel, and Nitropress, and testified that Pershing Square did not approve of the "rapid and large increases in the prices of certain drugs." Ackman testified, "[c]lear1y [there] were things I did not understand about the business." Ackman also told the Senate Aging Committee, and repeated on CNBC and in other media interviews, that replacing Pearson as CEO was "appropriate."

438.    After the disclosures, Munger's criticism was even sharper, stating "Valeant of course is a sewer, and those who created it deserve all the opprobrium that they got." Buffett added: "I don't think you'd want your son to grow up and run a company in the manner that Valeant was run." This time, rather than defend Pearson, as he had to Munger and Buffet in the past, Ackman essentially conceded Pearson's misconduct by stating only that "it is not fair to indict an[] entire company based on the actions of a few."

I. **Valeant's Executive Compensation Structure Provided them a Motive to Engage in Fraud**

439.   Valeant's unusual compensation structure, which was heavily dependent on increasing the value of its stock, provided a motive to commit fraud.  Valeant's unusual compensation structure provided incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination.  As Pearson described it, "[i]f a business does not make money, we either exit the business or we fire the person running that business.  Usually we fire the person running the business." This emphasis on results over ethics led to a culture of fraudulent practices.

440.   For example, at a May 28, 2014 conference, Pearson stated ''there's been a lot of turnover at the senior ranks; but that has been, by and large, our decision, not their decisions, as we continue to upgrade talent."  Pearson bluntly acknowledged "[t]here's no tenure at Valeant. It's up and out. ... It's more like a professional services firm than a sort of traditional pharmaceutical company."  Pearson also admitted that the compensation system at Valeant was entirely dependent on increasing the stock price, stating:

> So, our Company senior management and the Board-- we-- t**here's only one metric that really counts, and it's total return to shareholders. That's how we're paid.** We have a unique pay model, that at least we -at least -- **if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing**.

A December 12, 2013 Board of Directors presentation regarding Valeant's 2014 budget reflected these aggressive targets. The presentation noted that "[b]udget reflects stretched targets for all business units," and there would be "[n]o bonuses to be paid for performance <90% of base budget."

441.   While Valeant provided the stick of missing budgets that was punished with forfeiture of bonuses or worse, Valeant also provided a carrot to its highest ranking executives,

who stood to receive potentially millions and even hundreds of millions of dollars for achieving the increasingly aggressive financial targets. For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million. However, under the bonus program they could earn multiples of their base salary. Thus, Pearson received an $8 million bonus, an amount equal to 4 times his base compensation, and Schiller received a $2.4 million bonus, nearly 2.4 times his base compensation.

442. Yet these lavish salaries and bonuses paled in comparison to the rewards for bringing Valeant's stock price as high as possible until 2017. Industry observers noted that Valeant's compensation scheme paid Pearson "like a hedge fund manager." For example, on April 22, 2014, the Company filed a proxy statement with the SEC disclosing that Pearson's shares of Valeant stock on March 31, 2014 were worth approximately $1.3 billion. During an April 22, 2014 presentation in New York, Ackman appeared with Pearson and referred to the $1.3 billion, stating that "this is one of the more unusual and leveraged shareholder aligned compensation packages we've ever seen." Ackman also highlighted that a large portion of Pearson's compensation was tied to the grant of performance share units that vest only if he delivered incredibly aggressive annual returns over three years of between 15% and 60%, which compounded each successive year.

443. The compensation program provided Pearson the opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO. It also incentivized Pearson and other Valeant executives to use any means necessary to increase the stock price through 2017 at the expense of the long-term health of the Company and shareholder interests. Moreover, Pearson was allowed to effectively cash out a portion of his stock, pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

444.   With such powerful incentives, Pearson made statements to drive up the stock price, including in an October 27, 2014 letter Pearson wrote to Allergan's Board of Directors, which was publicly disclosed by the Company.  In it, Pearson stated: "We believe our stock is trading at artificially low levels."

445.   Pearson was also incentivized to omit mentioning facets of Valeant's business model that could negatively affect the stock price, such as how its business model based on temporary price increases could not be sustained long-term.

446.   Throughout Pearson's tenure as CEO, Valeant continued to create these perverse incentives for Pearson.  On January 13, 2015, the Company filed a Form 8-K with the SEC announcing it had entered into an amended and restated employment agreement with Pearson.  Pearson stopped earning an annual base salary, but his ''target bonus opportunity'' was increased from $6 million to $10 million.  Again, as large as it was, the cash bonus paled in comparison to the hundreds of millions of dollars in compensation Pearson would receive if he successfully drove Valeant's share price higher.[13]

_____

[13]Pearson's amended employment agreement stated, in relevant part:

> The Employment Agreement provides for the grant of 450,000 PSUs with a base price of $140.63 (with the potential to earn between zero and 2,250,000 PSUs depending on performance). The PSUs vest based on achievement of the following performance metrics (applying linear interpolation for performance between the applicable thresholds): if the total shareholder return ("TSR") over the five year measurement period is less than 10% over the base price, none of the PSUs will vest; if the TSR over the five year measurement period is 10% over the base price, 450,000 of the PSUs will vest; if the TSR over the five year measurement period is 20% over the base price, 900,000 of the PSUs will vest; if the TSR over the five year measurement period is 30% over the base price, 1,350,000 of the PSUs will vest; if the TSR over the five year measurement period is 40% over the base price, 1,800,000 of the PSUs will vest and if the TSR over the five year measurement

447.   During the Relevant Period, Schiller also had millions of dollars of his executive compensation connected with meeting challenging share price increase.[14]

448.   But as Valeant's fortunes took a dip after negative publicity and Philidor's closure, on March 21, 2016, the Company admitted that its aggressive compensation and performance-goal practices contributed to the wrongdoing. In particular, it stated: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the press release.

449.   The "tone at the top" material weakness further supports an inference of scienter as accounting and internal control guidance makes clear the importance "top management" has setting an appropriate tone. SEC Staff Accounting Bulletin No. 99 at 16.  As CEO during the Relevant Period, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation, which he failed to do.

## J.   DEFENDANTS WERE MOTIVATED TO INFLATE VALEANT'S STOCK PRICE TO FACILITATE ACQUISITIONS

450.   In addition to personal compensation, the Executive Defendants were motivated to conceal their fraudulent business practices described herein in order to artificially inflate Valeant's stock price to acquire other companies cheaply and to further Valeant's acquisition

---

period is 50% or more over the base price, 2,250,000 of the PSUs will vest.

[14] On top of their extreme compensation, Pearson and Schiller were permitted personal use of Valeant's $60-million fleet of private jets, which were used by them to fly friends and family for vacations.

strategy.

451.   For example, in 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock.  Thus, the more that each share of Valeant stock was worth, the fewer shares Defendants would be required to furnish upon Allergan in the acquisition, and ultimately, the less it would cost to Valeant and its shareholders, including the Executive Defendants.  On May 28 and 29, 2014, Valeant held meetings with some of Allergan's largest shareholders to gather their support for Valeant's bid.  Ackman reported that Allergan's shareholders would support the transaction if Valeant could "deliver $180 a share in Valeant in the value of the bid."  The more that the $180 could be funded with the trading price of Valeant's stock, the less cash would be required to deliver Allergan $180 per Valeant share.  If Valeant stock were trading at or above $180 per share, Valeant would not be required to tender any supplemental cash.

452.   Valeant also took advantage of the artificially inflated price of its securities to conduct numerous debt and equity offerings during the Relevant Period, including one of the largest high-yield debt offerings in history, which generated in the aggregate nearly $15 billion of cash for the Company from the investing public at artificially inflated prices.  For example, Valeant used proceeds from a $9.5 billion offering of senior notes in March 2015 to acquire Salix, and proceeds from a $3.2 billion offering of senior notes in July 2013 to acquire Bausch & Lomb.

453.   These acquisitions added to Valeant's drug portfolio, which meant more opportunities for it to increase prices and thus grow its revenue.  That, and the growth in assets that such acquisitions would imply, led to continual increases in Valeant's stock prices.  As a result, the Executive Defendants saw their own stock options increase in value, which gave them

incentives to continue engaging in deceptive practices and in concealing whatever facts would inhibit Valeant's ability to raise funds and acquire companies.

## IX.   LOSS CAUSATION

454.   Defendants' wrongful conduct, as detailed herein, directly and proximately caused Plaintiffs' economic losses.  Defendants' statements and material omissions caused, or were a substantial contributing factor, in causing Valeant stock to trade at artificially inflated prices during the Relevant Period, with the price of Valeant stock reaching over $260 per share on August 5, 2015.   As Defendants' false and misleading statements and omissions were revealed to the market beginning in the third quarter of 2015 and continuing through 2016, the price of Valeant's common stock declined precipitously, ultimately closing as low as $24 per share on June 7, 2016.  As the artificial inflation was removed from Valeant's stock price, tens of billions of dollars in shareholder market capitalization was destroyed, causing substantial damage to investors, including Plaintiffs. Similarly, the price of Valeant's bonds followed suit, trading at approximately 80% of par following the corrective disclosures.

455.   The truth began to emerge on September 28, 2015, when Bloomberg reported that members of Congress were calling for an investigation of price gouging by Valeant. Bloomberg reported that all Democratic members of the House Committee had directed Chairman Chaffetz to subpoena Valeant for documents related to massive price increases for two heart rate medications, and that, according to the House Committee members, Valeant had failed to "adequately answer" questions and provide documents requested by House Committee staff members regarding the Company's basis for such "skyrocketing prices." Also on September 29, 2015, numerous additional news reports were released detailing that Valeant was being targeted by Congress for the Company's practice of purchasing older drugs and then dramatically raising

their prices.

456.    In response to this partial disclosure regarding the Company's reliance on, and the associated risks of, price gouging, the price of Valeant stock dropped more than 16%, from a close of $199 per share on Friday, September 25, 2015, to a closing price of $166 per share on Monday, September 28, 2015, on unusually high trading volume. The price of Valeant stock continued to fall the following day, dropping an additional 5% to close at $158 per share on September 29, 2015, also on unusually high trading volume. The total stock price decline over this two-day period was over 20%, or $41 per share.

457.    On Sunday, October 4, 2015, additional details regarding Valeant's reliance on price gouging were revealed when *The New York Times* published a highly critical article concerning Pearson's September 28, 2015 letter to employees, specifically, his claim that Valeant was well-positioned for growth even without any price increases.  The article noted that extraordinary price increases on eight Valeant drugs accounted for approximately 7% of the Company's revenue and 13% of its earnings before taxes and interest in the second quarter, and that Valeant raised the prices on its branded drugs nearly five times as much as its closest competitor.  On this news, the price of Valeant stock declined by more than 10%, falling from a close of $182 per share on Friday, October 2, 2015 to a close of $163 per share on Monday, October 5, 2015, on unusually high trading volume.

458.    After the market closed on October 14, concerns about the legality of the Company's financial assistance programs were revealed when Valeant issued a press release disclosing that it had received subpoenas from the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York requesting documents related to, among other things, Valeant's PAPs, financial support provided by Valeant for patients, distribution of

Valeant's products, and pricing decisions. The press release also noted that the Company was beginning to reach out to hospitals impacted by above average price increases in response to Congressional inquiries. On October 15, 2015, additional information was revealed to the market as news reports detailed Valeant's failure to be responsive or transparent with Congress's investigation, and that despite being served with a federal subpoena, Valeant was still refusing to provide adequate answers regarding its price gouging and improper practices. On this news, the price of Valeant stock dropped by 4.75%, from a close of $177 per share on October 14, 2015, to a close of $168 per share on October 15, 2015, on elevated trading volume.

459. On October 19, 2015, the market learned additional information related to Valeant's dependence on price increases and its controlling interest in Philidor and a related secret network of specialty pharmacies, when the Company reported its third quarter 2015 financial results and hosted an earnings conference call (which started before the market opened). During the conference call, the Company revealed its direct relationship with and reliance on certain specialty pharmacies to increase the price of Valeant's drugs and volume of Valeant's sales, including Philidor, and Valeant's option to purchase Philidor. In addition, the Company disclosed that pricing accounted for approximately 60% of its growth in 2014 and 2015, that it would be making drug pricing a smaller part of growth going forward, and that R&D would become an increased area of focus. After the market closed on October 19, 2015, *The New York Times* published an article that described Philidor as not a ''typical'' specialty pharmacy, noted that Philidor's application for a license in California had been rejected for submitting false statements, and stated that Valeant was using Philidor as a tool to keep its drug prices high.

460.    On this news, the price of Valeant stock declined by nearly 8%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume. The following day, Valeant shares fell an additional 10% to close at $146 per share on October 20, 2015, also on unusually high trading volume. The total stock price decline over this two-day period was over 17%, or $30 per share.

461.    On October 21 and 22, 2015, the market learned of additional problems regarding Valeant's secret relationships with specialty and "affiliate" pharmacies, including Philidor and R&O, and related issues regarding Valeant's accounting practices. On that day, Citron published a research report questioning the relationship between Valeant and Philidor and Valeant's attendant accounting practices, and suggesting that Valeant had created a network of "phantom" specialty pharmacies for the purpose of inflating the Company's revenues. The Citron report also provided further details of the lawsuit between R&O and Valeant, where R&O accused Valeant of "conspiring ... to perpetuate a massive fraud." After Citron's report was published, trading in Valeant shares was temporarily halted because of the rapid decline in the price of Valeant shares. Specifically, as a result of the information provided to the market on October 21, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015, to a close of $118 per share on October 21, 2015, on extraordinary trading volume.

462.    Moreover, after the market closed, Philidor issued a press release disclosing its contractual relationship with "affiliated pharmacies," including R&O, and that it had a right to acquire such pharmacies now or in the future subject to regulatory approval. The following day, analysts reacted to the troubling disclosures regarding Philidor. For example, before the market opened on October 22, 2015, BMO issued a report downgrading its rating of Valeant and concluding that Valeant's arrangements with Philidor were "not just aggressive, but

questionable." As analysts reacted to the disclosures and the market continued to digest the negative news, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109 per share on unusually high trading volume. The total stock price decline over this two-day period was over 25%, or $36 per share.

463.   On October 25 and October 26, 2015, the market learned of additional issues concerning Valeant's improper relationship with and reliance on specialty pharmacies to increase the prices of Valeant products and to boost the volume of Valeant sales, and that the Company might be forced to terminate these clandestine relationships. On Sunday, October 25, 2015, *The Wall Street Journal* reported that former Philidor employees had revealed that Valeant employees worked directly at Philidor and were using fictitious names in order to conceal the companies' relationship "so it didn't appear Valeant was using the pharmacy to steer patients" to Valeant products. Before the market opened on October 26, 2015, Valeant filed its 2015 10-Q and hosted a conference call, which acknowledged that the Company had the ''power to direct'' Philidor's activities, and that the Company was conducting an investigation, through an ad hoc Board committee, into its relationship with Philidor. Later that day, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor." As a result of this news, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday, October 23, 2015, to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume.

464.   On October 28 and 29, 2015, further information was revealed to the market regarding Valeant's secret relationship with and reliance on specialty pharmacies, including Philidor, to increase the prices of Valeant products and boost the volume of Valeant's sales. On that day, *Bloomberg* reported that Philidor used "back door" tactics to increase payments and

"instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim- to essentially shop around for one that would be accepted.'' Then, on October 29, 2015, *Bloomberg BusinessWeek* reported on additional improper business practices at Philidor, including that Philidor was falsifying prescriptions to boost Valeant sales, based on the accounts of former Philidor employees and internal company documents. Additionally, during market hours on October 29, 2015, reports surfaced that CVS Caremark-one of the nation's three largest PBMs - had terminated its relationship with Philidor following an audit of Philidor's practices. As a result of this news, the price of Valeant stock dropped nearly 5%, from a close of $117 per share on October 28, 2015, to a close of $111 per share on October 29, 2015, on unusually high trading volume.

465.   After the market closed on October 29, 2015, the nation's other largest PBMs, Express Scripts and OptumRx, announced that they too had terminated their relationships with Philidor. Before the market opened on October 30, 2015, the Company issued a press release stating that it would be terminating its relationship with Philidor and that Philidor would be ceasing operations as soon as possible. On this news, Valeant shares fell by nearly 16%, from a close of $111 per share on October 29, 2015, to a close of $93 per share on October 30, 2015, on unusually high trading volume.

466.   On November 4, 2015, before the market opened, the Senate Aging Committee announced that it had formally launched a probe and requested documents and information from Valeant regarding its skyrocketing drug prices. That same day, also before the market opened, *Bloomberg* reported that just weeks prior to the Company's announcement that it was cutting ties with Philidor, Valeant had planned to expand its use of Philidor, which further called into question the viability of the Company's recently issued financial guidance. After the market

closed on November 4, 2015, *The Wall Street Journal* reported that Valeant's largest shareholder, Ackman, was considering liquidating his entire $3.8 billion stake in the Company and had demanded that Valeant management "come clean'' about Philidor.

467.    On this news, the price of Valeant stock dropped by approximately 6%, from a close of $97 per share on November 3, 2015, to a close of $91 per share on November 4, 2015, on elevated trading volume. Valeant shares continued to decline the following day, falling by more than 14%, to close at $78 per share on November *5,* 2015, on extraordinary trading volume. The total stock price decline over this two day period was 19.5%, or $19 per share.

468.    On November 10, 2015, before the market opened, Valeant hosted a business update call and disclosed the "significant" negative financial impact that Philidor's closing and the Government's spiraling probes into its pricing practices were having on the Company, including with respect to its financial guidance. In particular, Valeant disclosed that there would be a significant short-term disruption to the Company's dermatology division, that the Company was seeing short-term pressure in its neurology business, and that the Company was "working to quantify the potential short-term impact" on 4Q15 of the termination of its relationship with Philidor. The Company also acknowledged that filling prescriptions for free would "obviously" have an impact on the rest of the quarter and that if Valeant's pricing is "viewed as aggressive we're going to have to listen to that." On this news, Valeant stock dropped 2%, from a close of $85 per share on November 9, 2015, to a close of $83 per share on November 10, 2015, on unusually high trading volume.

469.    After the market closed on November 10, 2015, it was reported that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay Philidor employees in order to obtain information regarding Valeant's practices. The next day, before the market

opened, *Bloomberg* reported that Valeant's creditors were "[s]pooked" by a possible "[r]evenue [s]queeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." During market hours on November 11, 2015, analysts at Nomura cut their Valeant price target. On this news, the price of Valeant stock continued to decline, falling by over 5%, to close at $78 per share on November 11, 2015.

470.    On November 12, 2015, before the market opened, *Bloomberg* published another article regarding Valeant's relationship with Philidor, and multiple media outlets reported that analysts at several firms had lowered their price targets for Valeant. On this news, Valeant's stock price dropped an additional 6.5%, to close at $73 per share. The total stock price decline from November 10 through November 12, 2015 was over 13%, or $11 per share.

471.    On November 16, 2015, during market hours, *Bloomberg* reported that Congressman Elijah Cummings wrote Pearson requesting that Pearson make certain Valeant employees available for interviews. After the market closed that day, *The Washington Post* reported that the House Oversight Committee announced it would hold a hearing in early 2016 on prescription drug pricing, and that it had contacted Valeant to gather information. The article also disclosed that members of the House Oversight Committee were urging Valeant's executives to testify at the hearing and for Valeant to be subpoenaed. On this news, the price of Valeant stock dropped by nearly 3%, from a close of $75 per share on November 13, 2015, to a close of $73 per share on November 16, 2015, on unusually high volume. The price of Valeant stock continued to decline on November 17, 2015, dropping an additional l4% to close at $70 on high trading volume.

472.    On December 17, 2015, before the market opened, Mizuho cut its rating on Valeant stock to ''neutral" from "buy." The Mizuho analyst cited a lack of clarity regarding Valeant's agreement with Walgreens, and stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist." During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade. On this news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

473.    On February 19, 2016, media outlets reported on a Wells Fargo analyst report issued the prior day that included an in-depth analysis on Valeant and questioned whether the Company had been truthful about Philidor. In particular, the report questioned whether the Company had been truthful regarding Philidor and Valeant's relationship, including the adverse consequences to Valeant of terminating that relationship, management's credibility, and irregularities with the Company's accounting. The analysis noted that Valeant's ''new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact [of Philidor], as described by Valeant." The report stressed that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor." The report further noted that Valeant's accounting was misaligned with its purported performance, and suggested that the dramatic rise in Valeant's accounts receivables could be an indication of Valeant's "improperly timed recognition of revenue." On this news, the price of Valeant stock dropped by nearly 10%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume.

474.    On February 22, 2016, a Wells Fargo analyst released an updated note regarding Valeant that included two additional valuation models and a $62 price target. Also on February 22, 2016, CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less expensive generic drug. After the market closed on February 22, 2016, *The Wall Street Journal* reported that Valeant was likely to restate its 2014 and 2015 earnings following an internal review of its financials. Later that evening, the Company confirmed in a release that it would be restating its 2014 earnings by at least $58 million, which would reduce 2014 GAAP EPS by approximately $0.10. The Company disclosed that it had been improperly recognizing revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients. The Company also announced it would delay filing its 2015 10-K pending completion of related accounting matters. Schiller commented that the Company would be "improving reporting procedures, internal controls and transparency for our investors." On this news, the price of Valeant stock dropped by over 10%, from a close of $84 per share on February 19, 2016 to a close of $75 per share on February 22, 2016, the next trading day, on unusually high trading volume. Valeant shares continued falling in after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share.

475.    On Sunday, February 28, 2016, Valeant issued a press release announcing Pearson's immediate return as CEO, Ingram's appointment as Chairman of the Board, and the cancellation of a conference call set for February 29, 2016 concerning preliminary 2015 financial results and updated guidance for 2016. The press release also disclosed that the Company was withdrawing its prior financial guidance, and confirmed that it would delay filing its 2015 10-K pending completion of the review of accounting matters by the Ad Hoc Committee "and the

Company's ongoing assessment of the impact on financial reporting and internal controls." Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016. Also during market hours, Moody's placed Valeant ratings on review for potential downgrade on concerns that the Company's operating performance was weaker than expectations, potentially impeding deleveraging plans. As the day progressed, additional reports surfaced, and the Company ultimately confirmed that Valeant was under investigation by the SEC and had received a subpoena during 2015.

476.    On this news, the price of Valeant stock dropped by more than 18%, from a close of $80 per share on February 26, 2016 to a close of $65 per share on February 29, 2016, the next trading day, on unusually high trading volume.

477.    On March 15, 2016, before the market opened, Valeant issued its preliminary unaudited 2015 financial results and held a much anticipated conference call. The Company revealed that it was reducing its financial guidance for 2016, and provided certain unaudited financial information concerning its 4Q15 performance. In particular, the Company slashed its 2016 revenue guidance from $12.5-12.7 billion to $11-11.2 billion; reduced its Cash EPS guidance from $13.25-13.75 to $9.50-10.50; and cut its EBITDA guidance from $6.7-$7.1 billion to $5.6-$5.8 billion. The Company cited as reasons for these substantial downward revisions "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016." The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses," and a $79 million impairment charge related to Philidor. As to price increases, Pearson stated that all increases going forward ''will be more modest and in line

with industry practices and managed-care contracts." During the conference call, Defendants disclosed that even the Company's release from earlier that morning was inaccurate because its reporting forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the figure should have been only $6.0 billion. That same day, Moody's further downgraded Valeant's credit ratings, as well as those of its subsidiaries.

478.    On this news, the price of Valeant stock plummeted by more than 50%, from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extremely high trading volume.

479.    On June 7, 2016, Valeant issued a press release and hosted a conference call regarding the Company's long-delayed 1Q16 financial results. The Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance, and revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor. For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship." Papa, the Company's new CEO, added that with respect to dermatology, "a significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price.''

480.    In response to this news, which further revealed the extent to which Valeant relied on Philidor to boost prescription drug sales, refills, and prices during much of the Relevant Period, the price of Valeant stock dropped by nearly 15% to close at $24 on June 7, 2016, on unusually high trading volume.

481.    On August 10, 2016, after the market closed, *The Wall Street Journal* reported that Valeant is under criminal investigation by the DOJ for whether it defrauded insurers by concealing its relationship to Philidor and for a variety of other deceptive business practices. According to the *Wall Street Journal* article, which was quickly picked up by a variety of media outlets, federal prosecutors in the U.S. attorney's office in Manhattan are investigating possible mail and wire fraud violations based on whether Valeant "defrauded insurers by shrouding its ties to a mail-order pharmacy [Philidor] that boosted sales of its drugs," and for deceptive business practices used to sell Valeant drugs, such as rebates and other compensation provided to patients. According to sources interviewed by the *Wall Street Journal* familiar with the matter, "[p]rosecutors are investigating not only the level of control Valeant exerted over Philidor's business, but the extent of the ties, including Valeant's role in Philidor's growth." The *Wall Street Journal* cited these sources as stating that, ''the probe is expected to be the most serious Valeant currently faces, and could lead to criminal charges against former Philidor executives and Valeant as a company." The article quoted a statement by Valeant that it "has been cooperating and continues to cooperate with the ongoing Southern District of New York investigation."

482.    In response to this news, which further revealed the enormous risks presented by Valeant's secret pharmacy network and other undisclosed business practices, the price of Valeant stock declined by over 10% to close at $24.49 on August 11, 2016, on unusually high trading volume.

483.    In addition, Defendants' false and misleading material statements and omissions caused, or were a substantial contributing factor, in causing the Valeant bonds to trade at artificially inflated prices during the Relevant Period, when Plaintiffs purchased the Valeant

bonds.  As a series of partial disclosures corrected Defendants' statements, the artificial inflation was removed from the price of Valeant's securities and the price of Valeant bonds declined, causing substantial damage to Plaintiffs.

484.   Each of the declines discussed above in the price of the Valeant bonds was statistically significant at a high level after taking into account changes on the same days in the overall securities market and in relevant industry indices.  Furthermore, as set forth above, each of the price declines in Valeant's securities is attributable to the disclosure of previously concealed information relating to the materially false and misleading statements and omissions alleged herein.  The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiffs were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the alleged fraudulent conduct.  As the truth about the fraud was revealed, the price of Valeant bonds declined, the artificial inflation was removed, and Plaintiffs suffered damages.

485.   These declines in Valeant stock and bonds were the direct and proximate result of the nature and extent of Defendants' prior materially false and misleading statements and omissions being revealed to the market. The partial removal of artificial inflation from the price of Valeant securities following each of these disclosures would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

486.   The timing and magnitude of the price declines negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

## X.    PLAINTIFFS' RELIANCE

487.    During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing Valeant securities.

488.    There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's securities traded in efficient markets;

(d)    The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's securities; and

(e)  Plaintiffs purchased Valeant securities between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

489.    At all relevant times, the markets for Valeant securities were efficient for the following reasons, among others: (a) Valeant's common stock was listed, and actively traded, on the NYSE, a highly efficient and automated market; (b) Valeant filed periodic reports with the SEC; (c) Valeant regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) Valeant was followed by numerous analysts who wrote reports that were published, distributed and entered the public market. As a result of the foregoing, the market for Valeant's securities promptly

digested current information with respect to the Company and reflected such information in the price of Valeant's securities. Plaintiffs relied on the prices of Valeant's securities, which reflected all the information in the market, including the misstatements by Defendants.

490.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact for which there was a duty to disclose.

491.    To the extent that the presumption of reliance does not apply to some or all of Plaintiffs' claims, Plaintiffs directly relied on Defendants' false statements in making their decision to purchase Valeant common stock and bonds. Plaintiffs were not aware of the truth when they made the decisions to invest in Valeant securities.

## XI.    NO SAFE HARBOR

492.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

493.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew that the statement was materially false or misleading

when made.

## XII.   COUNTS

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
#### (Against All Defendants)

494.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

495.    This claim is brought by Plaintiffs in connection with their purchases of Valeant securities against all Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

496.    During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

497.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Valeant securities.

498.    In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the

SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

499.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Valeant securities during the Relevant Period. In reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Valeant securities and experienced losses when the artificial inflation was removed from the securities as a result of the revelations and price declines detailed herein. Plaintiffs would not have purchased or acquired Valeant securities at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

500.     By virtue of the conduct alleged herein, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs.

### COUNT II
### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
#### (Against Defendants Pearson, Schiller, and Rosiello)

501.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

502.     This claim is brought by Plaintiffs against Defendants Valeant, Pearson, Schiller, and Rosiello for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

503.     During their tenures as officers and/or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Va1eant, these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and

indirectly, the decision-making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the individual Defendants.  Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

504.    In their capacities as senior corporate officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above.  These Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed above in ¶¶ 359-390.

505.    As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

506.    As set forth above, Valeant violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent that Valeant is liable to Plaintiffs.  Valeant exercised control over the individual Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable participation, is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the individual Defendants

are liable to Plaintiffs.

507.    By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. §78(a), and are liable to Plaintiffs.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, as allowed by law;

B.    Awarding Plaintiffs extraordinary, injunctive and/or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.


Dated: November 27, 2017                      **LITE DEPALMA GREENBERG, LLC**


                                              */s/ Bruce D. Greenberg*
                                              Bruce D. Greenberg
                                              570 Broad Street, Suite 1201
                                              Newark, New Jersey 07102
                                              Telephone: (973) 623-3000
                                              Facsimile: (973) 623-0858
                                              Email: bgreenberg@litedepalma.com

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
Jing-Li Yu
485 Lexington Avenue
New York, NY  10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

*Attorney for Plaintiffs*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is

related to the following civil action:

Class case

- *Potter v. Valeant Pharmaceuticals International, Inc. et al.*, 15-cv-7658:  (M. Shipp)

Opt-outs

- *T. Rowe Price Growth Stock Fund, Inc. et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-5034  (M. Shipp);
- *Public Employees Retirement System Of Mississippi v. Valeant Pharmaceuticals International, Inc. et al.*, 17-cv-7625  (M. Shipp)
- *The Boeing Company Employee Retirement Plans Master Trust et al. v. Valeant Pharmaceuticals International, Inc. et al.*, 17-cv-7636 (M. Shipp)
- *Pentwater Equity Opportunities Master Fund Ltd. et al. v. Valeant Pharmaceuticals International, Inc. et al.*, 17-cv-7552 (M. Shipp)
- *Okumus Opportunistic Value Fund, Ltd. v. Valeant Pharmaceuticals International Inc. et al.*, 17-cv-6513  (M. Shipp)
- *Lord Abbett Investment Trust-Lord Abbett Short Duration Income Fund et al. v. Valeant Pharmaceuticals International Inc. et al.*, 17-cv-6365 (M. Shipp)

I hereby certify that the following statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

                                        **LITE DEPALMA GREENBERG, LLC**

Dated: November 27, 2017               */s/ Bruce D. Greenberg*
                                        Bruce D. Greenberg
                                        570 Broad Street, Suite 1201
                                        Newark, New Jersey 07102
                                        Telephone: (973) 623-3000
                                        Facsimile: (973) 623-0858

                                        **GRANT & EISENHOFER, P.A.**
                                        Jay W. Eisenhofer
                                        Daniel L. Berger
                                        Caitlin M. Moyna
                                        Jing-Li Yu
                                        485 Lexington Avenue
                                        New York, NY  10017
                                        Telephone: (646) 722-8500
                                        Facsimile: (646) 722-8501
                                        *Attorney for Plaintiffs*